Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT
for the
Southern District of Texas
Houston Division

| | |
|---|---|
| Caitlin Weathers <br> *Plaintiff(s)* <br> (Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) <br> -v- <br><br> Houston Methodist Hospital <br> *Defendant(s)* <br> (Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | Case No. 4:22-CV-04085 <br> *(to be filled in by the Clerk's Office)* <br><br> Jury Trial: *(check one)*  ☒ Yes  ☐ No |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

I.  **The Parties to This Complaint**

   A.  **The Plaintiff(s)**

   Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

   Name: Caitlin Weathers
   Street Address: 2425 Capitol St. #2143
   City and County: Houston, Harris County
   State and Zip Code: Texas 77003
   Telephone Number: 832-314-6357
   E-mail Address: J.weathersca@gmail.com

   B.  **The Defendant(s)**

   Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

   Defendant No. 1
   Name: Houston Methodist Hospital
   Job or Title *(if known)*: Entity

|  |  |
|---|---|
| Street Address | 6565 Fannin |
| City and County | Houston, Harris County |
| State and Zip Code | Texas |
| Telephone Number | (713) 790-3311 |
| E-mail Address *(if known)* | |

Defendant No. 2

|  |  |
|---|---|
| Name | Sunila Ali |
| Job or Title *(if known)* | Neuro ICU Director |
| Street Address | TMC- Fannin and/ or Sugarland |
| City and County | Houston - Harris County |
| State and Zip Code | TX |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

- Name
- Job or Title *(if known)*
- Street Address
- City and County
- State and Zip Code
- Telephone Number
- E-mail Address *(if known)*

Defendant No. 4

- Name
- Job or Title *(if known)*
- Street Address
- City and County
- State and Zip Code
- Telephone Number
- E-mail Address *(if known)*

C. **Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is

|  |  |
|---|---|
| Name | Houston Methodist Hospital |
| Street Address | 6565 Fannin |
| City and County | Houston, Harris County |
| State and Zip Code | Texas 77030 |
| Telephone Number | (713) 790-3311 |

II. **Basis for Jurisdiction**

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☒ Other federal law *(specify the federal law)*:
42 U.S. Code 1981, 1981(a)

☒ Relevant state law *(specify, if known)*:
Tex. Lab. Code 21, Texas Penal Code: Ch. 32 Fraud - nondisclosure

☒ Relevant city or county law *(specify, if known)*:
Houston Code of Ordinances, Executive Order 1-50

### III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐ Failure to hire me.
☒ Termination of my employment.
☐ Failure to promote me.
☐ Failure to accommodate my disability.
☒ Unequal terms and conditions of my employment.
☒ Retaliation.
☒ Other acts *(specify)*: Harassment and Hostile Work Environment

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.  It is my best recollection that the alleged discriminatory acts occurred on date(s)

Between 05/28/2019 and 10/04/2021, last act occurred on 10/04/2021, however circumstances are still ongoing because the underlying causes have not been resolved pertaining to "but-for" cause

C.  I believe that defendant(s) *(check one)*:

☒ is/are still committing these acts against me.
☐ is/are not still committing these acts against me.

D.  Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☒ race — Caucasian
☒ color — Non-Hispanic White
☒ gender/sex — Female
☐ religion
☐ national origin
☐ age *(year of birth)* _____ *(only when asserting a claim of age discrimination.)*
☐ disability or perceived disability *(specify disability)*

E.  The facts of my case are as follows. Attach additional pages if needed.

Weathers is a non-Hispanic, White, Caucasian Female born on February 18, 1989. On May 28, 2019, Weathers was hired by Houston Methodist Hospital as a Patient Transporter. On July 1, 2020, Weathers completed Patient Sitter cross-training. On August 16, 2020, Weathers completed an Associate of Science in Psychology degree. On September 17, 2020, Weathers reported illegal activity to management. On October 09, 2020, Weathers received a letter of recommendation from management in response to having expressed prior interest enlisting in the military, and on the same day she received a communication record (discipline) for reporting illegal activity. On February 1, 2021, Weathers was accepted into the University of Texas at Arlington's (AO) Pre-licensure Bachelor of Science in Nursing Program. On June 6, 2021, Weathers was internally transferred to the Position of a Patient Care Assistant in HMH's Neuro ICU. Weathers had been an employee for two years when she tranferred to its Neuro ICU job role. A month later without having been provided any unit specific requirements as promised, Sunila left for vacation between July 17, 2021, and August 11, 2021. On August 1, 2021, Weathers reported to Sunila about discrimination and harassment without response. After Ali failed to respond, Weathers emailed Mariana Mondragon in Human Resources (HR) about concerns. Weathers then texted Ali again, informing Ali that she had reached out to HR.In Weathers complaints she reports of new co-workers on the Neuro ICU subjecting her to race and sex based harassment.

HR alleges that they conducted interviews with Weathers co-workers about her complaints but evidence only reflects a smear campaign led as confirmation bias of negative beliefs about Weathers based on race, sex and retaliation - which ignored further discriminatory language. On August 23, 2021, Weathers met with Sunila Ali and Mariana Mondragon to discuss Weathers's reports of discrimination and harassment, but instead of Ali or Mondragon presenting an opportunity to resolve the matter by providing unit specific requirements as described in the job description, Ali and Mondragon placed Weathers on a performance improvement plan (PIP), without coaching. The subjective criteria in the PIP does not substantiate any defined unit specific requirements such as any policies, procedures, or protocols. Ali followed up with Weathers in September regarding job performance without ever intending to fulfill this promised expectation for unit specific requirements. Rather than offer coaching in reference to defined unit specific requirements as requested by Weathers, Sunila shared results from

her campaign against Weathers. Then again on September 30, 2021, Weathers reported on her co-worker, Sharon Agway for the second time regarding issues of harassment. Four days later, on October 4, Methodist fired Weathers.

To date, defendants have yet to produce evidence without a causal connection to intentional discrimination and have failed to answer how they plead. The evidence that supports Weathers's claims includes: A, D, E, G, H, L, M, O., which respectively represents the following factual material: Charge of Discrimination; Records with the EEOC, which includes a timeline; Mariana Mondragon's notes that make a direct admission of falsity; Job description, which includes reference to defined "unit-specific requirements" that were not provided to Weathers during anytime of her employment with the hospital; Confirmation that Sunila Ali hired Weathers; Dates of reports to Sunila Ali about discrimination referencing disparaging comments and inappropriate touch as pertains to sex and race; and an Unsigned termination letter proving adverse harm within proximity to reports.
Matters pertaining to these facts were included in the Charge of Discrimination that was dually filed with the Texas Workforce Commission which reads,

"On or about October 4, 2021, I was discharged from my position as a Patient Care Assistant. I believe my termination is discriminatory based on my race (white) and sex (female). The alleged reason for my termination is performance, which I believe to be pretext to discrimination because my performance first came into question shortly after complaining of harassment. From April 1, 2021, until my termination, I was harassed by Cameron Shonk, Sharon Agway, Cassie Hull, and Amanda Ronning. I reported the harassment to management officials Dante Macasaet, Sunila Ali, and Mariana Mondragon during all of August 2021, but I was ignored, and the harassment continued. Here are a few examples of the harassment I had been subjected to: I was called "white trash" by Cameron Shonk, I was called "psychotic" and "gay" by Sharon, and I was subjected to daily bullying from Cassie Hull and Amanda Ronning. On or about August 23, 2021, I finally met with Sunila Ali and Mariana Mondragon about the issue for the first time. During this meeting, instead of my complaint being listened to, my "fit" within the company was questioned. Shortly after this meeting, I suffered tangible harm when I was terminated. I believe that I was retaliated against for complaining about harassment and discriminated against because of my color, race, and sex in violation of Title VII of the Civil Rights Act of 1964, as amended."

Additionally there was a timeline included in correspondence with the EEOC which reads,

1. 4/21/2021: Internal transfer to PCA on WT Neuro ICU
2. 6/7/2021: PCA internal training completion
3. 7/17/2021 - 8/11/2021: Sunila Ali left for vacation
4. 7/25/2021 and 8/2/2021: Emailed Dante the on-duty manager about workplace harassment
5. 8/1/2021: Texted Sunila Ali about harassment with no response
6. 8/15/2021: Emailed Mariana Mondragon in HR about the concerns
7. 8/17/2021: Texted Sunila Ali about harassment with response
8. 8/23/2021: Met with Sunila and Mariana Mondragon for the first time to discuss the reports

Weathers was surprised during the 8/23/2021 meeting because during the meeting instead of providing information about promises of anti-racist practices, they said that they didn't have any defined unit specific requirements such as were listed in the job description. They alleged to have been unable to find discrimination to have occured at the time in conducted interviews, before meeting with Weathers on 8/23/2021, but Weathers found in evidence from the conducted interviews that Sharon Agway was quoted using discriminatory language again calling the reports "crazy". Rather than discuss it at the time, in lieu of a handbook for the unit which could define unit specific requirements, Sunila Ali and Mariana Mondragon initiated a Performance Improvement Plan (PIP) without any offer of coaching, training or education. The only offer during this meeting was more like that of a threat aligned to constructive discharge where Weathers was presented with questions and remarks such as,

1. "Are you sure you want to work here?"
2. "Do you really think this is a good fit for you?"

3. "Don't be surprised if the other employees don't want to work with you anymore"

After the initial complaint was made into the EEOC, and Weathers made her complaint in court, HMH's attorneys provided to Weathers her file for the court's initial discovery requirements, mentioned above, which have since been tampered with in email threads. However, personal duplicate copies have been made. Within those files there are additional findings of discriminatory actions in the campaign against Weathers that further prove race, sex, and retaliation were motiviating factors in the ultimate employment decision to terminate Weathers in adverse action to good faith reports. Example of such exists that the Fifth Circuit Court of Appeals made referrence to, where in Weathers last report of harassment about co-worker Sharon Agawy, Weathers was terminated four days later. Evidence of this event was also written in Weathers Summary of Recollections, which read,

"…On the last shift before my termination date, I was held in an impromptu meeting with Sunila where she said she had something important she wanted to talk to me about. She called me into the room as I was walking by and as soon as I sat down in the chair across from her, Cameron Shonk called me over to the Vocera and asked if we could talk. Sunila nodded her head at me. I told him I was with Sunila. He sighed and then Sunila asked him if everything was okay. They began talking to each other and Sunila took my Vocera from me. They continued their conversation for almost an hour when suddenly Sunila said that we both needed to apologize to each other. I felt violated and didn't understand why I would have to apologize; nobody had talked to me that entire time. I asked Sunila what it was that she wanted to talk to me about and she said she couldn't remember. Then I had to go to Sharon Agway's room to perform my last bath for the day and she was angry with me as soon as I arrived to the room. She started yelling at me and asked why I was even there, what I wanted, yelled at me for not having been there sooner. I asked her about a specific piece of medical equipment that a new policy was being implemented for via email which made it a requirement for all patients to always wear. It also stated that it was not up to the nurse to discontinue the device. I asked the nurse if she had let anyone know that the patient was going to discontinue wearing the device because it was required of me to ask. She was angry with me and told me that it wasn't my job to tell her what to do and wasn't going to do this with me. She got angry and said let's not do this in front of the patient and started yelling at me in the hallway. She said what's the matter with you are you psychotic, what is it? Are you gay? Just tell me. I'm a nurse. I'm supposed to know these things. Then another nurse came up to her and told her she had to stop. That she was being loud."

Due to the ongoing discrimination, harassment and being prevented from doing job, and the ultimate and adverse employment action, CW was unable to continue in chosen career (nursing) because HMH revoked tuition payment and left CW with a $0 paycheck which caused Weathers to become severely ill.

Background:
CW's Illness
a) When did CW become ill? While employed at Houston Methodist Hospital, and worsened after because of the humiliation that was undeserved and unpredicted. Family certainly didn't expect it and it wasn't part of CW's plans for the future to no longer participate in the affiliated partnership program between UTA and HMH.
b) Please describe that. Symptoms of CW's illness that occurred because of HMH's actions include: feelings of sadness, anger, stress, grief, shock, confusion, humiliation, and trauma, that were and are adequately severe enough to cause depression, nausea, diarrhea, migraines, insomnia, crying spells, ruminating thoughts, and inappropriate guilt and shame to such an extent that required and continues to require medical treatment. Weathers initially sought medical treatment at UTHealth and was dropped from her doctor's case load without a reason why such as if they determined that she was an adversary or for conflict of interest once the lawsuit was officially opened, which are the most likely reasons. This further exacerbated symptoms, making it more difficult to find healthcare providers willing to treat her. This along with financial concerns about how to pay bills. Additionally, CW attributes the rapid decline in her stepmother's health to the strain that CW's job loss caused on her family that lead to her stepmother passing away only a couple months later.

d) Was it unexpected? Yes
e) What was CW's emotional state? Scared
3) Need to describe the nature, duration, and severity.
a) How would you describe CW's emotional reaction to what happened? When CW was terminated under false pretenses, CW immediately started crying in front of Sunila and HR who were unmoved and apathetic. HMH didn't offer a severance package and CW depended on bi-weekly paychecks for daily living expenses.
 b) How long has this continued? When CW was terminated, she had no income or health insurance. CW hasn't stopped crying over it and hasn't been able to pursue the same interest in career (nursing), or join in the military as a medical officer because of recent diagnosis.
c) How severe has it been? Due to the nature of the termination, CW has had to endure undue obstacles in pursing career due to resulting accusations of performance. Weathers stopped attending nursing school.
d) Did it disrupt her life and daily routine? Yes
e) How? Struggled to pay bills for costs for housing, food, transportation, healthcare, as well as other financial obligations. HMH did not provide transitional support throughout the process requiring CW to withdraw retirement savings. Unable to finish nursing school during this time, having to drop out and find more readily available employment in a new career that has cost additional time and money. This set back has prevented the anticipated financial stability that would have come with finishing nursing school. Weathers has also been unable to join the military like intended which would have provided benefits that are now of loss beause of illness.
f) Could you distinguish between grief over the loss, and CW's emotional reaction to her reputation being desecrated? The loss of employment directly affected finances and future earning capacity, straining the family, causing both grief and embarrasment. Things are not the same anymore and can't ever get back what was lost. CW has since been unable to participate in usual activities. It wasn't just the loss of her stepmother, less than a year after her passing, her grandfather who served in the military over 20 years died. It doesn't feel like it's ever going to stop. CW describes feeling the way how her stepmother looked on the day that she died.
g) Specifics:
i) has she been depressed? Yes
ii) unable to sleep? Yes
iii) angry? Yes
iv) tense? Yes
v) headaches? Yes
vi) nightmares? Yes
vii) nausea? Yes
viii) physically ill? Yes
ix) stomach problems? Yes
(1) e.g., knots in her stomach Yes
x) affect her appetite? Yes
xi) nervous? Yes
xii) anxious? Yes
xiii) upset? Yes
xiv) hurt? Yes
xv) has it affected her ability to trust? Yes
xvi) has she felt betrayed? Yes
 xvii) devastated? Yes
xviii) affected her relationship with others? Yes
xix) has she acted differently? Yes
xx) has she become withdrawn? Yes
xxi) has she cried? Yes
(1) how often? everyday
(2) what causes her to cry? Feelings of helplessness
xxii) has it affected her happiness? Yes
1) how would you describe before and after? Before working at Houston Methodist, CW was hopeful

and confident in her abilities and was capable of employment in the military and nursing. Never has anything like this happened before, defintely not in a work environment
xxiii) affected her ability to engage in other activities? Yes
xxiv) has she been afraid? Yes
(1) what is she afraid of? That it will never stop, feelings of persecution, afraid of medical providers deliberately causing more harm leading to early and preventable death. Since this has happened medical providers have been discriminating against her. CW feels as though she will never be free from the environment of HMH's egoism culture that thinks first of promoting the company and striving for growth at all costs, lacking both principle and benevolence. Scared that their ethical transgressions are toward lobbying the deregulation of drugs and that's why they started retaliating against Weathers which signaled that ethical transgressions are ethical resulting in a recent 2024 case where Houston Methodist Hospital employee Alexis Mcneilly was terminated for stealing and shooting up drugs while at work. The false statements that Weathers co-workers made never observed any actual misconduct which is defined as threats, insubordination, unexcused absenses, dishonesty, abuse, or theft, but the smear campaign led by Sunila Ali based on confirmation bias (ignoring derogatory remarks) about Weathers race and sex, as opposed to defined terms, hurt Weathers reputation by allowing co-workers to make accusations about performance under false pretenses and this scares Weathers about the long-term impact on livelihood and employability. There's already been devastating effects in the short term and it doesn't feel like it's ever going to get any better unless someone does something.
xxv) feelings of helplessness? Yes
xxvi) physical reaction? Light-headed, dizzy, nauseous, weak, body aches, headaches
xxix) stress? Yes
xxx) worried? Yes
xxxi) heart racing? Yes
xxxii) how often does she recall the event? Everyday

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.  Exhaustion of Federal Administrative Remedies

A.  It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

2/11/2022 as it relates to the digital signature copy sent on 8/3/2022

B.  The Equal Employment Opportunity Commission *(check one)*:

☐ has not issued a Notice of Right to Sue letter.
☒ issued a Notice of Right to Sue letter, which I received on *(date)* 8/3/2022.
*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.  Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐ 60 days or more have elapsed.
☐ less than 60 days have elapsed.

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Wrongful Termination:
Compensatory Damages
- Last Pay Stub = $1507.50/ bi-weekly (net pay was $0, based sum is on gross) = $3015.00/mo.
- Loss of (cost of COBRA) health insurance = $1050.56/ mo.
- Loss of tuition benefit = $8,000.00/ annually

$3015.00+$1050.56+$8000 = $12,065.56 economic damages/ back pay
$12065.56 x4.5 = $54,295.02 months unemployed
$54,295.02 x3 = $162,885.06 each claim
162,885.06 x5 = $814,425.30 pain & suffering
$814,425.30 x4 = $3,257,701.20 punitive damages
$3,257,701.20 + $540,153.64 = $3,797,854.83 pre-judgment interest
$3,797,854.83 x3 = $11,393,564.50 city, state, and federal jurisdictions

Fraud:
Compensatory Damages
- Last Pay Stub = $1507.50/ bi-weekly (net pay was $0, based sum is on gross) = $3015.00/mo.
- Loss of (cost of COBRA) health insurance = $1050.56/ mo.
- Loss of tuition benefit = $8,000.00/ annually

$3015.00+$1050.56+$8000 = $12,065.56 economic damages/ back pay
$12065.56 x4.5 = $54,295.02 months unemployed
$54,295.02 x5 = $271,475.10 pain & suffering
$271,475.10 x4 = $1,085,900.40 punitive damages

Total: $12,479,464.90

Expungement of record; Public apology; Correct the wrong doing with anti-racist adoption. Implementation of departmental handbook. Hold the responsible parties accountable who were involved in the decision to terminate CW - allowing for personal liability under 1981 and fraud because of evidence discovered after initial complaint was made. Implement and adopt unbiased ethics training programs, add new unbiased ethics reporting mechanisms; institutionalize unbiased ethics protocols that follow Ethics Research Center's purpose. Re-regulation where possible (handbook). Implementation of better clincial decision support systems (HMIS) that includes clinical support decisions made by PCAs that assist in monitoring patient needs because choosing to allow Weathers to document pt progress was discriminatory and based on stereotypical view of white people and healthcare in rural America. Change the name of the process to something other than "PIP" which associates derogatory negative connotation to the term "PIP SQUEAK" which is discriminatroy in and of itself.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 10/27/2024

Signature of Plaintiff: 
Printed Name of Plaintiff: Caitlin Weathers

### B. For Attorneys

Date of signing:

Signature of Attorney:
Printed Name of Attorney:
Bar Number:
Name of Law Firm:
Street Address:
State and Zip Code:
Telephone Number:
E-mail Address: