# Exhibit 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

CAITLIN WEATHERS,

      Plaintiff,

vs.               CIVIL ACTION NO.: 4:22-cv-04085

HOUSTON METHODIST HOSPITAL,

and SUNILA ALI,

      Defendants.

_____


VIDEOTAPED DEPOSITION OF

CAITLIN WEATHERS


TAKEN ON

WEDNESDAY, NOVEMBER 5, 2025

12:11 P.M.


SHANNON ROAD CONFERENCE CENTER

3511 SHANNON ROAD, THIRD FLOOR

DURHAM, NORTH CAROLINA  27707

CAITLIN WEATHERS                    November 05, 2025                    2 to 5
90477

Page 2

```
 1                    APPEARANCES
 2
 3   Appearing on behalf of the Plaintiff:
 4   CAITLIN WEATHERS, PRO SE
 5   2616 Erwin Road, Suite 2218
 6   Durham, North Carolina  27705
 7   (832) 314-6357
 8   j.weathersca@gmail.com
 9
10   Appearing on behalf of the Defendants:
11   MICHAEL K. BURKE, ESQUIRE
12   DANIEL PATTON, ESQUIRE
13   Scott Patton, P.C.
14   717 Texas Avenue, Suite 3100
15   Houston, Texas  77002
16   (281) 377-3311
17   mburke@scottpattonlaw.com
18   dpatton@scottpattonlaw.com
19
20   Also present:
21   Mark Nilson, Naegeli Technician
22
23
24
25
```

Page 4

```
 1                    EXHIBIT INDEX
 2   EXHIBIT                                      PAGE
 3
 4     1    CHARGE OF DISCRIMINATION               62
 5     2    2ND AMENDED COMPLAINT                 102
 6     3    PCA                                   132
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                EXAMINATION INDEX
 2                                        PAGE
 3
 4   EXAMINATION BY MR. BURKE               6
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              VIDEOTAPED DEPOSITION OF
 2                  CAITLIN WEATHERS
 3                     TAKEN ON
 4            WEDNESDAY, NOVEMBER 5, 2025
 5                    12:11 P.M.
 6
 7            THE VIDEOGRAPHER:  So we are on the
 8   record.  The time is 12:11 p.m.  The date is
 9   November 5th, 2025.
10            This is the beginning of the deposition of
11   Caitlin Weathers.  The case caption is Weathers
12   versus Houston Methodist.
13            Now, will Counsel introduce yourselves and
14   state whom you represent.
15            MR. BURKE:  My name is Mike Burke.  I
16   represent the defendants, Houston Methodist Hospital
17   and Sunila Ali.
18            THE REPORTER:  Okay, Counsel.  Go ahead.
19            THE VIDEOGRAPHER:  The court reporter will
20   now swear in the witness.
21            THE REPORTER:  Ms. Weathers, please raise
22   your right hand.  Do you affirm under penalty of
23   perjury that the testimony you're about to give will
24   be the truth, the whole truth, and nothing but the
25   truth?
```



Page 6

1    THE DEPONENT:  Yes.
2    THE REPORTER:  Thank you.
3    Counsel, you may proceed.
4    CAITLIN WEATHERS, having been first duly affirmed
5    to tell the truth, was examined, and testified as
6    follows:
7    EXAMINATION
8    BY MR. BURKE:
9        Q.    Ma'am, if you would, please state your
10   full name for the record.
11       A.    Caitlin Weathers.
12       Q.    Ms. Weathers, my name is Mike Burke.  As I
13   just said, I'm one of the lawyers representing
14   Houston Methodist Hospital and Sunila Ali in the
15   lawsuit that you filed against them.  You understand
16   that, ma'am?
17       A.    Correct.
18       Q.    I'm sorry?
19       A.    I'm here to be deposed in the lawsuit
20   4:22-CV-04085.
21       Q.    Okay.  And you understand that that's what
22   we're here today, is for your deposition in this
23   case, correct?
24       A.    My deposition in the case Weathers against
25   Houston Methodist Hospital, et al.

Page 7

1        Q.    Okay.  Ma'am, have you ever participated
2    in a deposition before?
3        A.    I have not.
4        Q.    I'm going to go over some ground rules and
5    housekeeping-type things to try to help this go as
6    smoothly as possible going forward.  You understand
7    that the oath you took under penalty of perjury is
8    the same oath that you would take if we were sitting
9    in a court room with a judge and a jury, correct?
10       A.    Correct.
11       Q.    Okay.  The court reporter mentioned this.
12   Even though this is being recorded, the official
13   court -- official record is being taken by the court
14   reporter.  She has to do her best to take down
15   everything that's being said verbatim.  It's
16   difficult for her to do that if two people are
17   talking at the same time.
18       So during the course of the deposition,
19   when I'm asking questions, you may know where I'm
20   going.  You may already know what answer you want to
21   give to the question, but I'm going to ask that you
22   please allow me to finish stating the full question
23   before you start providing your answer, okay?
24       A.    From what you just said, I heard you say
25   that we are not going to be speaking over one

Page 8

1    another.
2        Q.    And that's for the benefit of the court
3    reporter, the -- so she can take down the -- my
4    questions and your testimony verbatim.  So I'm
5    asking if you will agree, to the best of your
6    ability, to allow me to finish my question before
7    you start giving me your answer.
8        A.    Yes.
9        Q.    Okay.  It's also difficult for the court
10   reporter to take down gestures like a shrug of the
11   shoulders or a nod of the head, so please make your
12   answers verbal, okay?  Ma'am?
13       A.    I heard you say to make my answers
14   pertinent, short.
15       Q.    I -- I need you to -- I need you to make
16   your answers verbal rather than through gestures
17   because the court reporter is not able to take down
18   a shrug of the head or a -- a nod of the head or
19   shrug of the shoulders, so you understand I'm asking
20   that you keep your answers verbal rather than non-
21   verbal, okay?
22       A.    Keep my answers verbal.
23       Q.    It's also difficult for her to take down
24   if you say uh-huh or huh-uh, so if the answer is
25   yes, please say yes.  If the answer is no, please

Page 9

1    say no, okay?
2        A.    Okay.  That wasn't a yes-or-no question.
3    That was a question -- an okay with a question mark,
4    so I'm agreeing with an okay.
5        Q.    I -- I understand.  If I ask a question
6    that -- that you don't understand, please just let
7    me know, and I'll rephrase it, okay?
8        A.    If I need a question rephrased, I will ask
9    for clarification, yes.
10       Q.    Thank you.  I try to take a break every
11   hour or so.  But if at some point during the
12   deposition you need a break before then, please just
13   let me know, and we can take a break.  The only
14   thing I'll ask is, if there's a question on the
15   table, that you answer that question before we take
16   a break, all right?
17       A.    If there's a question that's still needing
18   to be answered before a break, to try and answer the
19   question before taking a break.  Yes, I can --
20       Q.    Hold on.
21       A.    I can try to do that, to the best of my
22   ability.
23       Q.    Are you under the influence of alcohol or
24   any sort of medication or drugs today?
25       A.    No, absolutely not.

Page 10

1    Q.    Can you think of any reason that would
2    prevent you from recalling facts or giving truthful
3    testimony today?
4         A.    Other than sheer time of it having been a
5    long duration since I initiated the lawsuit, no,
6    nothing mind-altering or medicinal-wise. Absolutely
7    not.
8         Q.    Okay. I'm going to use some shorthand
9    throughout the deposition today. I just want to
10   make sure we can agree you understand what I'm
11   talking about. If I say Houston Methodist,
12   Methodist, or the hospital, you understand that I'm
13   talking about Houston Methodist Hospital, correct?
14        A.    When you're referring to Houston Methodist
15   Hospital, are you referring to Houston Methodist
16   Hospital as the corporation or the -- or both
17   parties combined --
18        Q.    I'm -- I'm --
19        A.    -- Sunila Ali and Houston Methodist
20   Hospital?
21        Q.    I'm referring to Houston Methodist, the
22   hospital.
23        A.    Yes. I understand. When referring to
24   Houston Methodist, you're explicitly referring to
25   Houston Methodist.

Page 11

1         Q.    If -- if I say Ms. Ali or Sunila, you
2    understand I'm talking about Sunila Ali, correct?
3         A.    Correct.
4         Q.    And if I use the term "defendants,"
5    plural, you understand I'm talking about both
6    Houston Methodist and Ms. Ali, correct?
7         A.    Correct.
8         Q.    Okay. I want to talk a little bit about
9    what you may have done to prepare for your
10   deposition today. Did you review any documents?
11        A.    I have reviewed the documents that were
12   sent to me electronically -- I think referred to as
13   Bates -- multiple times. It's voluminous and hard
14   to memorize everything, but I have reviewed them.
15        Q.    Do you remember any specific documents you
16   reviewed, or are you just saying you reviewed
17   everything that's been produced in this case?
18        A.    I was referring to the voluminous document
19   that was sent to me electronically with multiple
20   files included in this one PDF.
21        Q.    Do you recall what specific documents were
22   included in that PDF?
23        A.    Too many to list. I think information as
24   far as my co-workers, employees that I've worked
25   with and their races was -- were included amongst

Page 12

1    others.
2         Q.    Okay. Did you speak with anyone in order
3    to prepare for your deposition today?
4         A.    Only in an attempt to try and seek
5    counsel.
6         Q.    Okay. Well, I don't want to know anything
7    that you may have talked to with another lawyer,
8    okay? Did you -- did you speak to any current
9    Houston Methodist employees in order to prepare for
10   your deposition today?
11        A.    No.
12        Q.    Did you speak to any former Houston
13   Methodist employees in order to prepare for your
14   deposition today?
15        A.    No.
16        Q.    Did you speak to anyone else in order to
17   prepare for your deposition today, other than
18   possibly an attorney?
19        A.    No.
20        Q.    Other than this lawsuit, have you ever
21   been involved in any other lawsuits?
22        A.    No.
23        Q.    Other than your testimony today under
24   oath, have you ever testified in court as a witness?
25        A.    No.

Page 13

1         Q.    Have you ever been involved as a witness
2    in any other lawsuits?
3         A.    No.
4         Q.    Have you ever been convicted of a felony?
5         A.    No.
6         Q.    Okay. Let's talk about your -- a little
7    bit about your educational background. Well, what's
8    the highest level of education you've achieved,
9    ma'am?
10        A.    I've completed a bachelor's of applied
11   science in healthcare leadership from the University
12   of Texas Permian Basin.
13        Q.    When did you receive that degree?
14        A.    In 2025, over this summer this past --
15   this year.
16        Q.    Is that an online program?
17        A.    Correct.
18        Q.    Okay. Other than your bachelor's of
19   applied science from UT Permian Basin, do you have
20   any other college degrees, associate's degrees,
21   anything like that?
22        A.    I have an associate of science degree in
23   psychology from Houston -- it's now Houston City
24   College, formerly Houston Community College.
25        Q.    And when did you obtain the associate's

Page 14

1  degree in psychology?
2      A.    In 2020.
3      Q.    Did you attend classes in person, or was
4  that an online program?
5      A.    Hybrid.
6      Q.    Okay.  Other than the degree from UT
7  Permian Basin and the associate's degree from
8  Houston Community College or Houston City College,
9  do you have any other college degrees?
10     A.    No other college degrees.
11     Q.    Have you taken any other college courses?
12     A.    In pursuit of certification, I've taken a
13 certified nurse's aide program.
14     Q.    At what institution did you take those
15 courses?
16     A.    The same, Houston Community College at the
17 time, now Houston City College.
18     Q.    When was it that you took those classes?
19     A.    I believe the CNA course was in 2019.
20     Q.    Did you complete that program?
21     A.    I completed the program, yes.
22     Q.    Did you obtain the certification?
23     A.    I did not test for my state exam, but I
24 did complete the program, yes.
25     Q.    Is taking the state exam required in order

Page 15

1  to actually obtain the certification?
2      A.    If I were to practice as a CNA, yes.  But
3  I was a patient care assistant, so it wasn't
4  necessary to my role in 2019.
5      Q.    Did you ever actually obtain that
6  certification?
7      A.    I completed -- I have a certificate of
8  completion, yes.
9      Q.    Okay.  Do you have any other professional
10 licenses or certifications?
11     A.    I have a CCT and a CRAT.
12     Q.    What was that first one again?
13     A.    Certified cardiographic tech or
14 cardiography tech.
15     Q.    When did you obtain that certification?
16     A.    2024.
17     Q.    And is that certification current?
18     A.    Yes.
19     Q.    I didn't catch the second one.  What was
20 the second certification?
21     A.    CRAT, certified -- sorry, not -- cardiac
22 rhythm analysis tech certification.
23     Q.    And when did you obtain that
24 certification?
25     A.    Same year, in 2024.

Page 16

1      Q.    And is that certification current?
2      A.    Yes.
3      Q.    Did you have to study any sort of program
4  or course of study in order to obtain those
5  certifications?
6      A.    I received an employer verification.
7      Q.    When did you graduate high school?
8      A.    2007.
9            THE REPORTER:  Counsel, I think there's
10 someone on the Zoom, so give me one -- one moment to
11 let that person in.
12           MR. BURKE:  Okay.
13           THE REPORTER:  Thank you.  Would you like
14 to go off the record for -- for a second?
15           MR. BURKE:  Sure.
16           THE VIDEOGRAPHER:  Okay.  Then please
17 stand by.  The time is 12:27 p.m.  We are going off
18 the record.
19           (WHEREUPON, a recess was taken.)
20           THE VIDEOGRAPHER:  The time -- the time is
21 12:28 p.m.  We are back on the record.
22           THE REPORTER:  Go ahead, Counsel.
23 BY MR. BURKE:
24     Q.    Ms. Weathers, we took a brief break off
25 the record.  Do you understand we're back on the

Page 17

1  record now, ma'am?
2      A.    Yes.
3      Q.    You understand that you're still under
4  oath, correct?
5      A.    Correct.
6      Q.    Right before we went off the record, you
7  mentioned you graduated high school in 2007.  What
8  high school did you graduate from?
9      A.    Alexander-Smith Academy.
10     Q.    Where is Alexander-Smith Academy located?
11     A.    It was located on Richmond in Houston,
12 Texas.
13     Q.    In Richmond Avenue?
14     A.    Correct.
15     Q.    Is it no longer in existence?
16     A.    I think they merged with another private
17 school in the Houston area called St. John's.
18     Q.    Okay.  Other than the degrees from UT
19 Permian Basin and Houston Community College and the
20 professional certifications that we talked about, do
21 you have any other post-high school degrees,
22 coursework, or professional certifications?
23     A.    Not that I can think of at the moment.
24     Q.    Okay.
25     A.    Or none that would be relevant that I can

Page 18

1  think of.
2      Q.   Where are you currently employed, ma'am?
3      A.   I work at Duke University Hospital.
4      Q.   How long have you worked at Duke
5  University Hospital?
6      A.   I started in July of this year.
7      Q.   July of this year, did you say?
8      A.   Correct.
9      Q.   What's your position?
10     A.   My job role?
11     Q.   Yes, ma'am.
12     A.   Cardiovascular invasive specialist.
13     Q.   What -- what's your pay rate as a
14  cardiovascular invasive specialist at Duke?
15     A.   Around $30 an hour.
16          MR. BURKE:  I'm sorry, her audio dropped
17  out.
18          THE REPORTER:  Can you repeat that,
19  please?
20          THE DEPONENT:  Around $30 an hour.
21  BY MR. BURKE:
22     Q.   Do you know the exact hourly rate?
23     A.   No.  Not at this time.
24     Q.   I'm sorry?
25     A.   Sorry.  I actually -- I recently completed

Page 19

1  my ACLS certification I did not mention to you.
2  Sorry, I couldn't remember.  I just completed it a
3  couple weeks ago.  I don't have the exact date off
4  the top of my head.  So I think that they are
5  considering -- having met that criteria, I may be
6  eligible for, like, a company-wide pay increase.
7  I'm not exactly sure where -- where it's at, but
8  approximately around $30.
9      Q.   Okay.  What is an ACLS certification?
10     A.   Advanced cardiovascular life support.
11     Q.   And you said you just obtained that
12  certification a couple weeks ago, approximately?
13     A.   From the American Heart Association, yes.
14     Q.   Is your approximate $30 an hour pay rate
15  the same as your pay rate when you started at Duke?
16     A.   Yes.
17     Q.   So you haven't any raises since you
18  started in July.
19     A.   Correct.  I think I'm due potentially for
20  one, but I'm not sure exactly if that starts at the
21  beginning of next year or if it's active now.
22     Q.   How many hours a week do you work?
23     A.   Approximately 40.
24     Q.   Do you ever work more than 40?
25     A.   I have not yet, no.

Page 20

1      Q.   Who is your direct supervisor at Duke
2  Hospital?
3      A.   Can you repeat the question?
4      Q.   Sure.  Who is your direct supervisor at
5  Duke University Hospital?
6      A.   Sorry, my first point of contact, like,
7  who would be, like, managing employees, or who is
8  the supervisor of management in -- I'm sorry?  I'm
9  not exactly sure what you're asking.
10     Q.   What I want you -- who's your, using your
11  words, first point of contact?
12     A.   Like, who is my hiring manager?
13     Q.   I'm -- you -- you used the phrase "first
14  point of contact," and so I'm asking who you were
15  referring to when you said the first point of
16  contact.
17     A.   Currently, I believe my first point of
18  contact would be -- his name is Rex.
19     Q.   Did you say his name is Rex?
20     A.   Rex, correct.  R-E-X.
21     Q.   What's Rex's last name?
22     A.   Ruiz.
23     Q.   What's Mr. Ruiz's position at Duke
24  University Hospital?
25     A.   I'm not sure exactly what his title is.  I

Page 21

1  know that he's in charge of employees and
2  scheduling.
3      Q.   And you consider Mr. Ruiz to be your
4  direct supervisor?
5      A.   I believe so, yes.  I believe he would be
6  my first point of contact.
7      Q.   What, besides scheduling, does Mr. Ruiz
8  do?
9      A.   I don't know all of his duties.  I'm not
10  -- I'm not sure.
11     Q.   Well, I take it he manages your schedule;
12  is that correct?
13     A.   Correct.
14     Q.   With respect to you personally, what other
15  roles does Mr. Ruiz fill, other than setting your
16  schedule?
17     A.   He has reviewed with me expectations.
18     Q.   What do you mean by expectations?
19     A.   Ensuring that I'm getting signed off on
20  having met certain criteria.
21     Q.   What -- what types of criteria are we
22  talking about?
23     A.   Unit-specific requirements, I guess, would
24  be comparable.
25     Q.   What do you mean by unit-specific

Page 22

1  requirements?
2      A.    Expectations for my job role or for my
3  department.  I'm trying -- I don't understand maybe
4  your question or exactly what you're asking for.  I
5  think I've asked and answered it three times now.
6      Q.    I asked you, other than handling your
7  schedule, what other roles does Mr. Ruiz fill as
8  your supervisor, and you said expectations, so I'm
9  trying to understand what you mean by expectations.
10     A.    I answered this already.  I said that he
11 signed off on having completed certain expectations
12 for my job role.
13     Q.    And I want to know what specifically the
14 expectations are that you're talking about.
15     A.    That's voluminous.  It's too -- that's too
16 much to answer.  That's overly burdensome.  I'm
17 sorry.  I can't answer exactly every specific thing
18 that I've met and each and every criteria off to
19 you.  If it were a document that Houston Methodist
20 could provide to me so I could verify that, yes,
21 this happened, but that's just not possible in this
22 scenario.
23     Q.    Well, ma'am, I don't have any documents
24 from Duke University Hospital --
25     A.    No.  And --

Page 23

1      Q.    -- so I'm asking for your testimony today
2  under oath.
3      A.    Very similar to the previous question that
4  you asked, like, what specific documents were in all
5  of the Bates that were sent to me, it's voluminous
6  is my answer.  It's too overly burdensome for me to
7  be able to answer everything that he signed off on.
8  I can't do that.
9      Q.    Can you tell me one expectation that he
10 signed off on?
11     A.    I think that there may be a conflict of
12 interest, and I don't feel that that's appropriate
13 either.
14     Q.    I don't understand what you mean by a
15 conflict of interest, ma'am.
16     A.    They're competing companies, and I don't
17 feel like that's appropriate for me to try and
18 answer.
19     Q.    You don't feel being under oath during
20 your deposition in a lawsuit you filed in federal
21 court against Houston Methodist is appropriate for
22 you to answer questions?
23     A.    I've already answered this question to the
24 best of my ability.
25     Q.    Can you give me one expectation that Mr.

Page 24

1  Ruiz has signed off on through you?  Ma'am?
2      A.    He has signed off on -- and I -- I've
3  already said this.  I've already answered.  He has
4  signed me off on meeting expectations for the unit
5  that I work for at Duke University.  That's for my
6  job role.  I've answered.  That's my answer.
7      Q.    So you can't identify any specific
8  expectations for your job role that Mr. Ruiz has
9  signed off on for you.  Is that what you're telling
10 me?
11     A.    Tasks for my job role.
12     Q.    I'm sorry?
13     A.    He has signed off tasks.  Are you asking
14 specifically what tasks?
15     Q.    Yes, ma'am.  I mean, I'm using your words.
16 You said he signs off on expectations.  Now you're
17 saying the signs off on specific tasks.
18     A.    Completing my ACLS.
19     Q.    I'm sorry?
20     A.    Completing my ACLS.
21     Q.    Okay.  Was completing ACLF -- is it ACLF
22 --
23     A.    ACLS.
24     Q.    -- as in Frank or -- ma'am, let me -- we
25 can't talk over each other, okay?  Is it ACLF as in

Page 25

1  Frank or
2  ACLS as in science?
3      A.    I answered this question.  It's ACLS,
4  advanced cardiovascular life support.
5      Q.    Okay.  Is completing your ACLS
6  certification a requirement of your job role at Duke
7  University Hospital?
8      A.    Yes.
9      Q.    Okay.  Is that the only expectation or
10 task that you can recall, sitting here today under
11 oath, that Mr. Ruiz has signed off on for you?
12     A.    No.
13     Q.    Give me another task or expectation that
14 Mr. Ruiz has signed off on for you.
15     A.    Being on time and having good attendance.
16     Q.    Did Mr. Ruiz give you performance reviews?
17     A.    No.
18     Q.    Is your answer no because you haven't had
19 one yet or because that is handled by a different
20 person at Duke University Hospital?
21     A.    Can you rephrase the question?
22     Q.    Sure.  Let me ask you this way.  Have you
23 had any performance reviews yet since your
24 employment started in July 2025 at Duke University
25 Hospital?

Page 26

1    A.    No.
2    Q.    Okay.  Do you know if you are scheduled to
3  have a performance review at any particular time?
4    A.    No.
5    Q.    Okay.  Have you had any disciplinary
6  counseling at Duke University Hospital since you
7  started in July of 2025?
8    A.    No.
9    Q.    Would Mr. Ruiz be the person to handle
10 that if it were to happen?
11    A.    I believe that it may be in his scope, but
12 I don't know if I can really answer.  It's not --
13 that's not one of my job duties to know that
14 information.  I think I would have to reach out to
15 administration to have that question answered for
16 me.  But it's possible, yes.
17    Q.    Okay.  Other than your $30 --
18 approximately $30 an hour pay rate, what other
19 employee benefits, if any, do you receive from Duke
20 University Hospital?
21    A.    I have applied for medical and dental
22 benefits.  To -- I -- yeah.  I believe those
23 renew.  You sign up for them at the end of the year
24 for them to go into effect the following year.
25    Q.    Any -- any other benefits besides applying

Page 27

1  for medical and dental?
2    A.    Not that I can think of.
3    Q.    Since Houston Methodist -- your employment
4  at Houston Methodist, did you work anywhere else
5  between Houston Methodist and Duke University
6  Houston?
7    A.    Yes.
8    Q.    Okay.  What is your employer immediately
9  prior to Duke University Hospital?
10    A.    Boston Scientific.
11    Q.    When did you work for Boston Scientific?
12 Between what dates?
13    A.    I believe I started officially in February
14 2020 -- the February following the year of 2021,
15 leaving Houston Methodist.  So I believe that was
16 2022.
17    Q.    So you believe approximately February 2022
18 is when you started at Boston Scientific.
19    A.    Correct.
20    Q.    What job role or job duties did you have
21 at Boston Scientific?
22    A.    I was an electrophysiology tech or a lab
23 tech.
24    Q.    What were your duties and responsibilities
25 as a lab tech at Boston Scientific?

Page 28

1    A.    To interpret heart rhythms.
2    Q.    Was that here in Houston?
3    A.    Correct.  It was in Houston.
4    Q.    What was your pay rate at Boston
5  Scientific?
6    A.    I'm not sure exactly.  I think it was
7  around $16, 18.
8    Q.    Did you say 16 to 18?
9    A.    Right.  Correct.
10    Q.    Did your pay rate change at any time while
11 you were at Boston Scientific, or did you receive
12 the same hourly rate for your entire employment?
13    A.    I think that there was a small -- like, an
14 incremental increase based on performance.  I'm not
15 sure exactly how much, if it was a dollar, two,
16 somewhere -- a rough estimate.
17    Q.    Okay.  When did you -- when did your
18 employment at Boston Scientific end?
19    A.    I can't remember the exact date.  I think
20 about -- I gave notice that I was leaving about a
21 month before moving to North Carolina.
22    Q.    So I -- I take it, then, you voluntarily
23 resigned at Boston Scientific by giving them notice
24 that you'd gotten a job at Duke University Hospital.
25    A.    Correct.

Page 29

1    Q.    So other than perhaps time to move from
2  Houston and North Carolina, there wasn't any gap in
3  your employment between Boston Scientific and -- and
4  Duke University Hospital?
5    A.    No substantial gap.  Maybe just enough
6  time to try and get -- move from one state to the
7  other.
8    Q.    Okay.  Other than your hourly rate, did
9  you receive any other employment benefits at Boston
10 Scientific?
11    A.    Can you repeat the question?
12    Q.    Sure.  We talked about your hourly rate
13 that you received for working at Boston Scientific.
14 Did you receive any other employment benefits during
15 your employment with Boston Scientific?
16    A.    I received one incentive bonus for
17 completing my CCT certification, but I left before
18 receiving the payout for the bonus on my CRAT.
19    Q.    Okay.  How about employee benefits?  Did
20 you have medical insurance?
21    A.    Yes.
22    Q.    Did you have dental insurance?
23    A.    Yes.
24    Q.    Any other benefits?
25    A.    Not that I can think of.

Page 30

1     Q.    I'm sorry.  The audio didn't come through,
2  is that a "no"?  --
3     A.    Not that I can -- not that I can think of
4  right now, no.
5     Q.    No 401(k) or anything like that?
6     A.    I don't think so, unless it was something
7  that they just -- that I -- nothing that I signed up
8  for that I can recall, but --
9     Q.    Okay.  Who was your supervisor at Boston
10 Scientific?
11    A.    My supervisor before leaving was named --
12 sorry.  I'm not remembering her name right now.
13    Q.    Did your supervisors change at some point
14 during your --
15    A.    Correct.  Yes.  Yes.
16    Q.    -- employment with Boston Scientific?  Let
17 me -- just so the court reporter doesn't have to
18 deal with two people talking at the same time, just
19 let me finish my question before you start
20 answering, okay?  Did your supervisor change at some
21 point during your employment at Boston Scientific?
22    A.    Correct.
23    Q.    Okay.  Did you have more than two
24 supervisors at Boston Scientific?
25    A.    Not at the same time.

Page 31

1     Q.    Okay.  Do you remember who your initial
2  supervisor was at Boston Scientific?
3     A.    I believe -- I can't remember their names
4  right now.
5     Q.    Were they both females?
6     A.    No.
7     Q.    Were they both male?
8     A.    Oh, her name was -- her name was Alex.
9  Sorry.  My -- before leaving, the manager's name was
10 Alex.
11    Q.    That -- that was the second supervisor?
12    A.    Correct.
13    Q.    Was the first supervisor a male?
14    A.    Correct.  His name was Dennis.
15    Q.    Do you remember Dennis' last name?
16    A.    I can't recall.
17    Q.    Do you recall Alex's last name?
18    A.    I can't remember.
19    Q.    Okay.  Did you -- during your time at
20 Boston Scientific, did you receive any performance
21 reviews from Dennis while he was your supervisor?
22    A.    No, I don't think so.
23    Q.    How about Alex?  Did you receive any
24 performance reviews from Alex when she was your
25 supervisor at Boston Scientific?

Page 32

1     A.    An annual review, a positive, like,
2  review, indicating that I met their expectations
3  annually and was eligible for their incentive.
4     Q.    So when you were at Boston Scientific, you
5  received an annual performance review.
6     A.    Right.  Not -- not, like, a -- how did --
7  like, an evaluation that's done to all of the
8  employees every year at the end of every year.
9     Q.    And did it measure your performance, or
10 did it measure some sort of other metric; do you
11 recall?
12    A.    It measured metrics and if you're
13 achieving certain tolls.  I think it encompassed
14 both.  So long as you're achieving certain criteria,
15 they input that into a metric and then qualify you
16 for the annual, I guess, performance, you know --
17 yeah.
18    Q.    Do you recall --
19    A.    I'm sorry.  I never administered or gave
20 them.  I just, yeah, qualified for their end-of-the-
21 year, I guess, incremental salary increase.
22    Q.    Do you recall what any of the criteria
23 were -- were in order to qualify for the --
24    A.    I know --
25    Q.    -- annual increase?

Page 33

1     A.    -- one of the criteria was to meet
2  productivity standards.
3     Q.    Any others that you can recall?
4     A.    Not at this time, no.
5     Q.    What sort of productivity standards did
6  you have at Boston Scientific?
7     A.    We had to see so many patients or their
8  scans, their -- yeah.  I'm sorry.  I'm tired.  Can I
9  take a break?  What time is it?
10    Q.    Can -- let me -- if you just finish your
11 answer to that question, we --
12    A.    Right.
13    Q.    -- we can take a break.
14    A.    Okay.  I don't -- I'm trying to think of
15 how to re-answer.  I already answered the question
16 that we had to achieve productivity standards.  I
17 don't know how to re-word that so that it's more
18 detailed, so I -- I don't know if I can answer that
19 question any better.
20    Q.    Well, "productivity standards" is a vague,
21 broad term.  What -- what was your production being
22 measured?
23    A.    How many patient scans we completed.
24    Q.    Okay.  Any other productivity standards
25 you had to meet while you were at Boston Scientific

Page 34

1 that you can recall?
2        A.    We did have to obtain our CCT and CRAT by
3 certain -- on a certain timeline.
4        Q.    And those are the certifications that we
5 talked about earlier that you got in 2024; is that
6 correct?
7        A.    Correct.
8              MR. BURKE:  Okay.  All right.  We can take
9 a break if you need to take a break, ma'am.
10             THE DEPONENT:  Thank you.
11             MR. BURKE:  How long do you want to take?
12             THE VIDEOGRAPHER:  Okay.  Okay.  Thank
13 you.  Please stand by.  The time is 12:56 p.m.  We
14 are going off the record.
15             (WHEREUPON, a recess was taken.)
16             THE VIDEOGRAPHER:  Time is 1:08 p.m.  We
17 are on the record.
18             THE REPORTER:  Go ahead, Counsel.
19 BY MR. BURKE:
20       Q.    Ms. Weathers, we just took a short break.
21 We're back on the record.  Are you ready to
22 continue, ma'am?
23       A.    Yes.
24       Q.    You understand that you're still under
25 oath, correct?

Page 35

1        A.    Correct.
2        Q.    Okay.  We were -- when we took a break, we
3 were talking about your employment at Boston
4 Scientific.  Have you had any disciplinary
5 counselings or disciplinary write-ups that -- or
6 excuse me.  Strike that.
7              Did you, during your employment at Boston
8 Scientific, have any disciplinary accounting --
9 counselings or disciplinary write-ups?
10       A.    No, zero.  None.
11       Q.    Between your employment at Houston
12 Methodist and Boston Scientific, did you have any
13 other employment during that gap?
14       A.    No.  There was a training period that I
15 had to go through before starting at Boston
16 Scientific around the December before starting in
17 February.
18       Q.    Was that a paid training?
19       A.    I don't recall.  I don't think so.
20       Q.    Do you recall how long that training
21 period lasted?  You said it started in approximately
22 December.
23       A.    Yeah, December or beginning of January,
24 end of December.  I'm not sure.  It was about two to
25 four weeks.

Page 36

1        Q.    And you don't recall whether that was paid
2 or not?
3        A.    I don't think it was.
4        Q.    Okay.
5        A.    I'm going to say no to that.
6        Q.    Did you -- when was -- when did your
7 employment at Houston Methodist end?
8        A.    When did I start working at Houston
9 Methodist?
10       Q.    No, no, no.  When did your employment at
11 Houston Methodist end?
12       A.    October 4th, 2021.
13       Q.    So between October 4th and -- excuse me,
14 between October 4th, 2021, and the start of your
15 training schedule at Boston Scientific, did you earn
16 any other income?
17       A.    No.
18       Q.    Did you -- did you receive unemployment
19 benefits?
20       A.    I think I might have received, for maybe a
21 month, unemployment benefits.
22       Q.    Okay.  Do you recall how much you received
23 in unemployment benefits?
24       A.    I can't recall.  I'm not sure.
25       Q.    Do you recall how long after your

Page 37

1 employment at Houston Methodist ended that you
2 applied for unemployment benefits?
3        A.    I believe so, yes.
4        Q.    No, I'm -- I'm asking, do you recall how
5 long after your employment ended that you actually
6 applied for employment benefits?
7        A.    I don't remember the exact date.  I know
8 --
9              THE REPORTER:  Counsel, can you repeat
10 your question, please?
11             MR. BURKE:  Sure.  I'm asking if she can
12 recall how long after employment -- her employment
13 at Houston Methodist ended that she applied for
14 unemployment benefits.
15             THE DEPONENT:  I answered I don't have an
16 exact date, but I know that I provided documentation
17 of it to Patrick Palmer while he was representing
18 the case.  I just can't remember exactly what was on
19 those documents, but I know I -- I gave my signature
20 so he could have access.
21 BY MR. BURKE:
22       Q.    I understand.  I'm just asking about what
23 you can recall, sitting here today.
24       A.    I can't remember the exact date.
25       Q.    When did you start your employment at

Page 38

1 Houston?
2     A.    May 28th, 2019.
3     Q.    And what was your position when you
4 started at Houston Methodist in May of 2019?
5     A.    Patient transporter.
6     Q.    Do you recall what your pay rate was as a
7 patient transporter at Houston Methodist?
8     A.    I think I started around $12 or 13.
9     Q.    How long did you work as a patient
10 transporter at Houston Methodist?
11     A.    Until my start date as a patient care
12 assistant under Sunila Ali.
13     Q.    Was that sometime in 2021?
14     A.    Correct.
15     Q.    Do you recall when in 2021 you started as
16 a patient --
17     A.    Care assistant?
18     Q.    Yes.
19     A.    I believe around June. I can't remember
20 exactly because there was that hiring event that I
21 attended, I believe might have been in May or June,
22 and then my official start date, I think, was in the
23 month of June.
24     Q.    Okay. Who was your supervisor when you
25 were a patient transporter?

Page 39

1     A.    I had two managers. The assistant manager
2 was -- was Elizabeth Seay, and the manager that
3 oversaw her -- the manager for the whole department
4 was Shakindra Gonzales.
5     Q.    When you say "department," what department
6 are you talking about?
7     A.    The patient transportation department.
8     Q.    And your assistant manager was Ms. Seay?
9     A.    Assistant manager was Elizabeth Seay, yes.
10     Q.    Were Ms. Gonzales and Ms. Seay in those
11 positions the entire time you were a patient
12 transporter at Houston Methodist?
13     A.    Correct. Yes.
14     Q.    Did you get any raises that you recall as
15 a patient transporter at Houston Methodist?
16     A.    While I was a patient transporter, yes. I
17 was eligible and received the company-wide pay
18 increases or salary increases. Yes.
19     Q.    Can you recall what your hourly rate was
20 at the end of your time as a patient transporter at
21 Houston Methodist?
22     A.    I believe it was around the same as it was
23 as a patient care assistant. I think I was making
24 around 16.
25     Q.    Okay. And so I take it your recollection

Page 40

1 is that as a patient care assistant, your hourly
2 rate was about $16 an hour?
3     A.    Correct.
4     Q.    Did that change at any point while you
5 were a patient care assistant?
6     A.    No. I never received any pay increases as
7 a patient care assistant.
8     Q.    As a patient transporter, did you ever
9 have any disciplinary counselings or write-ups?
10     A.    Only one.
11     Q.    Okay. Tell me about that. What happened?
12     A.    I received a communication record from
13 Elizabeth Seay after having reported to her about a
14 patient visitor who was smoking marijuana.
15     Q.    Tell me what it was that you reported to
16 Ms. -- well, strike that.
17         Did you make a report to Ms. Seay, or did
18 you make a report to someone else?
19     A.    I wrote directly to Elizabeth Seay.
20     Q.    And what was it that you described in your
21 report to Ms. Seay?
22     A.    I described to her a patient visitor who
23 had been smoking when I came to go pick up a
24 patient. And I could smell smoke in the hallway,
25 and I -- because of that, I felt uncomfortable and

Page 41

1 had tried to call into the transportation department
2 to ask them what to do. I didn't feel comfortable,
3 and I was told it -- you know, if something like
4 this happens and you feel uncomfortable, report it
5 to us. You don't have to take the patient. It was
6 that kind of a circumstance.
7         The nurse had been questioning him. And I
8 wrote this in an e-mail as best I could. I can't
9 remember exactly if what I'm saying now is, sentence
10 for sentence, exactly what I said, but I'm trying to
11 relay the content of what I was sharing to her.
12         And the nurse that was evaluating him had
13 asked him a series of questions, if he had any
14 marijuana on him, and he said, yes, that he had a
15 small amount in his pocket, but had answered
16 questions as no, I'm not smoking now as I'm talking
17 to you. No, he's not actively smoking while he's
18 standing there in front of us, but he was smoking
19 before he came out of the hallway and started
20 talking to us.
21         So it was just an uncomfortable situation
22 for me, and I had asked if she could help me with
23 it, reporting it to her, kind of trying to figure
24 out if we can better simplify the policies around
25 situations if they arise again. And they just said

Page 42

1  we don't care about any of that, and we were just
2  supposed to have taken the patient.
3       Q.   Okay Let me -- let's break that down a
4  little bit.  Was the -- strike that.
5            You were reporting to the patient's room
6  to transport the patient somewhere.  Is that what
7  happened?
8       A.   The -- the patients -- the patient that I
9  was assigned to to take to, like, a exam room to
10 have imaging, I think, performed -- I can't remember
11 it exactly -- the ticket had already been canceled a
12 number of times.  I didn't know why when I got
13 there, that that was the circumstance.
14           And after talking to the patient and
15 talking to the charge nurse, the charge nurse just
16 said I'm not going to tell you what I'm going to do,
17 but just go.  And so I left and ended up receiving a
18 communication record, even though I was trying to,
19 you know, do the right thing.
20      Q.   Well, let me -- let me see if I can
21 understand what happened.  You -- you say it was a
22 ticket that was canceled a number of times.  Do you
23 remember saying that?
24      A.   Right.  Yes.  Before I got the ticket,
25 other patient transporters also had been assigned

Page 43

1  tickets to take this patient, and they were
2  canceled.  I don't know exactly why, but they shared
3  with me that it had already been canceled.
4       Q.   So you received a ticket to report to this
5  patient's room to transport the patient to, for
6  example, an exam room.  Is that the scenario?
7       A.   Correct.  Yes.
8       Q.   Are you telling me that you -- that the
9  ticket you received had already been canceled when
10 you got it and you didn't realize it, or are you
11 talking about prior attendants?
12      A.   No, there -- there were other patient
13 transporters who had canceled the ticket.
14      Q.   So as far as you know, when you got the
15 ticket, it was still a current ticket when you
16 reported to the patient's room?
17      A.   Correct.  Yes.
18      Q.   And as you're approaching the patient's
19 room, are you -- let me see if I'm understanding
20 your testimony correctly.  There was a patient
21 visitor in the hall smoking marijuana?
22      A.   Not in the hallway where the patient rooms
23 are, but there was a separate hallway for the
24 stairs, like a stairwell, a stair hall --
25      Q.   Okay.

Page 44

1       A.   -- that had a door just outside.  So the
2  patient's room was on the left, the stairwell was on
3  the right, and I'm walking down, and I can tell that
4  it's coming from that stairwell.
5       Q.   Okay.  And then at that point you entered
6  the patient's room.  Is that what happened?
7       A.   No.  When I got there, they're supposed to
8  have books, charts available, and the chart wasn't
9  there.  So when I got there to go and see, to check
10 on the patient to figure out what the room looked
11 like and what the situation was and -- I discovered
12 there was this marijuana smell, so I called.  While
13 I was on the phone with the transportation
14 department on the call, the patient visitor came out
15 of the hallway.
16           And the smoke started dissipating, and
17 then after about five to ten minutes, the charge
18 nurse came with the chart, but we're only supposed
19 to stay on tickets for about seven to eight minutes,
20 so it was already over the time that I was supposed
21 to be on the ticket for this patient.  So I asked,
22 you know, I don't understand.  This is an
23 uncomfortable situation.  Can y'all do something?
24 And -- yeah.
25      Q.   So the charge nurse was not at the

Page 45

1  patient's room when you first arrived, correct?
2       A.   Correct.  She was not there.
3       Q.   And there were -- there was supposed to be
4  a patient chart outside the room, but it wasn't
5  there.
6       A.   At the nurses' station, when you come into
7  each unit, you're supposed to, as a transporter, go
8  to the nurses' station to pick up the patient's
9  chart that will have a sheet for where they're
10 supposed to go.
11      Q.   Okay.  And that was not at the nurses'
12 station when you arrived?
13      A.   Correct.  Yes.  I had to wait for it.
14      Q.   So were you -- were you waiting at the
15 nurses' station?  Were you waiting outside the
16 patient's room?
17      A.   No, I did go to check on the patient.
18      Q.   Okay.  Did you actually go in the
19 patient's room?
20      A.   I didn't go into the patient's room.  I
21 looked into the patient's room to figure out if I
22 would need to move anything in the room to get the
23 stretcher into the room to move the patient over and
24 exactly what all of that would entail.
25      Q.   Okay.  So after you looked into the

Page 46
1  patient's room, was the door open, or are you saying
2  you looked through a window?
3      A.  I can't recall if the door was open or
4  not.  I might have had to open the door.  I don't
5  recall.
6      Q.  And at this point, was the visitor still
7  in the stairwell?
8      A.  When I first arrived onto the unit, yes.
9  He was not just waiting outside the door of the
10 patient's room.  He was in the stairwell.  Correct.
11     Q.  And at what point did the charge nurse
12 approach with the patient's chart?  Did you go back
13 to the nursing station, or were you still at the
14 patient?
15     A.  No, they eventually came to me, where I
16 was at the telephone that was beside the nurses' --
17 or beside the patient's room.  They came to me.  The
18 charge nurse came to me and the patient visitor.  I
19 didn't start approaching the patient visitor.  I was
20 on the phone when he came out, and then the charge
21 nurse came and started asking him, like, a series of
22 questions.
23     Q.  Okay.  Did you actually -- did you ever
24 have any conversation or communication with the
25 visitor?

Page 47
1      A.  I don't think that it was ever any of my
2  words directly with the visitor.  I was only on the
3  phone communicating with transportation and the
4  charge nurse.
5      Q.  Okay.  But then the charge nurse
6  approached and had a conversation with the patient
7  visitor?
8      A.  Correct.
9      Q.  What happened after the charge nurse
10 finished questioning the patient visitor?
11     A.  She told me to go.
12     Q.  Okay.  Did -- did you follow her
13 instruction?
14     A.  Correct.  Yes.
15     Q.  Did -- did you have any conversation with
16 the charge nurse before you left?
17     A.  No.  She just told me to go, so I left and
18 then filed the report to Elizabeth.
19     Q.  Do you recall what the communication
20 record you received for this incident was about?
21     A.  She said that our policy is that you have
22 to take the patient.  That's what I think that I got
23 from it.
24     Q.  So, I mean, at -- at any point during this
25 scenario did you actually enter the patient's room?

Page 48
1      A.  No.
2      Q.  And you mentioned earlier, someone was --
3  I -- I thought you said the patient, but maybe you
4  were talking about the patient visitor.  Someone
5  questioned him or her, and they said they had a
6  small amount of marijuana in their pocket.
7      A.  Correct.  Yes.
8      Q.  Was that the patient visitor or the
9  patient who said that?
10     A.  Not the patient, the patient visitor.
11     Q.  Okay.
12     A.  That patient's visitor.  They were family.
13 I think it was mother, son.
14     Q.  Okay.  Did -- did the charge nurse explain
15 to you why she was instructing you to leave?
16     A.  No, just -- she said that she would take
17 care of it.  I'm not telling you what I'm going to
18 do.  You can go.
19     Q.  She -- she said she wasn't going to tell
20 you what she was going to do about what?
21     A.  I guess how she was going to handle how
22 the patient was going to get to the exam.
23     Q.  Did you ask her if that's what she was
24 talking about, or is that just how you took it?
25     A.  I think because that was the problem that

Page 49
1  we were trying to solve, like, I didn't know how
2  they were going to handle it.
3      Q.  From your perspective, what was the
4  problem that needed to be solved?
5      A.  The patient still needed to be taken to
6  the exam, but under that particular circumstance, I
7  think that there were other concerns about, since I
8  knew that he had been smoking -- I came in, and I
9  could smell that he had been smoking, and I know --
10 I knew that as a fact -- the potential for him to
11 continue doing that or to bring that over to another
12 exam room, my concern was what liability I would
13 hold in my department, and they wouldn't really
14 explain that to me or assure me that that wasn't
15 going to be a problem or just really didn't say a
16 whole lot there.
17     Q.  What -- what prevented you from moving the
18 patient to wherever it was the patient was supposed
19 to be moved?
20     A.  That patient's visitor was going to go
21 with their family member, with their mom, to the
22 site.  They had made -- had stated that they want to
23 be with their mom to go to the exam, that they want
24 to be there.
25     Q.  And why didn't -- or I'm sorry.  Were you

Page 50
1  finished?
2        A.   And I -- and it wasn't my place to say,
3  no, they couldn't.  I've never said that before to
4  anyone before.  I've never had a circumstance like
5  that ever come up.  So I wanted to get clarification
6  from the patient transportation department on what
7  we were supposed to do.  But they wouldn't really
8  say in the case of, like, when there's potential for
9  drugs to be involved and what exactly that policy
10  is.
11       Q.   What about someone other than the patient
12  having smoked marijuana in the stairwell prevented
13  you from moving the patient --
14       A.   Because it's --
15       Q.   -- where the patient was supposed to be?
16  Ma'am --
17       A.   -- it's always been told to to me that
18  it's --
19       Q.   Ma'am.  Ma'am, ma'am.
20       A.   -- smoking is prohibited.
21       Q.   You got to let me finish my question --
22            THE DEPONENT:  Okay.
23            MR. BURKE:  -- before you start answering,
24  okay?  I'm going to go ahead and ask the question
25  again.  What about a patient visitor smoking

Page 51
1  marijuana in the stairwell prevented you from
2  fulfilling your job to move the patient from the
3  room to wherever it was the patient was supposed to
4  be moved?
5        A.   The fact that there were drugs involved,
6  and smoking in Houston Methodist, I know, is
7  prohibited.
8  BY MR. BURKE:
9        Q.   But what about that prohibited you from
10  doing your job of moving the patient who was not
11  smoking marijuana --
12       A.   Because the --
13       Q.   -- to where the patient was supposed to be
14  moved to?
15       A.   Because that exact person who was smoking
16  marijuana was going to go with that patient with
17  drugs on them, that told the nurse that they have
18  drugs on them.
19       Q.   Okay.  Is this -- this incident we've been
20  talking about with the patient visitor smoking
21  marijuana and the communication you -- record you
22  received after that, is that part of something you
23  are suing Houston Methodist for in this lawsuit?
24       A.   That's -- seems like a compound question.
25  Can you simplify it?

Page 52
1        Q.   You've sued Houston Methodist for
2  discrimination, correct?
3        A.   Correct.
4        Q.   And you sued Houston Methodist for
5  retaliation, correct?
6        A.   Correct.
7        Q.   The incident involving the patient visitor
8  who was smoking marijuana, as part of this lawsuit,
9  are you alleging that that was an event of
10  discrimination on the part of Houston Methodist?
11       A.   I believe having received a communication
12  record for reporting illegal activity is
13  retaliation. Yes.
14       Q.   So this communication record that you
15  received from Ms. Seay resulting from the -- let's
16  call it the marijuana incident, is part of your
17  retaliation claim in this lawsuit against Houston
18  Methodist?
19       A.   Correct.
20       Q.   Is it part of your discrimination claim
21  against Houston Methodist as part of this lawsuit?
22       A.   Correct.
23       Q.   I'm sorry, the audio cut out.  Is that a
24  yes?
25       A.   Yes.

Page 53
1        Q.   Okay.  Do you believe that Ms. Seay issued
2  the communication record after the marijuana
3  incident to you because of your gender?
4        A.   No.
5        Q.   Do you believe that Ms. Seay issued the
6  communication record resulting from the marijuana
7  incident -- do you believe she did that because of
8  your race?
9        A.   Yes.
10       Q.   Well, what makes you believe that?
11       A.   Because there were other transporters that
12  canceled the tickets, and I'm the only one who is
13  not Hispanic or only white that was working in the
14  department, and for some reason, I'm the only one
15  that got the communication record.
16       Q.   Who were the other patient transporters
17  who canceled the ticket?
18       A.   I can't name all of them.  I think that
19  there were around 50 other employees.
20       Q.   Can you name any -- can you name any
21  specific patient transporter that canceled the
22  ticket?
23       A.   Not that I can think of right now.  I
24  can't remember.
25       Q.   Well, at one time, did you have knowledge

Page 54

1 of any specific patient transporters who canceled
2 this specific ticket, and you just can't remember
3 now?
4      A.   Consistently, regularly, there would be
5 other transporters who would just not take any
6 tickets for hours and just hang out with each other
7 while I would consistently get tickets to do a
8 number of things.
9      Q.   All right.  I'm -- I'm talking about this
10 specific ticket that you responded to to go to the
11 room when the marijuana incident happened.  Are you
12 telling me that that specific patient was supposed
13 to be moved to, for example, an exam room on that
14 day, and other patient transporters refused to do
15 that?
16      A.   Correct.  And this is from other nurses on
17 the unit saying this is the second or third time
18 that this has happened.  So I don't know exactly who
19 it was, but it was from hearing when I got there
20 that it had already been a canceled ticket.  And I
21 just know --
22      Q.   Okay.  So --
23      A.   -- from fact of working with my other co-
24 workers that I was of my only race.
25      Q.   You know, as a fact from working there,

Page 55

1 the co-workers that what?
2      A.   That I was of my -- the only one of --
3 only white race.
4      Q.   But with regard to this specific ticket on
5 the specific day related to the patient who had a
6 visitor who was smoking marijuana in the stairwell,
7 can you tell me any specific patient transporter who
8 canceled that ticket prior to you?
9      A.   I don't know exactly who it was.  I just
10 know that they said that it had happened, that it
11 had already been.
12      Q.   So you would agree with me, you cannot
13 name a specific patient transporter who -- who
14 canceled this --
15      A.   Houston Methodist hasn't provided that
16 information --
17      Q.   Ma'am --
18      A.   -- in their Bates -- Ma'am -- -- about my
19 role as a transporter, only as a patient care
20 assistant.
21 BY MR. BURKE:
22      Q.   Ma'am, you need to let me finish my
23 question before you start answering, okay?  Okay,
24 I'm going to start the question again.
25           MR. BURKE:  You agree with me that, as you

Page 56

1 sit here today under oath, you cannot give me the
2 name of any specific patient transporter who
3 canceled the ticket on this day we're talking about,
4 the marijuana incident, correct?
5      A.   Yes and no.
6 BY MR. BURKE:
7      Q.   Well, tell me the yes part.  Tell me a --
8 the name of a specific patient transporter who
9 canceled this specific ticket.
10      A.   I can't remember their name.
11      Q.   Are you envisioning someone in your mind?
12 You just can't remember that person's name?  Is that
13 what you're telling me, or are you telling me you
14 don't know any --
15      A.   I believe it was -- I believe -- I think I
16 know who it was.
17      Q.   Ma'am --
18           THE REPORTER:  Counsel --
19           MR. BURKE:  Ma'am.
20           THE REPORTER:  -- I couldn't get your
21 question.
22 BY MR. BURKE:
23      Q.   You got to let me finish my question
24 before you start --
25      A.   He asked do you believe -- do you believe

Page 57

1 that you know who it was?  You just can't remember
2 their name.
3      Q.   I'm going to re-ask the question.  You
4 said you can't remember their name.  And so my
5 question was:  Is there a specific individual that
6 you are envisioning in your mind, and you just can't
7 remember that person's name, or are you telling me
8 you can't tell me the name of a specific individual
9 who canceled this ticket on that day?
10      A.   I think I recall who it was.  I cannot
11 remember their name.  And it's not -- it has not
12 been provided to me in the productions as far as my
13 comparators or my co-workers who worked alongside me
14 as a patient transporter.
15      Q.   How is it that you know that this person
16 you're thinking of canceled that ticket on that day?
17      A.   Repeat.
18      Q.   You said -- this person you're thinking of
19 that you can't remember their name, you said you
20 think you know that person who canceled this ticket.
21 And I'm asking how is it that you know that person
22 whose name you can't remember canceled that ticket
23 on that day with regard to the patient who had a
24 visitor who was smoking marijuana in the stairwell.
25      A.   Because I could hear my co-workers, before

Page 58

1  I got the ticket, talking about how they were
2  canceling a ticket. And I know it was a topic that
3  they had been talking about because of the changes
4  in regulation to marijuana, so it was definitely
5  something I had heard them talk about before.
6      Q.   Who were these co-workers who had this
7  conversation that you overheard?
8      A.   I can't remember their names. Do you have
9  a document you could provide to me to recollect my
10 memory, and I could point it out to you?
11     Q.   I'm asking about your memory, ma'am.
12     A.   It's hard to remember something from 2019
13 when the documents and evidence haven't been
14 provided to me. I'm doing the best that I can.
15     Q.   Did this happen in 2019 or 2020?
16     A.   Around 2019 or 2020, my -- during my time
17 as a patient transporter. You're right. It was
18 probably closer to 2020, five years ago.
19     Q.   Well, I -- I said that because I thought
20 that's what you had told me earlier, but I'm just
21 making sure. Was there anything else that occurred
22 while you were a patient transporter that you
23 claimed was discrimination on the part of Houston
24 Methodist that you are suing for in this lawsuit?
25     A.   I -- I don't know if, in and of itself,

Page 59

1  it's discriminatory, but I think it adds to the case
2  of discrimination that on the same day I received
3  the communication record from Elizabeth Seay, the
4  assistant manager, I also received a performance
5  appraisal from Shakindra Gonzales, the overseeing
6  manager.
7      Q.   You -- let me see if I understand what
8  you're telling me. You think the performance
9  appraisal is an example of discrimination on Houston
10 Methodist's part that you are suing for in this
11 lawsuit?
12     A.   I think it is evidence of discrimination
13 that up until having reported discrimination -- the
14 illegal activity to Elizabeth Seay, I had received
15 nothing but positive performance reviews from the
16 overseeing manager, Shakindra Gonzales.
17     Q.   And this performance review that you're
18 talking about was a positive performance review?
19     A.   Yes.
20     Q.   Elizabeth Seay is female, correct?
21     A.   Elizabeth Seay is a female. Correct.
22     Q.   Do you know what race Ms. Seay is?
23     A.   African American.
24     Q.   Do you think Ms. Seay personally
25 discriminated against you because of your race?

Page 60

1      A.   Yes.
2      Q.   Do you think Ms. Seay personally
3  discriminated against you because of your gender?
4      A.   I think it combined race and gender, but
5  not specifically just because of my gender.
6      Q.   Anything other than this communication
7  record involving the patient who had a visitor
8  smoking marijuana in the stairwell, is there
9  anything aside from that that you feel was
10 discriminatory on Ms. Seay's part against you
11 because of your race?
12     A.   Not that I can think of right now.
13     Q.   Why did you not sue Ms. Seay individually
14 in this lawsuit?
15     A.   I don't recall seeing anything in the
16 Bates in communication with Elizabeth Seay, other
17 than the communication record that she issued.
18     Q.   I'm not sure how that answers my question.
19 My question is: Why didn't -- if you believe Ms.
20 Seay discriminated against you --
21     A.   You mean something that might have
22 happened off the record that would not be in the
23 Bates.
24     Q.   Ma'am, I'm begging you to let me finish my
25 question before you start answering, okay? My

Page 61

1  question was: If you believe Ms. Seay individually
2  discriminated against you because of your race, why
3  did you not sue her in this lawsuit the same way you
4  did Ms. Ali?
5      A.   Compound question. Can you simplify?
6      Q.   Why didn't you sue Ms. Seay for
7  discriminating against you because of your race?
8      A.   It didn't result in a direct adverse
9  action such as termination. I thought maybe she had
10 just been confused herself and didn't know maybe the
11 understanding of the policies on marijuana.
12     Q.   Okay. Well, if you think it may have been
13 a misunderstanding about the policies of marijuana,
14 why do you think it was --
15     A.   I think barely the --
16     Q.   Ma'am. Ma'am.
17     A.   Okay. Sorry.
18     Q.   If you believe it might have been a
19 misunderstanding about the policies of marijuana,
20 why do you say that she discriminated against you
21 because of your race?
22     A.   Because of the result. I think the
23 department had -- because they had a handbook, it
24 covered a lot of information, and I was being -- my
25 performance was based off of what was in that

Page 62
1  handbook, and I was meeting that criteria. But
2  that's criteria that wasn't in the book, and so I
3  feel like it's still discriminatory because she
4  didn't do it to anyone else.
5      Q.  Didn't do what to anyone else?
6      A.  File communication record against someone
7  when they were reporting illegal activity on the
8  topic of marijuana.
9          MR. BURKE:  Okay.  We're going to take a
10 look at Exhibit 1, which I don't know if they have
11 -- are there any numbers at all on the exhibits,
12 ma'am?
13         THE REPORTER:  I don't believe so,
14 Counsel.
15         MR. BURKE:  Okay.  There should be a
16 document there titled Charge of Discrimination.
17         THE REPORTER:  Okay.  Is that Exhibit 1?
18         MR. BURKE:  Yeah, I'm going to go -- I'm
19 going to mark that as Exhibit 1.
20         (WHEREUPON, Exhibit 1 was marked for
21 identification.)
22         THE REPORTER:  Exhibit 1 marked.  Are you
23 going to present it on the screen, or --
24         MR. BURKE:  If -- if there's a hard copy
25 there, she can just look at that if it's easier for

Page 63
1  --
2          THE REPORTER:  I -- I do not have a hard
3  copy of it.
4          MR. BURKE:  Oh, I'm sorry.  Okay.
5          THE REPORTER:  That's okay, Counsel.  It
6  was just last-minute, so I didn't have --
7          MR. BURKE:  No, I understand.  Oh, okay.
8  I misunderstood.  When you said you have the
9  exhibits, you have electronic copies of them.
10         THE REPORTER:  Yes, Counsel.
11         MR. BURKE:  Got you.  All right.  I'm
12 sorry.
13         THE REPORTER:  That's okay.
14         MR. BURKE:  Yeah, let me --
15         THE DEPONENT:  I can't see that.
16         MR. BURKE:  Are you able to see --
17         THE DEPONENT:  I can't -- I can see -- I
18 recognize that document, but I can't see the
19 writing. That's still really little.
20         MR. BURKE:  Are you able to read that by
21 zooming up like that, ma'am?
22         THE DEPONENT:  Better.
23         MR. BURKE:  Is the --
24         THE DEPONENT:  Still, some of that writing
25 is really tiny.

Page 64
1          MR. BURKE:  Is the -- where -- where is
2  the screen you're looking at?
3          THE REPORTER:  If you want to move it up
4  to her, you can.
5  BY MR. BURKE:
6      Q.  Can you move closer to the screen?
7      A.  I can't.  I'm as close to the table as I
8  can get.
9      Q.  Are you able to read it now, ma'am?
10     A.  Yes.
11     Q.  Okay.  Do you recognize this document that
12 I've marked as Exhibit 1?
13     A.  Yes, I recognize it.
14     Q.  And this is the charge of discrimination
15 that you filed with the EEOC, correct?
16     A.  Correct.
17     Q.  Was that a yes?
18     A.  Correct.  Yes.
19     Q.  Okay.  This is the space where you filled
20 out, you know, the particulars of what you were
21 claiming is discriminatory and retaliatory contact
22 -- conduct, correct?
23     A.  Correct.  This was directly in result to
24 not having had a handbook once I started as a
25 patient care assistant.  This is from -- from having

Page 65
1  been a patient care assistant.  It still relates
2  back to the -- the original communication record
3  because I don't think that it would have escalated
4  that far if there hadn't been a communication
5  record, but the content and the particulars doesn't
6  include the communication record.
7      Q.  So you agree with me, there's no mention
8  whatsoever of the 2020 communication record related
9  to the patient who had a visitor smoking marijuana,
10 correct?
11     A.  Not in the EEOC's charge, no.
12     Q.  You see here, it says, "If additional
13 paper is needed, please attach extra sheets."  Do you
14 see that?
15     A.  Correct.
16     Q.  Why did you choose not to mention anything
17 about the 2020 communication record in your EEOC
18 charge of discrimination?
19     A.  I didn't fill this out.  The person taking
20 my case filled this out.
21     Q.  And did they fill it out from information
22 that you provided to them?
23     A.  Correct.
24     Q.  And did you read it before it was filed?
25     A.  I did, but we were already at the

Page 66
1 deadline, and I think it would have -- and we've
2 already argued this in court. The three-day, they
3 extended the three-day for equitable tolling in this
4 case, but had I -- were to try to change anything,
5 it would have taken even longer, and they may not
6 have recognized it.
7     Q.   Well, you didn't know anything about that
8 at the time you were communicating with the EEOC,
9 correct?
10    A.   Know about what?
11    Q.   The fact that there was equitable tolling
12 that would be applied to the deadline.
13    A.   No, but I knew that that was the deadline
14 then, that it was due.
15    Q.   Okay.
16    A.   I knew I did not have any time to make
17 changes.
18        THE VIDEOGRAPHER:  Counsel, can we take a
19 small break because there is some problem with the
20 audio after the computer was moved closer to her?
21        MR. BURKE:  Sure, let's take a break.
22        THE VIDEOGRAPHER:  Yeah.  Just stand by.
23 The time is 1:54 p.m.  We are going off the record.
24        (WHEREUPON, a recess was taken.)
25        THE VIDEOGRAPHER:  The time is 2:05 p.m.

Page 67
1 We are on the record.
2        THE REPORTER:  Go ahead, Counsel.
3 BY MR. BURKE:
4     Q.   Ms. Weathers, we took a short break.
5 We're back on the record.  Are you ready to
6 continue, ma'am?
7     A.   Yes.
8     Q.   And you understand you're still under
9 oath, correct?
10    A.   Sorry?
11    Q.   I said you understand you're still under
12 oath, correct?
13    A.   Correct.  Yes.
14        MR. BURKE:  Okay.  Let me just --
15 housekeeping.  Do I need to keep sharing documents,
16 or --
17        THE DEPONENT:  I have a computer here in
18 front of me that they have handed off, so I can see
19 the document better now.  There's a second computer
20 here.
21        MR. BURKE:  Yeah.  That's -- that's what
22 I'm asking the videographer.  Do I need to stop
23 sharing?  She just has control of the documents on
24 that screen.  Is that the way it's working now?
25        THE REPORTER:  You can stop sharing,

Page 68
1 Counsel.
2        MR. BURKE:  Okay.
3        THE DEPONENT:  Okay.
4 BY MR. BURKE:
5     Q.   Okay.  So do you have your charge of
6 discrimination pulled up in front of you, ma'am?
7     A.   Yes.
8     Q.   Okay.  There on the bottom left-hand
9 corner, where it says charging party signature, it
10 indicates that you digitally signed the charge
11 discrimination on
12 August 3rd, 2022.
13    A.   Correct.
14    Q.   Did you in fact -- did you in fact
15 digitally sign the charge of discrimination?
16    A.   I think it is probably on or about that
17 date. It's, I would assume, accurate.
18    Q.   But from your memory, you -- you did, in
19 fact, digitally sign the charge.  You're not
20 disputing that --
21    A.   I did -- yes, I did digitally sign.  I
22 can't remember exact --
23    Q.   Okay.
24    A.   -- the exact date.  But I would -- yeah, I
25 think we've argued this already.

Page 69
1     Q.   Well, ma'am I'm not arguing anything.  I'm
2 just having you confirm certain facts, okay?
3     A.   I see it's for 8/3/2022.
4     Q.   Okay.  The box or two above that where it
5 starts, "The particulars are," do you see where I'm
6 looking at?
7     A.   Yes.  And then it has a few examples of
8 the harassment.
9     Q.   We -- we established earlier that all the
10 information that's contained in this box is
11 information that you provided to the EEOC, correct?
12    A.   Correct.
13    Q.   And there's no information about the 2020
14 communication record in here, correct?
15    A.   Correct.
16    Q.   Did you in fact provide information to the
17 EEOC about the 2020 communication record?
18    A.   It's possible that I did, and he may have
19 said that it's not directly relevant.  I know that
20 this, at the time of filing, was more pressing.  I
21 think -- I know I had started looking for an
22 attorney earlier -- closer to that time as well,
23 trying to get help with it, and these things, I
24 think, were -- yeah.
25    Q.   But my -- my question is this: Can you, as

Page 70

1  you're -- as you're sitting here under oath today,
2  can you tell me that you did, in fact, provide the
3  EEOC with information regarding the 2020
4  communication record?
5      A.   I don't recall exactly.  I may have.  It
6  just -- I don't think it was necessary at that time.
7      Q.   Why didn't you think it was necessary at
8  that time?
9      A.   I think that he felt that this was enough.
10     Q.   Why did you think this -- what's -- what's
11 here, this box that says, "The particulars are" --
12     A.   I think --
13     Q.   -- why did you believe that was -- ma'am,
14 hang on.
15     A.   -- it was enough sufficient --
16     Q.   Yep.  Ma'am, you got to let me finish my
17 question before you start answering, okay?  You --
18 you said that, if I understand you correctly, you
19 believe that the information contained in this box
20 was enough.  If you believe the 2020 communication
21 record was discriminatory, why did you choose not to
22 include it in this box?
23     A.   I don't think it was a matter of me
24 choosing not to include it.  I think it was a matter
25 of this is sufficient enough information to file a

Page 71

1  charge.  And I think under the deadline, having only
2  -- what was his name?  I can't remember what his
3  name was, who filed it for me.  It was appointed to
4  him close to the deadline, and we only had a couple
5  of weeks, I think, to get this written up, and I
6  think he felt that this was sufficient for -- for
7  filing the notice and everything.
8      Q.   Okay.  Let's read through this.  Says, "On
9  or about October 4th, 2021, I was discharged from my
10 position as patient care associate."  Did I read that
11 correctly?
12     A.   Right.  And I think that's -- "associate"
13 and "assistant" are similar enough words.  It didn't
14 need to be corrected, but I think Houston Methodist
15 uses the title patient care assistant.
16     Q.   I'm not -- I'm not trying to trip you up
17 on the name of the role.
18     A.   Okay.
19     Q.   I'm just -- but -- but in any event, I
20 read that -- that sentence correctly, correct?
21     A.   "On or about October 4th, 2021, I was
22 discharged from my position as a patient care
23 associate," but yes, you read it correctly.
24     Q.   Okay.  The next sentence says, "I believe
25 my termination is discriminatory based on my race

Page 72

1  (white) and sex (female)."  Did I read that
2  correctly?
3      A.   Correct.
4      Q.   Okay.  Excuse me.  The next sentence
5  reads, "The alleged reason for my termination is
6  performance, which I believe to be pretext to
7  discrimination because my performance first came
8  into question shortly after complaining of
9  harassment."  Did I read that correct?
10     A.   Correctly.
11     Q.   Which complaint of harassment are you
12 referring to here when you say you complained of
13 harassment shortly before a termination?
14     A.   So this is referring to issuing the
15 performance -- Sunila Ali issuing the performance
16 improvement plan.
17     Q.   Okay.  Now, you're not talking about the
18 2020 communication record, correct?
19     A.   When it says "The alleged reason for my
20 termination is performance," yes, I read that as the
21 performance improvement plan leading to termination.
22     Q.   Okay.  The next sentence says, "From April
23 1st, 2021, until my termination, I was harassed by
24 Cameron Shonk, Sharon (last name unknown), Cassie
25 Hall (sic), and Amanda Roning."  Did I read that

Page 73

1  correctly?
2      A.   Correct.  Yes.
3      Q.   Okay.  Again, here, it says, at least
4  reading from your words, the harassment started in
5  April 1st, 2021, correct?
6      A.   Correct.  I reported the harassment to
7  management officials Dante, Sunila, and Mariana
8  Mondragon, during all of August 2021, but was
9  ignored, and the harassment continued.
10     Q.   Objection.  Non-responsive, ma'am.  You
11 said from April -- April 1st, 2021, until your
12 termination, you were harassed by Cameron Shonk,
13 Sharon last name unknown, Cassie Hull, and Amanda
14 Roning, correct?  That's the sentence that you
15 approved of in this EEO -- charge of discrimination,
16 correct?
17     A.   On or about that time frame from when I
18 was hired as a patient care assistant.
19     Q.   April 21st, 2021, would have been prior to
20 your time as a --
21     A.   Right.
22     Q.   -- patient care assistant, correct?  Isn't
23 that correct?
24     A.   Right.  Yeah.  I think on or about.  It's
25 kind of, like, a rough estimate I was relaying to

Page 74

1  him.  But yeah, it would have been closer to May or
2  June.
3      Q.    Did you review this before you digitally
4  signed it?
5      A.    I did review it.  I think April covers May
6  and June, but I do agree that, yeah, it's -- it's
7  earlier --
8      Q.    Okay.
9      A.    -- than my official start date, but it's
10 still accurate in being approximate.
11     Q.    Okay.  "I reported the harassment to
12 management officials Dante Macasaet, Sunila Ali, and
13 Mariana Mondragon during all of August 2021, but I
14 was ignored, and the harassment continued." Did I
15 read that correctly?
16     A.    Yes.
17     Q.    So are you saying that it was August of
18 2021 before you reported any of the harassment that
19 you had --
20     A.    No.
21     Q.    -- allegedly received starting in April
22 1st, 2021?
23     A.    No, but it's inclusive that in August,
24 throughout all of August, I reported.  He did get
25 that accurate.

Page 75

1      Q.    Is August of 2021 when you first reported
2  any alleged discrimination or harassment?
3      A.    No.
4      Q.    When's the first time you reported alleged
5  discrimination or harassment?
6      A.    Believe in June -- June or July.
7      Q.    The next sentence says, "Here are a few
8  examples of the harassment I had been subjected to.
9  I was called 'white trash' by Cameron Shonk.  I was
10 called 'psychotic' and 'gay' by Sharon, and I was
11 subjected to daily bullying from Cassie Hall and
12 Amanda Roning." Did I read that correctly?
13     A.    Correct.  I think that this was, again,
14 his interpretation of what I shared with him, but
15 generally covers --
16     Q.    Well, I -- I'm not interested in what you
17 think might have been his interpretation.  I read
18 that --
19     A.    These are his words that were written for
20 me.
21     Q.    Ma'am.  Ma'am, I'm not asking about what
22 your -- you believe his interpretation is of what
23 you told him.  These are the words that are written
24 in the EEOC charge of discrimination that you signed
25 under oath, correct?

Page 76

1      A.    Correct.
2      Q.    Okay.  Who is Cameron Shonk?
3      A.    A nurse, a student nurse.
4      Q.    Cameron -- male or female?
5      A.    A male student nurse at the time.
6      Q.    Okay.  Cameron Shonk called you what,
7  "white trash"; is that correct?
8      A.    Correct.
9      Q.    Is that correct?
10     A.    Correct.
11     Q.    Did that occur once, or did it occur
12 multiple times?
13     A.    At least once.
14     Q.    Did it occur more than once?
15     A.    I can recall at least once.
16     Q.    And my question is: Did it occur more than
17 once?  As you sit here today under oath, can you
18 testify that it had indeed occurred more than once?
19     A.    I can -- I can honestly say at least once.
20     Q.    I understand you can say at least once.
21 My question is: Can you testify under oath today
22 that it happened more than once?
23     A.    I think it happened --
24     Q.    And that's either yes --
25     A.    I think it happened more than once.  I

Page 77

1  can't remember all the names I was called by
2  everyone every single day, but I know that it
3  happened at least once. I can't remember all the
4  names I was called and if it was always white --
5  white trash that he was calling me, but I know he
6  called me names and made me feel really
7  uncomfortable.
8      Q.    So is it your testimony --
9      A.    He would get very belligerent.
10     Q.    Did you say he was very belittling?
11     A.    Yes.
12     Q.    Is it your testimony that Cameron Shonk
13 called you names other than white trash? Ma'am?
14     A.    I can't remember all the names.
15     Q.    Okay.  Can you -- can you sit here today
16 under oath and testify that he called you names
17 other than white trash? I'm not asking if you
18 remember them all. I'm asking if you can tell --
19     A.    Not at this time.
20     Q.    I'm sorry?
21     A.    Not at this time.
22     Q.    Okay.  And you can't tell me whether he
23 called you white trash more than once, correct?
24     A.    Not at this time.
25     Q.    Okay.  What race is Cameron Shonk?

Page 78

1    A.   I believe he's white.  I think it's -- in
2  the Bates somewhere would have that more accurately.
3    Q.   Looks like you can't remember Sharon's
4  last name.  What -- do you recall what job title or
5  role Sharon held?
6    A.   She was a nurse.
7    Q.   You report here that Sharon called you
8  psychotic and gay.  Did I read that correctly?
9    A.   Yes.  And there's documentation of her
10  using those words or using the word "crazy."
11    Q.   Did Sharon call you psychotic on more than
12  one occasion?
13    A.   Yes.
14    Q.   How many times?
15    A.   At least two.
16    Q.   More than two?
17    A.   I don't know.
18    Q.   Or -- okay.  Did Sharon call you gay more
19  than once or once?
20    A.   At least once.
21    Q.   I understand it's at least once.  My
22  question is: Can you testify under oath today that
23  she called you gay more than once?
24    A.   I think she used -- when I reported her
25  inappropriately touching me, I think it was

Page 79

1  suggested without using the words.
2    Q.   I -- I don't see anything in this charge
3  about Sharon touching you.  Do you see anything
4  about Sharon touching you?
5    A.   Not in the charge of discrimination, no.
6  A few of the examples, they added, but they did not
7  include everything.
8    Q.   How many times did you report Cameron
9  Shonk for calling you white trash?
10    A.   I didn't report him on paper, but I talked
11  about it when I was in interviews with Mariana
12  Mondragon and Sunila Ali.
13    Q.   Was this in August of 2021?
14    A.   This is when Sunila Ali returned from her
15  vacation.
16    Q.   Prior to that meeting, you had not
17  reported Cameron Shonk for calling you white trash?
18    A.   I hadn't.  I talked about it in person.
19    Q.   Sorry, did you say you had or hadn't?
20    A.   Had not.
21    Q.   Okay.  Prior to this meeting you had with
22  Ms. Mondragon and Ms. Ali in August of 2021 or
23  whenever it was that she came back from vacation,
24  had you reported Mr. Shonk for calling you any
25  names?

Page 80

1    A.   He was so loud and so belligerent,
2  everyone already knew.  And I didn't feel
3  comfortable reporting it because I didn't understand
4  why nobody else was reporting it.  I felt
5  uncomfortable.
6    Q.   So the answer is no, you did not report
7  him for calling you any names, correct?
8    A.   I didn't.
9    Q.   Okay.  How many times, if any, did you
10  report Sharon for calling you psychotic?
11    A.   I reported her after the last incident, my
12  last shift before I came in on the date that I was
13  terminated.
14    Q.   Okay.  So on October 3rd, you reported
15  Sharon?
16    A.   No, October 3rd would have been a Sunday.
17  I believe I came in -- October 4th was a Monday, so
18  it would have been either a Thursday or a Friday
19  prior.
20    Q.   Okay.
21    A.   Approximately.
22    Q.   So that's -- that's the first time that
23  you reported Sharon at all?
24    A.   No.  The first time I reported Sharon was
25  when she touched me inappropriately.

Page 81

1    Q.   Okay.  We'll get back to that.  Was the
2  Thursday or Friday before you were terminated the
3  first time that you reported Sharon for calling you
4  names at all, any names at all?
5    A.   Not any names, just that incident where I
6  felt uncomfortable.
7    Q.   The psychotic incident?
8    A.   The psychotic incident I reported, I
9  believe, the same day.
10    Q.   The same day as what?
11    A.   As it happened, before I came in on
12  Monday.
13    Q.   Well -- okay.  And did it happen more than
14  once or just once that you can recall?
15    A.   More than once because she used the same
16  term when she was talking about me when she was with
17  Mariana and Sunila Ali to discuss my reports or in
18  their interviews.
19    Q.   How many times, if any, did you report
20  Sharon for calling you gay?
21    A.   I filed a report about when she touched me
22  inappropriately, and it was suggested, and then I
23  reported her again.  I -- sorry, asked and answered.
24  I'm saying the same thing over again.  Both of those
25  reports are in the Bates.

CAITLIN WEATHERS

Page 82

1    Q.   Well, my question is: You keep talking
2  about that you reported her for touching you
3  inappropriately. My question had nothing to do with
4  touching you. My question was reading from your
5  charge that she called you "gay." And so my question
6  is --
7     A.   She did.
8     Q.   -- how many -- ma'am, you got to let me
9  finish before you start talking, okay? My question
10 is: How many times, if any, did you report Sharon
11 for calling you gay?
12    A.   Can you repeat the question?
13    Q.   Sure.  I'm reading from your charge that
14 Sharon called you gay. How many times, if any, did
15 you report to someone that Sharon called you gay?
16    A.   I reported Sharon at least twice.
17    Q.   To whom?
18    A.   I can't remember exactly who I reported it
19 to. It was either Sunila Ali or to Human Resources.
20    Q.   And this -- these -- at least twice,
21 you're talking about, specifically for her calling
22 you gay?
23    A.   Yes.
24    Q.   Okay. How many times, if any, did you
25 report Sharon for touching you inappropriately?

Page 83

1     A.   Once.
2     Q.   When was that report?
3     A.   I don't have the exact date off the top of
4  my head. It would have been within the first -- the
5  beginning half, I would assume, of the three months
6  that I was there as a patient care assistant.
7     Q.   Was this report in writing or verbally?
8     A.   Writing.
9     Q.   And do you remember to whom you made this
10 written report?
11    A.   Asked and answered.
12    Q.   And I'm asking again.  Do you remember to
13 whom you made this report?
14    A.   Either Sunila Ali or Human Resources.
15    Q.   You can't tell which -- either one. It
16 was just one or the other?
17    A.   I don't recall exactly. I know I filed
18 the report. I know there's documentation of it in
19 the Bates. I can't remember exactly who it was. It
20 could have been Dante, but I believe it was either
21 Sunila or Human Resources.
22    Q.   Okay. After the passage about Sharon, you
23 say, "I was subjected to daily bullying from Cassie
24 Hall and Amanda Roning." Did I read that correctly?
25    A.   Correct.

Page 84

1     Q.   Who is Cassie Hull?
2     A.   A nurse.
3     Q.   Cassie's female, I take it?
4     A.   Correct.
5     Q.   What race is Cassie Hull?
6     A.   I'm not sure. I believe that's also in
7  the Bates.
8     Q.   I'm asking if you know what her race is.
9     A.   I believe she was white.
10    Q.   Okay. How did Cassie Hull bully you?
11    A.   By filing -- she filed a performance
12 report about me on grounds that were fabricated.
13    Q.   Okay. Any other instances of Cassie Hull
14 bullying you, other than this report that you
15 mentioned?
16    A.   Not that I can think of.
17    Q.   And you believe Cassie Hull made this
18 report about you because you're female?
19    A.   In part. I think it was because of me
20 being a white female.
21    Q.   So you think that Cassie Hull, a white
22 female, made a report about you, because you're a
23 white female?
24    A.   I think it was a motivating factor, yes.
25    Q.   Other than your personal belief, what

Page 85

1  evidence do you have that Cassie Hull made this
2  report about you because you're a white female?
3     A.   Because she didn't base it off of company
4  policies or unit-specific requirements.
5     Q.   Well, why does that make it because of
6  your race and/or gender?
7     A.   Nobody else in my job role was subjected
8  to the same treatment.
9     Q.   And -- and you -- okay. Specific to
10 Cassie Hull, the treatment you're talking about is
11 her issuing or making this report?
12    A.   Correct.
13    Q.   Who did she make this report to, if you
14 know?
15    A.   I can't recall, but I believe it was
16 likely Sunila Ali.
17    Q.   Okay. Amanda Roning, how did Amanda
18 Roning bully you?
19    A.   Same -- setting -- filing reports about me
20 that were not based on verifiable, unit-specific
21 requirements for the unit or objective -- objective
22 information that was required of me or not required
23 of me.
24    Q.   I -- I think you used plural reports. Is
25 it one report or more than one report that you say

Page 86

1  was bullying behavior?
2      A.   At least one report.
3      Q.   Ma'am, I understand many times you know
4  where I'm going with my question, but you got to let
5  me finish talking before you start answering, all
6  right? So let me make sure we have the record clean.
7  I believe you used plural reports, but I want to
8  clarify. Are you saying Amanda Roning filed more
9  than one report that you consider to be bullying?
10     A.   No.
11     Q.   Okay. So it was one report; is that
12 correct?
13     A.   Correct.
14     Q.   Okay. Other than this one report that
15 Amanda Roning made about you, any other instances of
16 Amanda Roning bullying you?
17     A.   Not that I can think of right now.
18     Q.   Amanda Roning is female, correct?
19     A.   Correct.
20     Q.   Do you know what race Amanda Roning is?
21     A.   I believe she's also white.
22     Q.   Okay. Do you believe the report that
23 Amanda Roning made you was based on your gender?
24     A.   I believe it was based on being a white,
25 non-Hispanic female.

Page 87

1      Q.   Other than your personal belief, do you
2  have any evidence that Amanda Roning reported you
3  because you're a white, non-Hispanic female?
4      A.   There was no objective reason for her
5  basis.
6      Q.   Not sure I understand what you mean by
7  that.
8      A.   There was no verifiable, objective reason
9  for the basis of why she would have subjected me to
10 that, as opposed to any of the other PCAs. Why was
11 it only me, as the only non-Hispanic, white female
12 in my job role, to be subjected to standards not
13 officially set in any kind of a record?
14     Q.   Hang on a second. Let me turn this light
15 on. My apologies. What --
16     A.   Why was allowed or not allowed --
17     Q.   What standards are you talking about?
18     A.   I -- yes, I do believe that it was because
19 I was white and non -- a non-Hispanic, white female
20 that she filed these reports about me.
21     Q.   Is Amanda Roning a non-Hispanic, white
22 female?
23     A.   No.
24     Q.   Is she Hispanic?
25     A.   No, she's a non-Hispanic, white female.

Page 88

1      Q.   What -- what standards are you talking
2  about that she applied to you that you think she did
3  not apply to others?
4      A.   I think she fabricated what she said. She
5  said that I was doing things like giving a patient
6  on a BiPAP ice chips, but I didn't. I couldn't
7  have. There was a respiratory care therapist there
8  who would have known if I had done that and would
9  have been able to do that for them.
10           And I wasn't able to even, like, hardly
11 touch the face mask without it beeping and
12 respiratory care having to come over to take care of
13 the patient. I did nothing else but, like, touch
14 Velcro, like, a tiny bit of Velcro after the
15 respiratory care therapist said you can help him,
16 you can -- you know, I couldn't. I didn't alter his
17 care plan or his treatment in any way.
18     Q.   Okay. Next sentence says, "On or about
19 August 23rd, 2021, I finally met with Sunila Ali and
20 Mariana Mondragon about the issue for the first
21 time." Did I read that correctly?
22     A.   Correct.
23     Q.   It says "the issue." What issue are you
24 talking about?
25     A.   Repeat.

Page 89

1      Q.   I'm sorry?
2      A.   Repeat.
3      Q.   The sentence that we just read said, "On
4  or about August 23rd, 2021, I finally met with
5  Sunila Ali and Mariana Mondragon about the issue for
6  the first time."
7      A.   Correct.
8      Q.   What is the issue you're referring to?
9      A.   The issues that I had been reporting about
10 feeling like I was being harassed on the unit. He
11 might have been referring to the issue of not having
12 a handbook because I did tell him that they don't
13 have a handbook, but I don't think that he included
14 that in this report either.
15     Q.   Explain to me what you mean by "they don't
16 have a handbook." What are you talking about?
17     A.   When I was hired as a patient care
18 assistant at the hiring event by Sunila Ali, there
19 was an HR manager there facilitating it. And she
20 sent me a document saying congratulations. Sunila
21 Ali is bringing you on board. She will provide you
22 with commitment expectations.
23           And so after I received that, I messaged
24 Sunila Ali, will you be providing me everything that
25 I need when I come onto the unit, while I was still

Page 90
1  a patient transporter, because that was what was
2  suggested to me by Sunila Ali -- by, sorry,
3  Shakindra Gonzales, that I communicate to make sure
4  everything goes smoothly to Sunila and make sure
5  that I get everything that I needed.  She said that
6  I would, "she" being Sunila Ali, that they would
7  give me everything.
8           But once I came onto the unit, she just --
9  her only directions to me were to proceed with on-
10 the-job training.  She never gave me any kind of
11 unit-specific requirements as far as what was
12 written in the job description.  She didn't give me
13 any work commitment expectations that was in the on-
14 boarding sheet that I received from HR.  The only
15 kind of expectations I received were in the
16 performance improvement plan, which is not the same
17 thing.
18      Q.   Let me make sure I capture everything you
19 think Sunila Ali promised to give you that you did
20 not get, okay?  You said unit-specific requirements.
21 You also said work commitment expectations, correct?
22      A.   Right.
23      Q.   Anything else that you believe you should
24 have gotten from Sunila Ali that you did not
25 receive?

Page 91
1       A.   Just anything that I would have needed for
2  the unit and that would have been in some kind of a
3  guide or handbook or sheet, even, if -- even if it
4  was just, like, a sheet of these are going to be
5  your expectations in your new role here, and I
6  didn't get anything.
7       Q.   You got a job description, didn't you?
8       A.   I have the job description, and she
9  referred to the job description, but in the job
10 description, it says that the manager will provide
11 unit-specific requirements, and I never received
12 those.
13      Q.   Did it say written requirements?
14      A.   It did.  Yes, it did.
15      Q.   Okay.  So we've got unit-specific
16 requirements, work commitment expectations,
17 handbook, guide, or sheet.
18      A.   Of any --
19      Q.   Is there anything else --
20      A.   No, not that I can think of.
21      Q.   You got to let me -- okay.  And I believe
22 you're telling me you were not -- well, strike that.
23           Do you -- as part of this lawsuit, are you
24 saying that you were not provided those things
25 because Sunila Ali was discriminating against you?

Page 92
1       A.   Repeat.
2       Q.   These five things that we just listed --
3  the unit-specific requirements, the work commitment
4  expectations, a handbook or some sort of guide or
5  sheet -- do you -- are you alleging in your lawsuit
6  that Sunila Ali failed to give you these things out
7  of discriminatory intent?
8       A.   Yes.
9       Q.   Okay.  Because of your gender?
10      A.   Because of my combined race and gender,
11 being a non-Hispanic, white, Caucasian female.
12      Q.   Do you know of -- strike that.
13           If -- if I use the acronym "PCA," we know
14 what you're talking about, correct?
15      A.   Yes.
16      Q.   The position you held under Sunila Ali?
17      A.   Correct.
18      Q.   Do you know of any PCAs under Sunila Ali
19 who received unit-specific requirements in writing?
20      A.   No, but according to the accrediting
21 agency, across all other teams, they're provided.
22      Q.   Object as non-responsive after "no."  Do
23 you know any PCAs who worked under Sunila Ali who
24 received work commitment expectations that you did
25 not receive?

Page 93
1       A.   I wouldn't -- I'd -- I -- I don't know.
2       Q.   Okay.  Were these supposed to be in
3  writing?
4       A.   Sorry?
5       Q.   The work commitment expectations, were
6  those supposed to be in writing?
7       A.   Yes.
8       Q.   Okay.  The handbook, do you know of any
9  other PCAs who worked under Sunila Ali who received
10 a handbook that you didn't receive?
11      A.   I don't know.
12      Q.   Is that a no?
13      A.   I don't know.
14      Q.   Okay.  Can you identify any PCAs who
15 worked under Sunila Ali who received a guide that
16 you did not receive?
17      A.   I know that according to Det Norske
18 Veritas, Houston Methodist's accrediting agency,
19 supervisors such as Sunila Ali in her role as a
20 supervisor of the Neurosurgical Intensive Care Unit
21 are required to provide written instructions that
22 can be -- such as a guide or a handbook.
23      Q.   Objection.  Non-responsive.  My question
24 is: Ma'am, while we were talking --
25      A.   Excuse me, I didn't hear you.

Page 94

1     Q.   Ma'am, you got to let me finish my
2  question, okay?  My question is --
3     A.   Did you make an objection?  My -- sorry, I
4  have to ask, did you make an objection to my
5  response, and if so, can you please speak clearly so
6  I can hear what objection you just raised?
7     Q.   I said objection, non-responsive.
8     A.   You said --
9     Q.   And now I'm moving on to my next question.
10 Can you identify a PCA who worked under Sunila Ali
11 that received a guide that you did not receive?
12    A.   Leading.
13    Q.   I'm sorry?
14    A.   Objection.  Leading.
15    Q.   I'm allowed to lead you, and you can
16 answer anyway.  Ma'am, can you identify a single PCA
17 who worked under Sunila Ali who received a guide
18 that you did not receive?
19    A.   Asked and answered.
20    Q.   You haven't answered.
21    A.   Objection.  Asked and answered.
22    Q.   You have not answered the question, ma'am.
23 Can you identify a single PCA who received a guide
24 who worked under Sunila Ali that you did not
25 receive?

Page 95

1     A.   Objection.  Asked and answered.
2     Q.   Are you refusing to answer the question,
3  ma'am?
4     A.   No.  I answered the question.
5     Q.   What was your answer?
6     A.   My answer is it is her job role to provide
7  those to her employees.  I have not seen that in the
8  Bates.  That has not been provided to me in the
9  Bates through Houston Methodist, so I don't know if
10 I can provide you a better answer than that.
11    Q.   Well, that's why I objected as non-
12 responsive because I didn't ask you about what --
13    A.   I am responding.
14    Q.   -- what requirements Sunila Ali --
15    A.   I would assume that, yes --
16    Q.   Ma'am.  Ma'am.
17    A.   -- that she does because that's her --
18    Q.   Ma'am.
19    A.   -- her job expectation.
20    Q.   Ma'am.  Ma'am, you cannot interrupt me
21 while I'm asking a question.  Please don't do that.
22 My question didn't have anything to do with what you
23 think Sunila Ali is required to do in her role as a
24 supervisor.  My question is:  Can you identify a
25 single PCA who worked under Sunila Ali who received

Page 96

1  a guide that you did not receive?
2     A.   My response is --
3     Q.   That's yes or no.
4     A.   -- I did not receive one.  But it -- I
5  know that it is her job role, according to the
6  accrediting agency, that, yes, I would assume that
7  they have, but I can't speak on behalf of people who
8  are not here at this table.  So the question is
9  objected to, leading.
10    Q.   Objection.  Non-responsive.  Ma'am, yes or
11 no?  As you sit here today under oath, can you
12 identify a single PCA who worked under Sunila Ali
13 who received a written guide that you did not
14 receive?
15    A.   Leading.  I don't know if it necessarily
16 has to be a written guide.  I object to the question
17 in form.  I can't answer it.
18    Q.   Are you refusing to give me a yes-or-no
19 answer to my question?
20    A.   I'm objecting to it.
21    Q.   And objecting does not absolve you of the
22 duty to answer the question.  So my question is:  Are
23 you refusing to answer my question --
24    A.   I --
25    Q.   -- yes or no --

Page 97

1     A.   It's to --
2     Q.   -- on the basis of an objection you've
3  asserted?
4     A.   To the best of my knowledge, I've answered
5  the question.
6     Q.   Ma'am, again, you have to wait until I
7  finish my question before you start to answer, okay?
8  The court reporter can't take down two people
9  talking at the same time.  So I'm asking, are you
10 refusing to answer, yes or no --
11    A.   No.
12    Q.   -- whether you can identify -- ma'am, you
13 need to let me finish talking before you answer
14 because I can't hear you, and the court reporter
15 can't take it down, okay?  Let me finish my
16 question, and then you can provide your answer.
17         I've asked you if you can identify a
18 single PCA who received any guide from Sunila Ali
19 that you did not receive.  You've objected to it.
20 And my question is:  Are you refusing to answer my
21 question based on an objection?
22    A.   Yes.
23    Q.   Which objection are you asserting that
24 you're refusing to answer that question?
25    A.   Form and leading and asked and answered,

Page 98

1 and argumentative.

2      Q.   Okay.  The fifth thing that you mentioned
3 was some sort of sheet.  Are you aware of any PCA --
4 can you identify a single PCA, who worked for Sunila
5 Ali, who received a sheet that you did not receive?

6      A.   Same objections.  Object to the form of
7 the question.  Object on the basis that it's
8 leading.  Object that it's argumentative.

9      Q.   What's wrong with the form of the
10 question?

11     A.   (No audible response.)

12     Q.   Do you know?

13     A.   (No audible response.)

14     Q.   Do you know what's wrong with the form of
15 the question, ma'am?

16     A.   (No audible response.)

17     Q.   Are you just refusing to answer me now?

18     A.   No, I'm not refusing to answer you.  I'm
19 allowed to pause and think.  In Sunila Ali's
20 statement, she says that none exists.  I don't know
21 if that meant that she's just saying doesn't exist
22 because she didn't want to give me any kind of a
23 written instruction, but in fact, that is the
24 requirement for her job role.

25     Q.   Objection.  Non-responsive.  Again, I'm

Page 99

1 not asking you anything Sunila Ali said or anything
2 that's required of her job.  You said that not
3 giving you a sheet was an example of Sunila Ali
4 discriminating against you.

5      A.   Yes.

6      Q.   And so I want to know -- okay, we've
7 established that.  So I want to know if you can
8 identify a single PCA who worked under Sunila Ali
9 who received a sheet that you did not receive.

10     A.   I don't know.

11     Q.   Okay.  Ma'am, I'm going to give you
12 another chance to answer the --

13     A.   You wouldn't accept my objections.  I
14 objected to the question, but you wouldn't accept my
15 objection, so the only thing I can say is I don't
16 know.  I don't feel like that's fair.  I object
17 based on form, based on the fact that it's
18 argumentative, based on the fact that it was asked
19 and answered, and based on the fact that it was
20 leading.

21     Q.   Object as non-responsive to everything
22 after "I don't know."  I'm going to give you another
23 chance to --

24     A.   You can accept the "I don't know," so we
25 can move on.

Page 100

1      Q.   I'm going to give you another chance to
2 answer my previous question instead of refusing to
3 answer on the basis of an objection --

4      A.   I'm not refusing to answer.  I'm answering
5 the only thing that you'll accept.  I don't know.

6      Q.   Ma'am --

7      A.   I was -- what I was told --

8      Q.   Ma'am --

9      A.   -- when I asked was just --

10     Q.   Ms. Weathers --

11     A.   -- it doesn't exist, but it doesn't seem
12 plausible.

13     Q.   -- don't argue with me when I'm trying to
14 answer your question.  I'm trying to --

15     A.   And Houston Methodist won't cooperate with
16 me.

17          THE REPORTER:  Counsel, I can't make an
18 accurate transcript.

19          MR. BURKE:  I understand, ma'am.

20 BY MR. BURKE:

21     Q.   You cannot interrupt me when I'm asking a
22 question.  She's got to take down what everyone
23 says.  When you try --

24     A.   You need to allow me to finish answering
25 your question.

Page 101

1      Q.   Ms. Weathers, when I am talking, don't
2 talk over me, okay?  That's one of the rules of the
3 deposition that you agreed to earlier.  So when I'm
4 talking, don't talk over me, all right?

5      A.   It was intended to be mutual.

6      Q.   I asked you earlier if you can identify a
7 single PCA who worked under Sunila Ali who did not
8 receive a guide -- or, excuse me, that received a
9 guide that you did not receive.  As far as I know,
10 you refused to answer that question on the basis of
11 objections; is that correct?  Am I correct, or are
12 you going to provide the answer to that question?

13     A.   I don't think it's correct because I don't
14 think it can be confirmed as true or not.  I don't
15 -- I -- I don't --

16     Q.   That's what I'm asking you.

17     A.   I'm not a trained -- I -- I think that the
18 correct objection would be under material, but I
19 can't remember.  I'm not -- I'm not an attorney.  I
20 don't -- I just don't think that that's an
21 appropriate question to ask.

22     Q.   Ma'am, you're the one that told me that
23 refusing to give you a guide is one of the ways that
24 Sunila Ali discriminated against you.  That was your
25 testimony.

Page 102

1      A.   Yes.
2      Q.   And so -- and so my question is: Yes or
3 no? Can you identify a single PCA who -- who worked
4 under Sunila Ali who received a guide that you did
5 not receive; yes or no?
6      A.   I don't know.
7      Q.   Okay.
8      A.   It's not your turn.  You accept I don't
9 know.
10     Q.   All right.  Let's look at what's marked as
11 Exhibit 2.
12            (WHEREUPON, Exhibit 2 was marked for
13 identification.)
14            THE REPORTER:  Exhibit 2 marked.
15 BY MR. BURKE:
16     Q.   That is a copy of -- well, do you have
17 Exhibit 2 pulled up, ma'am?
18     A.   Work -- it kicked me out.  I clicked on --
19 I clicked on it, and it kicked me out.  It needs
20 someone to log in for them.  I -- I don't have a
21 log-in account.
22     Q.   Okay.  Actually, let's get back to Exhibit
23 1, just for one more question real quick.  Let me
24 know when you have that pulled up, ma'am.
25     A.   Okay.  It's open.

Page 103

1      Q.   Are you looking at Exhibit 1 again, ma'am?
2      A.   No, Exhibit 2.
3      Q.   Okay.  I want to go back to Exhibit 1 for
4 just a second.
5      A.   Okay, back in Exhibit 1.
6      Q.   Okay.  Looking back to the -- the section
7 of the charge where you described the particulars,
8 you'd agree with me there's no mention of hostile
9 work environment in there; is that correct?
10     A.   This is intended to be a few examples of
11 what I had been experiencing, not entirely.  That --
12 that is what was relayed to me from the person that
13 I spoke to. I can't remember what his -- I think it
14 was Rafael, to just fulfill an initial charge.
15     Q.   Okay.  I -- I'm going to object as non-
16 responsive.  My question was: You would agree with
17 me, there is no reference whatsoever in this section
18 to a hostile work environment, correct?
19     A.   He doesn't use specifically those words.
20     Q.   And -- and you didn't either, correct,
21 because you signed this under oath?
22     A.   It's -- I don't see those specific words
23 used in here.
24            MR. BURKE:  Okay.  Why don't we take a
25 short break before we move on to Exhibit 2?

Page 104

1            THE REPORTER:  Please stand by.
2            THE VIDEOGRAPHER:  Okay.  The time is 2:57
3 p.m.  We are going off the record.
4            (WHEREUPON, a recess was taken.)
5            THE REPORTER:  Okay.  The time is 3:11
6 p.m. We are on the record.
7 BY MR. BURKE:
8      Q.   Ms. Weathers, we took a break off the
9 record. We're back on the record.  Are you ready to
10 continue, ma'am?
11     A.   Ready to continue.
12     Q.   And you understand you're still under
13 oath, correct?
14     A.   Correct.
15     Q.   Okay.
16            THE REPORTER:  Can you just speak up a
17 little bit, please?
18 BY MR. BURKE:
19     Q.   Ma'am -- okay, if you would, please pull
20 up Exhibit 2, ma'am.
21     A.   Exhibit 2 is open.
22     Q.   Can you identify for me what Exhibit 2 is?
23     A.   Me, myself, as the pro se plaintiff, my
24 second amended complaint.
25     Q.   Okay.  This is -- this is the second

Page 105

1 amended complaint you filed in this case on October
2 26th of this year, correct?
3      A.   Correct.  Yes.
4      Q.   Is that correct?  Okay.  Did you draft
5 this alone, or did you have help drafting this?
6      A.   I wrote this.
7      Q.   Okay.  I want to turn to Page 2.  If you
8 look roughly halfway down, under the heading Factual
9 Allegations, do you see where I am?
10     A.   Yes.
11     Q.   The second sentence of that section, it
12 says, "Throughout the duration of her employment at
13 Houston Methodist Hospital, Plaintiff was subjected
14 to ongoing race-based derogatory comments by her
15 colleagues." Did I read that correctly?
16     A.   Yes.
17     Q.   It says here throughout the duration of
18 your employment.  Is -- is that the case?  Were you
19 subjected to race-based comments throughout the
20 entirety of your employment?
21     A.   I -- it's an inclusive statement.  I was
22 not called names that I can recall or that I
23 documented within my first few months, but it --
24 it's not specific to just any one person or one
25 event.

Page 106
1    Q.    I understand that.  I'm talking about the
2  phrase "throughout the duration of your employment."
3  Is it your -- are you testifying here today that you
4  were subjected to ongoing race-based derogatory
5  comments from your colleagues during the entirety of
6  your employment?
7      A.    Not on Day 1 to the last day, but
8  ongoingly throughout my employment, not just the
9  last months.
10   Q.    Including time when you were a patient
11 transporter?
12     A.    Not as pervasively.  It was easier and not
13 as personal to -- it's not as personal, so it was
14 easier to not have it directly affect me quite as
15 much, but yes, yeah, it happened.  I didn't feel the
16 need to have to report it because I didn't feel like
17 anyone was directly trying to harm me in such a way
18 that they -- that I feel that they were when I was a
19 patient care assistant, but yes.
20     Q.    Okay.  So it may have happened prior to
21 the time you were a PCA, but you didn't feel the
22 need to report it; is that correct?
23     A.    Correct.
24     Q.    Okay.  The next sentence says, "In pursuit
25 of diversity goals, management and HR at Houston

Page 107
1  Methodist Hospital prioritized training, hiring, and
2  promoting minority candidates over equally or
3  better-qualified white candidates and ignored
4  Weathers' complaints."  Did I read that correctly?
5      A.    Right.  I had asked on multiple occasions,
6  could you please sign me up for certain trainings
7  that I -- that, oh, this is only for certain foreign
8  groups, or this is -- you know, Sunila had said that
9  this is -- that she just wants me to focus on my on-
10 the-job training.  She didn't want me to get the
11 formal training that Houston Methodist offers.
12     Q.    Okay.  Is part of your discrimination
13 claims against Houston Methodist that they failed to
14 provide you training?
15     A.    Right.  Once I was a PCA, I had requested
16 training with -- from Sunila Ali, and she refused
17 me.
18     Q.    Okay.  Specifically, what training are you
19 talking about?
20     A.    More advanced patient care assistant
21 training to perform tasks that I had asked the other
22 patient care assistants, have you received this
23 training?  Are you performing these tasks?  And they
24 said that they hadn't received the training and that
25 they hadn't been signed off on it, but they were

Page 108
1  performing the tasks.
2          And so I had asked if I could just get the
3  training so that, you know, I can do what they were
4  doing.  She said I could -- on Day 1, I can do
5  whatever my trainers were doing.  And I didn't know
6  if that was really true or accurate, and so I
7  thought that I could at least have the
8  certifications for myself, but wasn't allowed.
9      Q.    So let me see if I understand your
10 testimony.  You talked about PCA-specific training
11 with other PCAs and asked if they'd received the
12 training.
13     A.    Right.
14     Q.    And they told you, no, they had not
15 received the training.
16     A.    They said, no, that they hadn't, but I
17 know for a fact that they were performing those
18 skills.
19     Q.    Did you -- with regard to training, did
20 you speak to a single PCA that told you they had, in
21 fact, had the training?
22     A.    Not that I can recall.
23     Q.    Okay.  Hiring, are you claiming that you
24 were not hired for a specific role or position as a
25 part of this lawsuit?

Page 109
1      A.    My goal there was to become a nurse, but I
2  had not been refused for a job that I had applied
3  for.  I was hired.  Sunila Ali did hire me.
4      Q.    Did you apply for the PCA position?
5      A.    I did, yes.
6      Q.    And -- and you were hired for the PCA
7  position, correct?
8      A.    Yes.
9      Q.    And Sunila Ali is the one who hired you
10 for the PCA position, correct?
11     A.    Right.
12     Q.    Okay.  Were there any jobs that you
13 applied for that you did not get that you are
14 claiming is a part of discrimination or retaliation
15 on the part of Houston Methodist in this lawsuit?
16     A.    As part of my nursing program, Houston
17 Methodist Hospital was -- I'm trying to answer your
18 question.  No -- yes and no.  My -- because my goal
19 there was to apply for a nursing physician, I was
20 prevented from being able to do that because of the
21 termination, and they're an affiliate.  The
22 clinicals would have been there.
23     Q.    But you never actually applied for a
24 nursing position, and you didn't get it, correct?
25     A.    Correct.

Page 110
1    Q.    Okay.  Then it says "promoting minority
2  candidates."  Was there a promotion that you did not
3  get that you claim was discriminatory or retaliatory
4  by Houston Methodist as a part of this lawsuit?
5       A.    There was another co-worker that was hired
6  around the same time as me, who was outside of my
7  race, that I know did get hired to come on as a
8  nurse there.
9       Q.    Was that -- all right, strike that.
10           Who -- who are you talking about?
11      A.    Her name is Jordan.
12      Q.    Do you know what Jordan's last name is?
13      A.    I can't remember right now.  I think it
14  might have been Jones, but I'm not sure.
15      Q.    And you -- you referred to her as a her,
16  so she's female?
17      A.    Correct.
18      Q.    Do you remember what race Jordan is?
19      A.    African American.
20      Q.    And it's your testimony that she received
21  a promotion to a nursing role?
22      A.    She, right, became a nurse there.
23      Q.    Is that a job that she applied for?
24      A.    I would assume so, yes.
25      Q.    And you're not alleging, part of this

Page 111
1  lawsuit, that you applied for a position, and
2  Houston Methodist hired Jordan instead of you,
3  correct?
4       A.    I didn't apply for a nursing role, so
5  that's not exact -- the exact claim that I'm making,
6  but I think it's discriminatory in not being able to
7  complete my nursing program.
8       Q.    Well, are -- are there any promotions that
9  you thought you should have gotten while you were at
10  Houston Methodist that you didn't get that you claim
11  was discriminatory or retaliatory upon Houston
12  Methodist's part?
13      A.    I think, yes, it was discriminatory that I
14  was not able to complete the PCA trainings that I
15  had requested.
16      Q.    Well, that's going back to training.  I'm
17  asking about promotions, okay?
18      A.    Which would lead to direct promotions or
19  -- there are tiers.
20      Q.    What -- what's your evidence that if you
21  had gotten PCA training, you would have been
22  promoted?
23      A.    By being provided advanced training,
24  directly relates to the clinical skills in the
25  nursing role --

Page 112
1       Q.    And --
2       A.    -- required to perform nursing skills in
3  nursing school.
4       Q.    Was Jordan a PCA before she became a
5  nurse?
6       A.    Yes.
7       Q.    And you already told me that you don't
8  know of any PCAs who got the training -- the
9  training you're talking about, right?
10      A.    I don't know.
11      Q.    So as far as you know, Jordan didn't get
12  any PCA advanced training, and she was promoted to
13  nurse, correct?
14      A.    I don't know.
15      Q.    All right.  Go down to the bottom of that
16  page.  It's the last half sentence on that page.  It
17  goes to Page 3.  It says, "Plaintiff was denied
18  access to role-specific job training" --
19      A.    Yes.
20      Q.    -- "team meetings, and unit-specific
21  requirements as outlined in the job description for
22  her role as patient care assistant under the
23  supervision of Sunila Ali."  Did I read that
24  correctly?
25      A.    Correct.

Page 113
1       Q.    Okay.  Role-specific job training, is that
2  anything different than the PCA advanced training we
3  talked about?
4       A.    No.
5       Q.    So that's the same thing?
6       A.    Yes.
7       Q.    What team meetings were you excluded from
8  that you claim were discriminatory or retaliatory as
9  part of this lawsuit?
10      A.    They just kept canceling the team meetings
11  or telling -- sending me notifications that they
12  were canceling the meetings, but I'm not sure if
13  they were still conducting them without me.  It
14  seemed that way in how they were implementing
15  policies.  But, right, they just kept canceling.
16      Q.    So there -- okay.  What meetings are you
17  talking about?  What kind of meetings are you
18  talking about?
19      A.    PCA team meetings.
20      Q.    Okay.  So PCA team meetings, would those
21  be attended by you and the other PCAs?
22      A.    Uh-huh.
23           THE REPORTER:  Was that a yes?
24  BY MR. BURKE:
25      Q.    Was that a yes?

Page 114

1    A.    Yes.  Yes.  Yes.  Yes.  Sorry.  I said it
2  uh-huh.  Thank you.
3    Q.    And it's your testimony that these PCA
4  team meetings kept getting canceled.
5    A.    Correct.
6    Q.    Were they canceled for all the PCAs who
7  were supposed to attend?
8    A.    That's what I was noticed, that it's just
9  canceled.  That's what I have told.
10   Q.    So -- and do you have any knowledge or
11 information that you can share under oath, as you
12 sit here today, that these PCA team meetings
13 actually occurred?
14   A.    Yes and no.
15   Q.    Well, what's the yes part of it?
16   A.    I'm sorry.  I said -- give me a second.
17 Group texts that only certain employees were
18 included on later being included, not until after I
19 was terminated.
20   Q.    I'm sorry.  I didn't understand what you
21 said.  Did you say texts?
22   A.    Like, group text, group chats to discuss
23 things.
24   Q.    Okay.  Is that what you're talking about
25 when you say team meetings here in your second

Page 115

1  amended complaint, group texts?
2    A.    In part.  I think just -- it's referring
3  to the need to have team meetings so that we could
4  all be on the same page about how we're carrying out
5  tasks and them not being equal across the board
6  amongst all employees and not having any verifiable
7  -- anything written to ensure that we are all on the
8  same page and not even having meetings.
9    Q.    Okay.  Well, if there was nothing written,
10 then that means none of the other PCAs you worked
11 with got anything in writing, correct?
12   A.    I don't agree with that.  No.
13   Q.    Well, how did they get something in
14 writing if there was nothing written?
15   A.    That was provided to me.  Nothing was
16 written about instructions for performing the job
17 role to me.
18   Q.    I think we got a little bit off track
19 here.  I want to go back to team meetings.  Do you
20 have any evidence, other than your personal
21 suspicion, that there were team meetings that you
22 were excluded from that the other PCAs were included
23 in?
24   A.    Objection.  Argumentative and leading.
25   Q.    I'm allowed to lead, and you still answer

Page 116

1  the question.
2    A.    Objection.  Argumentative.
3    Q.    Still have to answer the question.
4    A.    Can you change the form of your question?
5    Q.    I'm sorry?
6    A.    Can you change the form of your question?
7    Q.    I'm reading from your second amended
8  complaint, and you mentioned team meetings.  And I
9  want to know if you can identify a single team
10 meeting that you were excluded from that other PCAs
11 were included in.
12   A.    Not to my knowledge.
13   Q.    Okay.  And then the next phrase is "unit-
14 specific requirements."  Is that the same thing we
15 talked about earlier when you mentioned the term
16 "unit-specific requirements"?
17   A.    What -- sorry, can you rephrase the
18 question again?
19   Q.    Sure.  You use the phrase "unit-specific
20 requirements" here.  What are you referring to when
21 you said "unit-specific requirements" here?
22   A.    I'm referring to what's defined in Det
23 Norske Veritas accrediting standards, as far as
24 written instructions for job roles, for staff in
25 their job roles.

Page 117

1    Q.    What written instructions are those?
2    A.    The ones that Sunila said do not exist.
3    Q.    Okay.  Are you aware of any of the other
4  PCAs receiving written instructions that Sunila Ali
5  told you did not exist?
6    A.    I don't know.
7    Q.    Is that a -- is that an I don't know?
8    A.    I don't know.
9    Q.    Okay.  The next phrase is "as outlined in
10 the job description for her role as patient care
11 assistant."  So does this mean that there were unit-
12 specific requirements that you believe were outlined
13 in the job description that you were supposed to
14 receive?
15   A.    Yes.
16   Q.    And you believe those were supposed to be
17 in writing?
18   A.    Yes.
19   Q.    Okay.  All right.  Under Hostile Work
20 Environment, it says, "Plaintiff Caitlin Weathers
21 was subjected to a continuous pattern of pervasive
22 harassment by her colleagues."  Did I read that
23 correctly?
24   A.    Correct.
25   Q.    "Plaintiff repeatedly complained to

Page 118
1  management about her colleagues' race-based comments
2  and unwelcome, inappropriate touching, but
3  management failed to address the issue." Did I read
4  that correctly?
5      A.   Correct.
6      Q.   Are there any other race-based comments
7  that you're referring to here in your second amended
8  complaint that we haven't already talked about?
9      A.   Not at this time.
10     Q.   Well, what do you mean by "not at this
11 time"? This is the only time --
12     A.   I -- I --
13     Q.   -- I get to talk to you before trial, so
14 if there's -- if there's something that you claim
15 was a race-based comment, I need to know about it
16 today.
17     A.   This specifically is referring to what we
18 already have in the Bates, the reports that I filed
19 that can be verified in the Bates.
20     Q.   Well, I'm not -- I'm not asking what you
21 say can be verified in the Bates. I'm talking
22 about, are there any race-based comments that you're
23 referring to here in your second amended complaint
24 that we haven't talked about today?
25     A.   No.

Page 119
1      Q.   Okay. It says "unwelcome, inappropriate
2  touching."
3      A.   Yes.
4      Q.   We talked about inappropriate touching
5  from -- I believe her name is Sharon, correct?
6      A.   Correct.
7      Q.   Is there any inappropriate touching that
8  you're referring to here in your second amended
9  complaint that -- beyond the inappropriate touching
10 from Sharon?
11     A.   No.
12     Q.   How did Sharon touch you inappropriately?
13     A.   She rubbed her chest against me.
14     Q.   Against your chest?
15     A.   Not just on accident and not just in
16 passing. It was intentional, deliberate, intended to
17 be intimidating. We were the only two people in the
18 hallway. I gave her more than enough space to pass
19 me. She deliberately walked towards me, despite
20 having significant space from me to go and do what
21 she needed, to just push against me.
22     Q.   She pushed -- she pushed the -- her chest
23 against your chest, or was it against your shoulder?
24 Where did she brush her chest?
25     A.   Against me, like, here.

Page 120
1      Q.   Okay. And did it just happen the one
2  time?
3      A.   Yes.
4      Q.   Next sentence says, "Additionally,
5  Plaintiff made attempts to request guidelines such
6  as could be found in a departmental handbook for
7  unit-specific requirements." Did I read that
8  correctly?
9      A.   Correct. Yes.
10     Q.   It said "request guidelines." What
11 guidelines are you talking about here?
12     A.   The ones we referred to earlier with
13 regard to what was provided upon hire from HR for
14 work commitments or -- I can't remember exactly --
15 commitment expectations and -- yeah, that -- this is
16 --
17     Q.   The -- those five category -- I'm sorry.
18 I didn't mean to interrupt you. You're talking
19 about the five categories of -- of things that we
20 talked about --
21     A.   Correct. Yes.
22     Q.   -- that you didn't get from Sunila Ali?
23     A.   Correct. No, this -- I mean, I -- those
24 were just general terms that it could have been
25 because Det Norske Veritas says written

Page 121
1  instructions, but it doesn't necessarily state that
2  it has to be a handbook or it has to be a sheet.
3  But it has to be something written, and I did not
4  receive anything written. When I say "request
5  guidelines," it's referring to anything in reference
6  to that, such as defined in other ways in the job
7  description and HR saying work commitments and then
8  Sunila Ali saying just everything would be given to
9  me.
10     Q.   And you said you made a request upon hire.
11 Are you talking about upon hire as a PCA or upon
12 hire originally at Houston Methodist?
13     A.   As a PCA.
14     Q.   Okay. And again, the phrase "unit-
15 specific requirements," is that what we've already
16 talked about when you've used that phrase
17 previously?
18     A.   Right. That was what was in the job
19 description.
20     Q.   Okay. The next section talks about
21 protected activity. Do you see where I'm looking,
22 Paragraph 8?
23     A.   Protected activity at 8.
24     Q.   It says, "On 9/17/2020, Plaintiff reported
25 to her assistant manager, Elizabeth Seay, regarding

CAITLIN WEATHERS                    November 05, 2025                    122 to 125
90477

Page 122

1  illegal activity by the patient visitor,
2  specifically that the patient had been smoking
3  marijuana in the stairwell directly across the
4  hallway from the patient's room." Did I read that
5  correctly?
6      A.   I would say yes, that's the correct date.
7  I'm sure that whatever I have written down there is
8  the same as what's verified in what -- in the Bates.
9      Q.   And this is referring to the marijuana
10 smoking incident that we discussed earlier, correct?
11     A.   Correct. Yes.
12     Q.   And I just want to clarify. It says here
13 specifically that the patient had been smoking
14 marijuana. It was, in fact, the visitor that was
15 smoking marijuana, not the patient, correct?
16     A.   Patient visitor. It says here patient
17 visitor.
18     Q.   It says "illegal activity by a patient
19 visitor, specifically that the patient had been
20 smoking marijuana in the stairwell."
21     A.   That's a typo. Sorry. It's patient
22 visitor.
23     Q.   Okay. That's what I was trying to clear
24 up. It's the patient visitor, not the patient --
25     A.   Correct.

Page 123

1      Q.   -- that was smoking, correct?
2      A.   Yes. Yes.
3      Q.   Okay. Next -- I'm sorry. "On May 5th
4  (sic), 2021, Plaintiff was notified of her internal
5  transfer to the position of patient care assistant
6  beginning on June 6th, 2021, and instructed that she
7  would be receiving information on expectations for
8  work commitments and organizational performance from
9  her new manager, Sunila Ali." Did I read that
10 correctly?
11     A.   Correct.
12     Q.   I'm asking this because you phrased it
13 "notified of her internal transfer."
14     A.   That's the document, what the document
15 specifically states.
16     Q.   Okay. I mean, this wasn't an involuntary
17 transfer, was it?
18     A.   No. I applied at a hiring fair event.
19     Q.   Okay. And then again, the "she would be
20 receiving information on expectations for work
21 commitments and organizational performance from her
22 new manager, Sunila Ali," those are the things that
23 we've already talked about that Sunila Ali told you
24 she was going to give you, and you never received.
25     A.   Correct.

Page 124

1      Q.   Is there anything that you're referring to
2  here that we didn't talk about earlier that Sunila
3  Ali failed to get you when you transferred to the
4  PCA?
5      A.   Repeat.
6      Q.   Sure. You agree with me that what you're
7  talking about here were the things we discussed
8  earlier --
9      A.   Yeah.
10     Q.   -- that Sunila Ali failed to give you when
11 you became a PCA, correct?
12     A.   Correct. Yes.
13     Q.   Is there anything that you're referring to
14 here that we did not discuss earlier when you were
15 telling me about the things that Sunila Ali failed
16 to give you when you became a PCA?
17     A.   Not that I can think of right now.
18     Q.   Okay. We're going to move to -- not the
19 next sentence, but the one after that. "Throughout
20 all of August, Plaintiff filed complaints about
21 ongoing harassment by her co-workers." Did I read
22 that correctly?
23     A.   Where are we? Okay, I see it. Correct.
24 Yes.
25     Q.   Did I read that sentence correctly?

Page 125

1      A.   Yes.
2      Q.   Is there any harassment that you're
3  referring to here that we've not talked about
4  already today?
5      A.   Not that I can think of right now.
6      Q.   Are there any co-workers that you're
7  referring to here that we have not talked about
8  already today?
9      A.   Not that I can think of.
10     Q.   Were there any complaints that you're
11 referring to here that we've not already talked
12 about today?
13     A.   Not that I can think of.
14     Q.   And then the next paragraph, nine, starts
15 Retaliation.
16     A.   Yes.
17     Q.   It says immediately -- it says,
18 "Immediately following Plaintiff's protected
19 activity on 9/17/2020, she was subjected to a series
20 of adverse employment actions." Did I read that
21 correctly?
22     A.   Yes.
23     Q.   "On or around 10/9/2020, Plaintiff
24 received a communication record in response to her
25 report of illegal activity from her assistant

Page 126

1  manager, Elizabeth Seay, despite having also
2  received a letter of recommendation from the manager
3  holding the highest authority for the department,
4  Shakindra Gonzales, on the same date, October 9th,
5  2020." Did I read that correctly?
6      A.   Yes.
7      Q.   And we discussed that briefly before,
8  correct?
9      A.   Correct.
10     Q.   "Then, on August 23rd, 2021, the plaintiff
11 received a negative performance review for the first
12 time in her career." Did I read that correctly?
13     A.   Correct.
14     Q.   "This review contained unsubstantiated
15 claims that were not addressed in any written"
16 specific -- strike that.
17          I'll start over.  "This review contained
18 unsubstantiated claims that were not addressed in
19 any written unit-specific guidelines for the
20 department." Did I read that correctly?
21     A.   Yes.
22     Q.   Ma'am?
23     A.   I said yes.
24     Q.   Did I read that correctly?
25     A.   Did you not hear me?

Page 127

1      Q.   I -- I didn't hear.
2      A.   Okay.  I said yes, you read it correctly.
3      Q.   What do you mean by "unsubstantiated
4  claims" there?
5      A.   They could not prove that I had done
6  anything that would have been outside of any
7  particular scope because they were -- a particular
8  scope was never defined.  The tasks --
9      Q.   Did -- did --
10     A.   -- that I was performing were either
11 directed to me by either a nurse or a tech or skills
12 that my job trainers had -- had been doing and shown
13 me.
14     Q.   Well, when you say "they," who are you
15 talking about?
16     A.   Can you repeat or re-form the question?
17     Q.   And you said they could not prove that you
18 did anything wrong, and I'm asking who you mean by
19 "they."
20     A.   "They" being the people who were filing
21 reports about me under the basis that I wasn't
22 performing up to a certain standard.
23     Q.   Okay.  The next sentence says, "According
24 to notes from Houston Methodist's HR investigation
25 into the plaintiff's complaints, co-workers referred

Page 128

1  to her using terms like crazy, flat, and don't want
2  to work with her." Did I read that correctly?
3      A.   Yes.
4      Q.   Who were the co-workers who referred to
5  you as crazy?
6      A.   I think it was a PCA who said that they
7  don't want to work with me.  And it was Sharon who
8  said crazy, and I'm not sure who said flat.  I can't
9  remember exactly if it was either one of those two
10 or vice versa, if it was one or the other.  It was
11 in one of those records, though.
12     Q.   Did this happen on more than one occasion?
13     A.   I mean, what do -- what do you mean by
14 occasion?  It's --
15     Q.   Well, did --
16     A.   -- in the report --
17     Q.   Did one of your co-workers call you crazy
18 on more than one occasion?
19     A.   Yes.
20     Q.   What co-worker called you crazy on more
21 than one occasion?
22     A.   Sharon.
23     Q.   Okay.  How many times?
24     A.   At least twice.
25     Q.   Okay.  Did one of your co-workers call you

Page 129

1  flat on more than one occasion?
2      A.   I didn't hear them directly call me that.
3  In this sentence, it's referring specifically to
4  what was found in the investigation, what they were
5  still saying about me that Sunila knew what they
6  were saying about me and allowed them to say that
7  with credibility.
8      Q.   So you don't have any first-hand --
9      A.   This --
10     Q.   -- experience -- ma'am, let --
11     A.   Sorry.
12     Q.   -- let me finish my question.  You don't
13 have any first-hand experience of a co-worker
14 calling you flat.  Is that -- am I understanding
15 your testimony?
16     A.   Not directly to me, but behind my back.
17     Q.   Well, that's what I mean by first-hand.
18 You don't have any -- you didn't have any experience
19 that you can testify to where a co-worker called you
20 flat, correct?
21     A.   I didn't -- not necessarily.  I can
22 testify to it because it was written about me and
23 documented about me in my performance reviews.  So I
24 can testify to it, but my statement is -- here isn't
25 saying that they called me flat to my face.  My

Page 130

1 statement specifically says, according to notes from
2 Houston Methodist's HR investigation into my
3 complaints, they used these terms and were not
4 reprimanded.
5       Q.   Is that the same with "don't want to work
6 with her"?
7       A.   Correct.
8       Q.   Did any of your co-workers ever tell you
9 directly they didn't want to work with you?
10      A.   Sharon.
11      Q.   Okay.  How many times did Sharon tell you
12 she didn't want to work with you?
13      A.   At least once.  But there was also another
14 event.  I believe Sunila was on vacation and --
15 something about linens and counting and making sure
16 -- like, there -- I don't -- they never implemented
17 any specific policy, so -- to say linens needed to
18 be filled to four, five, or six or however many.
19 There was no set standard that would allow to make
20 sure that everyone always had a certain number
21 allotted to them.
22           And I remember trying to coordinate with
23 someone about it.  And I heard them because they
24 were in such close proximity to me and yelling so
25 loudly that they didn't want to work with me when

Page 131

1 reporting -- I think her name was Fola or something.
2 I can't recall.  That wasn't the basis for what I
3 wrote here, but that -- that did happen.
4       Q.   One second.  Give me just a second.  The
5 next sentence says, "These statements were tolerated
6 and supported during the meeting with Sunila Ali and
7 HR representative Mariana Mondragon." Did I read
8 that correctly?
9       A.   Yes.
10      Q.   Is this the meeting that you had with Ms.
11 Ali after she came back from vacation?
12      A.   Correct.
13      Q.   And the first part of the next sentence
14 says, "During the August 23rd, 2021, meeting." Is
15 that the date that this meeting happened?
16      A.   Correct.
17      Q.   So this is the first meeting you had with
18 either Sunila Ali or Mariana Mondragon about the --
19 your co-workers using derogatory language toward
20 you?
21      A.   That was my first time getting to finally
22 sit with them, not my first time filing a report.
23 It was reports that I had already filed and finally
24 getting to discuss them in person.  This --
25      Q.   Right, but my question -- my question was

Page 132

1 about a meeting.  This is the first meeting you had
2 with her?
3       A.   Not my first ever meeting with Sunila Ali,
4 but my first meeting with Sunila Ali to discuss my
5 reports.
6            MR. BURKE:  Okay.  If you would, ma'am,
7 pull up Exhibit 3.
8            (WHEREUPON, Exhibit 3 was marked for
9 identification.)
10           THE REPORTER:  Exhibit 3 marked.
11 BY MR. BURKE:
12      Q.   Let me know when you have it in front of
13 you, ma'am.
14      A.   It kicked me out again.
15           THE VIDEOGRAPHER:  You may have a
16 protection between it, so I --
17           THE DEPONENT:  Okay, just say continue?
18           THE VIDEOGRAPHER:  Yeah.
19           THE DEPONENT:  I'm looking at the job
20 description.
21 BY MR. BURKE:
22      Q.   Okay.  That's the -- your PCA job
23 description, correct?
24      A.   Correct.
25      Q.   And at the top right-hand corner, it has

Page 133

1 your name handwritten in, correct?
2       A.   Correct.
3       Q.   Is that your handwriting, ma'am?
4       A.   Yes.
5       Q.   And then underneath it, it says employee
6 signature and date, and there's a signature and
7 date. Is that your signature and date?
8       A.   At the top, employee signature and date,
9 yes.
10      Q.   Yes.
11      A.   On the right-hand corner, yes, for
12 9/27/21.
13      Q.   Okay.  So this is the job description
14 you're referring to for your position as a PCA,
15 correct?
16      A.   Correct, at least a version.
17      Q.   Well, it's a version you signed, correct?
18      A.   Apparently.
19      Q.   Well, as you're sitting here today, do you
20 have any reason to believe you didn't sign this?
21      A.   No.
22      Q.   Okay.  If you look, the first heading
23 there says Job Summary.  Do you see where I am?
24      A.   Job summer?
25      Q.   Job summary.

Page 134

1      A.    Job summary, yes.
2          Q.    Okay. Let me just go ahead and read this.
3   "At Houston Methodist, the patient care assistant
4   (PCA) position functions as novice to competent and
5   demonstrates basic knowledge and skills necessary to
6   communicate appropriately and carry out delegated
7   nursing assistant-level tasks for assigned age-
8   specific, diverse patient population, assisting in
9   the delivery of patient care and services under the
10  supervision of a licensed nurse." Did I read that
11  correctly?
12     A.    Correct.
13         Q.    Do you -- do you disagree with anything
14  that I read in that sentence? Does that accurately
15  describe --
16     A.    That was the --
17         Q.    -- your position as you see it?
18     A.    You read the sentence that I am looking
19  at.
20         Q.    But my question now is: Do you believe
21  there's anything in that sentence that does not
22  accurately describe your position as a PCA?
23     A.    It sounds accurate.
24         Q.    I'm sorry?
25     A.    That sounds fairly accurate.

Page 135

1          Q.    Okay. You'd agree with me it's part of
2   your job, is to do assigned -- do tasks assigned to
3   you and under the supervision of a licensed nurse?
4      A.    Yes and no.
5          Q.    All right. What do you mean by no?
6      A.    Yes, we do and I did perform tasks under
7   the supervision of licensed nurses.
8          Q.    So is it -- is your answer yes?
9      A.    I think there are some things that PCAs
10  would or should not be performing even if asked,
11  like illegal activity.
12         Q.    Understood. But generally, part of your
13  job was to follow instructions under the supervision
14  of a licensed nurse, correct?
15     A.    Correct. Yes.
16         Q.    Okay. The next sentence says, "This
17  position conducts hourly rounding to ensure patient
18  needs are met and records data established by policy
19  and procedure and reports observations and patient
20  problems to the licensed nurse." Did I read that
21  correctly?
22     A.    You read it correctly. But the "records
23  data" part, PCAs were not really given access to
24  EPIC. It was -- the nurses were recording the data.
25  There were some things that were automatically

Page 136

1   recorded that we would perform, so we didn't have
2   to, like, do something secondary -- secondarily
3   offhand, like offhand charting or paper charting or
4   anything like that.
5          Q.    Uh-huh --
6      A.    We didn't have to. So I don't know if --
7   in my experience in my role there on the Neuro ICU,
8   that was not something that I would have been able
9   to do. It wasn't -- I wasn't given access to be able
10  to do that.
11         Q.    But other than that, do you see anything
12  in that sense that's inconsistent with your
13  experience as a PCA?
14     A.    I did perform hourly rounding to make sure
15  that we did half of the patient's bags every shift.
16  We did quality-control checks for glucose for
17  patients that needed it, either every three hours or
18  every hour for -- for specific patient populations.
19         Q.    Okay. Anything in that sentence that you
20  feel is inconsistent with your experience as a PCA,
21  other than what you identified about the reporting
22  data?
23     A.    Not that I can think of.
24         Q.    Okay. The next sentence says, "The PCA
25  physician performs basic patient care activities of

Page 137

1   daily living (ADL's) within unit-specific defined
2   limits and job scope, such as assistance with
3   patient elimination, hygiene, comfort, safety,
4   nutrition, and progress activity and practices,
5   patient and family-centered care in concert with
6   Houston Methodist ICARE values." Did I read that
7   correctly?
8      A.    Yes.
9          Q.    Are you familiar with Houston Methodist
10  ICARE values?
11     A.    Yes.
12         Q.    What are Houston Methodist ICARE values?
13     A.    Integrity, compassion, accountability,
14  respect, and excellence.
15         Q.    Is there anything in that sentence that I
16  just read that you feel is inconsistent with your
17  experience as a PCA at Houston Methodist?
18     A.    Yes.
19         Q.    Okay. Tell me what that is.
20     A.    Not providing a handbook, allowing for
21  illegal activity to occur, such as marijuana and
22  people smoking pot, not providing set criteria in
23  which to communicate with the nurses on so that
24  everyone could be on the same page about
25  expectations.

Page 138

1    Q.   Anything else?
2    A.   I have also -- I don't know if I want to
3  raise the question, but I know that there have been
4  recent changes in reporting on race and questions
5  there.
6    Q.   What -- what do you mean by that?
7    A.   Particular to my race as being only white
8  and not any other identifiers such as Hispanic or
9  mixed or other specific identifiers that are now
10 being reported since 2024, adding checkboxes.  Is
11 that -- I don't know if I'm explaining it very well.
12   Q.   Well, let me ask you this.  Is it -- are
13 you talking about something that has happened after
14 your departure from Houston Methodist?
15   A.   Yes and no. I think it's now an official,
16 like, federal change that's been made in 2024 with
17 how it's reported.  But my question as far as how --
18   Q.   Ma'am, do you agree with me, you can't
19 testify about anything that went on in 2024 at
20 Houston Methodist, right?
21   A.   But in application to how I think they're
22 upholding ICARE values and reference to that, I -- I
23 don't -- you're just asking for my personal opinion
24 on whether there are things going on that are not in
25 ICARE values, and I think that having been the only

Page 139

1  non-Hispanic, Caucasian, white female in my job
2  roles throughout the entirety of my experience there
3  may not be very ethical or compassionate.
4    Q.   Well, let me see if I understand what
5  you're telling me.  Are you saying that having only
6  one white Caucasian, non-Hispanic female in the role
7  of a PCA was somehow not compassionate or ethical?
8    A.   It wasn't just in my role as a PCA.  It
9  was also in my experience as a patient sitter in
10 those pools and my experience as a patient
11 transporter, not necessarily just what I have
12 documented and that I described from my amended
13 complaint, but just -- you're asking me, my personal
14 experience, if I felt like that was compassionate,
15 and I don't think that it was.
16   Q.   Just to make sure I understand what you're
17 telling me, you -- you think it was -- it showed a
18 lack of compassion on Houston Methodist's part to
19 have only one white Caucasian, non-Hispanic female
20 in your job role at any given time at Houston
21 Methodist?
22   A.   During my job roles throughout my entirety
23 of Houston Methodist, yes.
24   Q.   Well, what -- in your mind, how would
25 Houston Methodist have corrected that?  You -- you

Page 140

1  applied for the positions, correct?
2    A.   Right.
3    Q.   And you were hired for the positions,
4  correct?
5    A.   Correct.
6    Q.   Okay.
7    A.   They're the largest employer in Houston.
8    Q.   So how does the fact that the other
9  employees who were already in the role that you
10 applied for show a lack of compassion on Houston
11 Methodist's part?
12   A.   Given this demographic changes that have
13 been happening and occurring in Houston over the
14 past 20 or so years, and the only race in declining
15 is specific to white only, I don't feel like that's
16 very compassionate.
17   Q.   Explain to me how that's not
18 compassionate. I'm not -- I'm just not understanding
19 you.
20   A.   Because they would only advocate for
21 trying to hire foreign -- foreign individuals or
22 those who did not speak English.  So opportunities
23 for me to try and get training so that I can perform
24 my job duties and perform my job -- my job and have
25 opportunities available to me were just not allowed.

Page 141

1    Q.   Well, what evidence do --
2    A.   They didn't understand -- I find it
3  interesting that you wouldn't understand why that
4  would be hurtful.
5    Q.   Well, what evidence do you have that
6  Houston Methodist purposely did not try to hire
7  other white Caucasian, non-Hispanic females as a
8  patient transporter?
9    A.   There were no initiatives specifically for
10 that reason.  There were specific initiatives for
11 foreigners, but there was never any specific
12 initiative for non-Hispanic white people.
13   Q.   And is your answer the same if we're
14 talking about PCAs?
15   A.   Yes.
16   Q.   Okay.  You also mentioned that you found
17 that unethical.  Are you talking about for the same
18 reasons?
19   A.   Correct.
20   Q.   Okay.  This last sentence we read
21 mentioned unit-specific defined limits.  Do you see
22 that?
23   A.   Yes.
24   Q.   Is this where you're talking about that
25 the job description referred to unit-specific

Page 142

1  requirements?
2       A.   Right.  And they were never defined,
3  except for in PIPs, but even then when I asked,
4  would you please share with me what that would look
5  like or how to better define so that I can try to
6  achieve these goals for you, there was just -- you
7  have to just understand what I'm saying, and I
8  didn't feel like that was fair.
9       Q.   So you -- let me see if I understand what
10 you're telling me.  Are you telling me you didn't
11 feel it was fair to you for your supervisors to give
12 you training and instructions about your job that
13 were not in writing?
14      A.   That isn't what I said, no.
15      Q.   Okay.  Well, I'm trying to understand what
16 you mean.
17      A.   I think in the performance improvement
18 plan, which is an adverse action with an intent and
19 threat to terminate if you don't meet certain
20 expectations, but not provide the defined limits and
21 expectations in order to fulfill those requirements
22 in the PIP, is not compassionate.
23      Q.   Do those, in your mind, specific defined
24 limits of job scope have to be in writing?
25      A.   Yes, according to Det Norske Veritas.

Page 143

1       Q.   Do -- I believe you testified earlier that
2  the job description said that these unit-specific
3  requirements had to be in writing.  Do you see
4  anywhere in the job description where it requires
5  them to be in writing?
6       A.   The job description says they need to be
7  defined.  A definition just in its form means
8  written, defined.  You define something in a
9  dictionary that's written.
10      Q.   So you're taking the word defined to mean
11 that -- that they have to be in writing; is that
12 correct?  Am I understanding?
13      A.   Correct.
14      Q.   Okay.  Did you -- as part of your lawsuit,
15 you have sued Houston Methodist for discrimination
16 and retaliation, correct?
17      A.   Correct.
18      Q.   Under the heading of discrimination, you
19 sued them for discrimination based on race and
20 discrimination based on gender, correct?
21      A.   Correct, the combined race and gender,
22 yes.
23      Q.   Only combined?
24      A.   Are we looking -- which document are we
25 looking at?

Page 144

1       Q.   I'm not -- I'm not looking at a document.
2       A.   Okay.
3       Q.   I'm just asking you questions.
4       A.   Got it.
5       Q.   Are you saying only combined?
6       A.   I think it's gender -- based on gender
7  discrimination, using words such as "gay."  I think
8  it's sex-based, and I think the way that she touched
9  me inappropriately was sex-based.
10      Q.   Well, you're -- you're -- that's not
11 really my question.  I -- I said you're suing
12 Houston Methodist for discrimination based on race
13 and based on gender, and you said a combination.
14 And so my question is: Are you suing Houston
15 Methodist for discrimination solely because of a
16 combination of race and gender?
17      A.   Yes.
18      Q.   Okay.  So nothing that was limited only to
19 race?
20      A.   No.  I think being called gay was limited
21 -- is limited to sex, but I don't think -- I'm
22 trying to think how to answer this question.
23      Q.   Let me ask you this.  Identify for me, if
24 you can, every discriminatory act that you are suing
25 Houston Methodist for that was solely based on your

Page 145

1  gender.
2       A.   The claims with regard to what happened
3  with Sharon Agwaye.  I think -- I'm not sure if
4  that's the correct pronunciation of her last name.
5       Q.   And are you referring to her calling you
6  gay?
7       A.   Yes.
8       Q.   And you're referring to her brushing her
9  chest up against you?
10      A.   Yes.
11      Q.   Anything else?
12      A.   I think it's a combined race and sex when
13 she also uses terms like "crazy."
14      Q.   Okay.  Well, we'll get to that.  My
15 question is: Anything else that you are saying is
16 discrimination on Houston Methodist's part that is
17 solely based on your gender?
18      A.   I think Houston Methodist is liable for
19 what Sharon said and did.
20      Q.   I understand that.  And you said -- you
21 told me one thing that Sharon did that was solely
22 based on your gender was call you gay, correct?
23      A.   Right.
24      Q.   One thing that she did to you that was
25 solely based on your gender was brush her chest up

Page 146
1  against you, correct?
2      A.   Correct.
3      Q.   Anything else that Sharon did to you that
4  you believe was discriminatory on behalf of Houston
5  Methodist that was solely based on your gender?
6      A.   We just answered that, I think.  You're
7  asking gender?
8      Q.   I don't know if you did --
9      A.   Or you mean to say just race because we
10 just covered gender?
11     Q.   I -- ma'am, we -- you told me that you
12 believe Houston Methodist is liable for
13 discrimination against you because Sharon
14 discriminated against you solely based on gender,
15 and the two examples I've gotten you -- from you so
16 far were she called you gay, and she brushed her
17 chest up against you, correct?
18     A.   Correct.  There was also another incident
19 in comparison to Roberto, who was performing -- who
20 was also a PCA in the Neuro ICU, who was praised for
21 performing tasks that were outside of a PCA scope, a
22 male PCA.
23     Q.   So Roberto was praised for doing something
24 that you feel was outside of PCA scope, correct?
25     A.   Correct.  Yes, tasks that even nurses

Page 147
1  could not perform themselves or didn't know how to
2  perform.
3      Q.   And do you believe that is an instance of
4  discrimination by Houston Methodist against you
5  solely based on your gender?
6      A.   I think it's combined, but it's gender-
7  based.
8      Q.   Well, ma'am, again, I'm talking -- I'm
9  asking you right now --
10     A.   But yes.
11     Q.   I'm asking you right now solely based on
12 gender, okay, because you --
13     A.   Well, solely -- was solely on my gender
14 and combined.
15     Q.   Ma'am, I'm going to get to combined, okay?
16 So I want to -- it can't be solely and combined at
17 the same time.  So you've told me two examples so
18 far of Houston Methodist discriminating against you
19 solely based on your gender -- Sharon calling you
20 gay, Sharon brushing her chest up against you.  Are
21 you telling me that Roberto being praised for
22 performing tasks outside the scope of PCA is another
23 example of Houston Methodist discriminating against
24 you solely based on your gender?
25     A.   Yes.

Page 148
1      Q.   I'm sorry?
2      A.   Male colleagues being able to perform
3  tasks outside of the PCA scope and being praised for
4  it, whereas I, being a female who also happens to be
5  white, which you don't want to discuss right now,
6  but the fact that I am a female and not being
7  allowed to even have a scope --
8      Q.   Well, did you perform tasks outside the
9  scope of a PCA when you were a PCA?
10     A.   No, not to my knowledge.
11     Q.   Okay.
12     A.   Can we take a break --
13     Q.   Any other male PCAs who were praised for
14 performing tasks outside the scope of a PCA?
15     A.   Can you repeat the question?
16     Q.   Sure.  You mentioned Roberto was praised
17 for performing tasks outside the scope of a PCA.
18     A.   Right.
19     Q.   Were there any other male PCAs who were --
20 who were praised for performing tasks outside the
21 scope of a PCA?
22     A.   Not that I can think of.
23     Q.   All right.  Other than the two examples
24 we've talked about from Sharon and the Roberto
25 example, are there any other examples of Houston

Page 149
1  Methodist discriminating against you based solely on
2  your gender?
3      A.   Not that I can think of right now.
4      Q.   Okay.  Let's move to race.  Are there --
5  can you give me any examples of Houston Methodist
6  discriminating against you based solely on your
7  race?
8      A.   Sorry.  Can you repeat the question?
9      Q.   Sure.  What examples can you give me,
10 sitting here today under oath, of Houston Methodist
11 discriminating against you solely based on your
12 race?
13     A.   We've been over all of it.  I'm just
14 repeating more of everything that we've already
15 covered, but having filed reports or taking adverse
16 actions against me or making negative reviews about
17 me without giving me fair or adequate standards, as
18 defined in the job description or as defined by
19 their accrediting agency, is discriminatory against
20 my race because I'm the only one who was receiving
21 negative feedback and being treated the way that I
22 was.
23          They were saying that they didn't like me,
24 or that I wasn't a good fit, or that I was flat, or
25 I was crazy, but I didn't hear any of my other co-

Page 150

1 workers being called crazy or flat or any of those
2 names. While I was there, I didn't see anyone else
3 be subjected to having to go through a performance
4 improvement plan.
5     Q.   Is it your testimony that you were the
6 only PCA that received a performance improvement
7 plan while you were at Houston Methodist?
8     A.   To my knowledge. I've asked Houston
9 Methodist to provide me documentation of other
10 employees who have received performance improvement
11 plans and have not been provided such, and it's not
12 something that I witnessed or that I saw.
13     Q.   And so you -- you don't -- you don't have
14 any evidence that you're the only one. You're just
15 the only one that you know, correct?
16     A.   Compound question. Can you repeat?
17     Q.   You have no evidence that you were the
18 only PCA who was put on a performance improvement
19 plan while you were employed as a PCA at Houston
20 Methodist, correct?
21     A.   Repeat.
22     Q.   I'll ask you this way. Is it a true
23 statement that you -- strike that.
24        You know that you were put on a
25 performance improvement plan as a PCA, correct?

Page 151

1     A.   Correct.
2     Q.   Can you testify under oath today that no
3 other PCAs at Houston Methodist during your
4 employment were put on performance improvement
5 plans?
6     A.   I -- I can say I did not witness anyone
7 being placed on a performance improvement plan.
8     Q.   What do you mean by witness?
9     A.   I didn't witness. I didn't -- I don't
10 know how to answer that question. Leading.
11 Objection.
12     Q.   You -- can you -- you can't tell me under
13 oath today that no other PCAs were placed on a
14 performance improvement plan while you were --
15     A.   I don't understand the form of that
16 question, the way -- I don't understand that.
17     Q.   You have no knowledge that you are the
18 only PCA that was placed on a performance
19 improvement plan, correct?
20     A.   Wrong.
21     Q.   Okay. What do you mean by that?
22     A.   Your -- you said -- I'm repeating what I
23 heard you say -- that I have no knowledge of anyone
24 --
25     Q.   No, I said you're -- you have no knowledge

Page 152

1 that you're the only PCA who ever received a
2 performance improvement plan while you were employed
3 at Houston Methodist, correct?
4     A.   Yeah, I don't understand that question. I
5 don't understand the way that's worded.
6     Q.   You know you were placed on a performance
7 improvement plan, correct?
8     A.   Yes.
9     Q.   Would you have any way of knowing whether
10 any other PCA was placed on a performance
11 improvement plan while you were employed at Houston
12 Methodist?
13     A.   I believe it would have been in the Bates
14 or in production requests. If not, I think perhaps
15 it's my thought that Houston Methodist might feel
16 that it could be of embarrassment to them and not
17 sharing it.
18     Q.   So you're basing that purely on
19 speculation, correct?
20     A.   No.
21     Q.   Okay. What evidence do you have that you
22 are the only PCA who was placed on a performance
23 improvement plan during your employment at Houston
24 Methodist?
25     A.   Repeat.

Page 153

1     Q.   What evidence do you have that you were
2 the only PCA placed on a performance improvement
3 plan during your employment at Houston Methodist?
4     A.   Because I've asked for records, and they
5 haven't been shared with me.
6     Q.   Outside of what you've asked for in this
7 lawsuit, during the time that you were a PCA at
8 Houston Methodist, you wouldn't know one way or
9 another if another PCA was placed on a performance
10 improvement plan, would you?
11     A.   I don't understand the form of the
12 question.
13     Q.   When you were placed on a performance
14 improvement plan, was that something that was shared
15 with the group?
16     A.   Yes, it was shared with people. They
17 interviewed them.
18     Q.   They interviewed them, but did they share
19 with the group that you were placed on a performance
20 improvement plan?
21     A.   Yes. They asked for feedback for --
22     Q.   Who was there --
23     A.   -- I mean, that was part of what she
24 conducted. She was asking --
25     Q.   Who --

Page 154
1    A.   -- for performance reviews from co-workers
2  that had worked with me.
3    Q.   So -- so when you say "she," it's Sunila
4  Ali?
5    A.   Yes.
6    Q.   And she was asking for co-workers to give
7  their opinion of your work product; is that correct?
8    A.   Yes.
9    Q.   Can you testify here under oath that any
10 of those employees knew that later on you were
11 placed on a performance improvement plan?
12   A.   Did any of the employees that wrote
13 negative feedback about me --
14   Q.   Yes.
15   A.   -- knew that I was on a performance
16 improvement plan? Yes, I would -- yeah, I mean,
17 that was the purpose. Yes. I -- yes.
18   Q.   All right. Any other instances of
19 discrimination on behalf of Houston Methodist that
20 were solely based on your race?
21   A.   Not that I can think of right now. I'm
22 very tired.
23   Q.   I understand that, but we're going to have
24 to keep going.
25   A.   We're leaving out of here at 5, I think,

Page 155
1  correct?
2    Q.   No, we're not. No, we're not. Not if I'm
3  not done. Tell me all --
4    A.   I think you're limited to seven hours, and
5  I've been here since 10 a.m.
6    Q.   I have seven hours on the record, ma'am.
7  We haven't been near seven hours on record, so --
8    A.   Then we'll have to conclude it for another
9  day. I've only allotted seven hours to be available
10 for deposition today. I can't give you another two
11 hours. I can't.
12   Q.   Ma'am --
13   A.   I have work in the morning. I can't do
14 that. I apologize.
15   Q.   Well, apologies aren't going to -- aren't
16 going to work. You're -- you're here --
17   A.   I gave you and agreed to seven -- a seven-
18 hour deposition to start at 10 a.m. I don't have
19 time to give you outside of that.
20   Q.   Tell me all the examples of discrimination
21 on the part of Houston Methodist that were combined
22 based on your race and gender.
23   A.   Everything that's already been mentioned.
24   Q.   Okay. Anything that hasn't already been
25 mentioned today?

Page 156
1    A.   Not that I can think of right now.
2    Q.   Okay. You've also sued Houston Methodist
3  for retaliation, correct?
4    A.   Correct.
5    Q.   Retaliation based on race, correct?
6    A.   Correct.
7    Q.   Retaliation based on gender, correct?
8    A.   Correct.
9    Q.   Tell me every protected activity that you
10 took that was solely based on your race.
11   A.   Compound question. Objection. Leading.
12 Oh, my goodness.
13   Q.   What protected activity did you take
14 during your employment with Houston Methodist that
15 was solely based on your race, ma'am?
16   A.   I'm trying to get the documents so I can
17 just show them to you.
18   Q.   That's not the way this works. I'm asking
19 you questions. You don't show me documents.
20   A.   Okay.
21   Q.   Give me every instance of a protected
22 activity that you took based solely on your race at
23 Houston Methodist.
24   A.   Everything that we've already mentioned.
25   Q.   Well, you keep telling me that most of it

Page 157
1  is based on a combination of your race and gender,
2  so I want to make sure I'm specific if I know that
3  there's anything --
4    A.   It's both race and gender.
5    Q.   -- any protected activity that you took
6  was solely -- ma'am, you need to let me finish my
7  question. I want to know if there are any instances
8  of protected activity that you took that were solely
9  based on your race.
10   A.   All the reports that I filed to Houston
11 Methodist employees throughout my duration of
12 employment between May 28th, 2019, and October 4th,
13 2021.
14   Q.   All of those were solely based on your
15 race?
16   A.   Were based on my race, yes.
17   Q.   Solely based on your race?
18   A.   The reports that I filed were based on my
19 race.
20   Q.   Well, the question is, ma'am: Were they
21 solely based on your race?
22   A.   I don't understand the question.
23   Q.   Do you know what "solely" means?
24   A.   I don't think I agree to your
25 understanding and your interpretation.

Page 158

1    Q.    Only -- only on the basis of race, not on
2  any other --
3       A.    I don't think --
4       Q.    Ma'am, please don't talk over me.  I mean
5  only on the basis of your race and not on the basis
6  of any other characteristic.  Are you telling me
7  that all of the complaints that you made during the
8  entirety of your employment at Houston Methodist
9  were only based on your race and not some other
10 characteristic?
11      A.    I don't know how to separate my race from
12 my sex.  I -- I am an only white Caucasian female.
13 I'm not just white, and I'm not just female.  I
14 don't know how to separate the two.  So I don't know
15 how to answer your question.  I'm not understanding.
16      Q.    Can you identify a single protected
17 activity that you took during your employment at
18 Houston Methodist that was only based on your race?
19      A.    I'm not only just white.  I -- I mean, I'm
20 an only white Caucasian female.  I can't just be not
21 female.  I don't know how to say that it was only
22 race because I will always be white and female.
23      Q.    Again, my question, ma'am, is: Can you
24 identify a single protected activity that you took
25 during your employment at Houston Methodist that was

Page 159

1  based only on your status as a white, non-Hispanic
2  Caucasian?
3       A.    Anything that I filed as a -- on the basis
4  of race being because I am white is always going to
5  be because I'm a white female.
6       Q.    You're -- you're making this more
7  difficult than it has to be, ma'am.  Are you telling
8  me that every single protected activity that you
9  took during your employment at Houston Methodist was
10 based both on your race and your gender?
11      A.    Yes.
12      Q.    Okay.  So that would mean that you cannot
13 identify for me a single protected activity that you
14 took during your employment at Houston Methodist
15 that was based solely on your race, correct?
16      A.    No.  It's always also because of my race.
17      Q.    And so the answer to the question that you
18 cannot identify a single piece of protected activity
19 that was only based on your race is no, correct?
20      A.    I don't -- again, I told you, I don't
21 understand how to answer this question because when
22 I'm filing because of my race, I get that they're
23 because of my race, but it's always going to be that
24 I'm a white female filing this report.  Does that
25 make sense? My reports are always going to be coming

Page 160

1  from a place of being a white female.
2       Q.    And if all of your protected activity was
3  based on both being white Caucasian, non-Hispanic,
4  and being a female, then none of the protected
5  activity that you took was based solely on being --
6       A.    False.  That's wrong.
7       Q.    -- a white --
8       A.    Not true.
9       Q.    Ma'am, do not interrupt me when I'm asking
10 you a question.
11      A.    I don't agree.
12      Q.    Well, you can disagree with me after I'm
13 done with my --
14      A.    You're asking me a leading question that
15 calls for me to agree to something that is not a
16 material fact.  I can't say yes or no to it.  It's
17 not a fact. So do you agree that it's -- that you
18 never filed a race-based discrimination claim?  No.
19 That is not true.
20      Q.    Objection.  Non-responsive.  I didn't say
21 that.  I said based only on race.
22      A.    It's not a complete -- I can't answer the
23 question.  It's not a --
24      Q.    Okay.  Can't answer the question.  Any
25 protected activity that you took during your

Page 161

1  employment at Houston Methodist that was based
2  solely on your gender, can you answer that question?
3       A.    I don't understand.  That's my answer.  I
4  can't -- I don't understand.
5       Q.    Don't understand.  Do you understand what
6  "only" means?
7       A.    I understand what "only" means, but in the
8  context --
9       Q.    Ma'am --
10      A.    -- of your question, it doesn't make
11 sense.
12      Q.    What doesn't make sense?
13      A.    Your application of -- your application is
14 just -- I don't understand it.
15      Q.    Can you answer the question?
16      A.    You're twisting my words around.
17      Q.    Can you answer the question or not, ma'am?
18      A.    (No audible response.)
19      Q.    Can you answer that question or not?
20      A.    I object to that question.
21      Q.    Can you answer the question or not?
22      A.    I think it's a leading question, and I
23 object to it.
24      Q.    That's not a basis to refuse to answer.
25 Can you answer the question or not?

Page 162
1     A.    That is an answer.
2     Q.    That's not an answer.  Are you refusing to
3  give me an answer other than your objections?
4     A.    I'm not refusing anything.  I've been here
5  since 10 -- 10 a.m. this morning.  It'll have been
6  seven hours since I got here in less than half an
7  hour, and you're not making sense.
8     Q.    Give me every protected activity that you
9  took during your employment at Houston Methodist.
10  Tell me every single protected activity that you
11  took during your --
12     A.    It's -- it's overly broad, and it's
13  voluminous.
14     Q.    Ma'am, please do not --
15     A.    It's too much to have to do when --
16     Q.    Quit interrupting my questions, ma'am.
17  Stop doing that.  That's part of what's dragging
18  this thing out.  You need to wait until I'm finished
19  with my question before you talk over me --
20     A.    It's overly burdensome --
21          MR. BURKE:  -- okay?
22          THE DEPONENT:  What you're asking is
23  overly burdensome.  I can't answer all of that,
24  answer all of this.  I can't answer all of it.  I
25  have to go back through all of the notes.  Like --

Page 163
1  BY MR. BURKE:
2     Q.    List for me every protected activity that
3  you can think of today, sitting here under oath,
4  that you took --
5     A.    Every --
6     Q.    -- during your --
7     A.    Objection.
8     Q.    Ma'am, tell me every protected activity
9  that you took during your employment at Houston
10  Methodist that you are basing your retaliation
11  claims in this lawsuit.
12     A.    This is an argument, again, that we've
13  already had over claim versus cause of action versus
14  just what it says here, number 9 in the second
15  amended complaint on Page 4.  I don't know if it
16  includes every single retaliatory act that was taken
17  against me, but it's --
18     Q.    Ma'am --
19     A.    -- part of my complaint.
20     Q.    -- the question is about protected
21  activity, okay, not retaliation.  Protected
22  activity, okay?  Let's do it your way.  Let's look at
23  Exhibit 2, Paragraph 8, that's labeled Protected
24  Activity.  Do you see that?
25     A.    I'm scrolling back up.  Protected

Page 164
1  Activity.
2     Q.    Take a couple minutes, read through that
3  paragraph and tell me if there's anything that you
4  are claiming is protected activity on your part that
5  is not included in Paragraph 8.
6     A.    I think just the dates when I was first
7  hired, trying to ask for, when I texted Sunila Ali,
8  if I would be provided any -- with everything that I
9  needed and her saying that, yes, that I would, but
10  then not doing it is not necessarily a protected
11  activity, but at least protected activity, asking
12  for what I needed and then not providing it, I think
13  would be retaliation.
14     Q.    Okay.  I'm asking you about protected
15  activity right now, okay?
16     A.    You -- you said what --
17     Q.    My -- ma'am, my question is about --
18     A.    I -- asked and answered.
19     Q.    My question is about protected activity.
20  I'm asking, is there anything that you're contending
21  as a part of this lawsuit was protected activity
22  that is not included in Paragraph 8 of your second
23  amended complaint?
24     A.    I answered that question.  I said the only
25  thing that I can think of that is not just already

Page 165
1  included would include my asking for the handbook
2  when I was first hired.
3     Q.    First hired as a PCA or first hired at
4  Houston Methodist?
5     A.    As a PCA.
6     Q.    Okay.  Let's look at Paragraph 7, Hostile
7  Work Environment.  You see where I'm pointing to?
8     A.    I'm looking for Hostile Work Environment.
9  Yes, at 7.
10     Q.    Take a minute, read that paragraph, and
11  let me know if there's anything that you are
12  contending contributed to a hostile work environment
13  that is not included in Paragraph 7 of your
14  complaint.
15     A.    Can you ask the question again?  I was
16  reading while you were asking the question, and I
17  didn't hear it.
18     Q.    Okay.
19     A.    I got the first part of your question to
20  read over it, and then you started asking a question
21  while I was reading, and I did not hear the
22  question.
23     Q.    Okay.  Having read Paragraph 7 of the
24  second amended complaint, is there anything that
25  you're contending as a part of this lawsuit that

Page 166

1 contributed to a hostile work environment that is
2 not reflected in Paragraph 7 of your complaint?
3    A.   Honestly, not being provided everything
4 that I needed as -- in my role as a PCA.
5    Q.   So same thing as your answer to Paragraph
6 8?
7    A.   (No audible response.)
8    Q.   Anything else?
9    A.   Excuse me.  Not that I can think of right
10 now.
11    Q.   Turn back to the previous page, Paragraph
12 6.
13    A.   Okay.  I'm back on 6.
14    Q.   That's labeled Discrimination, correct?
15    A.   Correct, under Factual Allegations.
16    Q.   I understand that.  Take a moment or two
17 and read for me Paragraph 6.
18          THE DEPONENT:  I'm really tired and need a
19 break.
20          MR. BURKE:  Well, let me finish asking
21 this question, and we can take a break.
22          THE DEPONENT:  You had said earlier that
23 we could agree to -- if there was already a question
24 that needs to be answered, to wait until after I
25 answer it, but you haven't asked the question yet.

Page 167

1 Could I please take a break?
2          MR. BURKE:  How long a break do you need?
3          THE DEPONENT:  We've been taking five to
4 ten-minute breaks.  I wouldn't ask for more than
5 that, but we should be out of here by 5 o'clock.  I
6 have to call stop at 5.
7          MR. BURKE:  Okay.  I can tell you right
8 now, we're not going to be out of there by 5, so do
9 you want to take a break?
10          THE DEPONENT:  I can't stay after 5.  We
11 did not agree to stay after 5.  The -- the longest
12 time allowed is seven hours.  I've been here for
13 seven hours.
14          MR. BURKE:  Ma'am, do you want to take --
15 do you want to take a break, ma'am?
16          THE DEPONENT:  I need to take a break.
17          MR. BURKE:  So let's take a break.
18          THE VIDEOGRAPHER:  Okay.  Please stand by.
19 The time is 4:42 p.m.  We are off the record.
20          (WHEREUPON, a recess was taken.)
21          THE VIDEOGRAPHER:  The time is 4:53 p.m.
22 We are back on the record.
23          MR. BURKE:  Ms. Weathers, we took a break.
24 We're back on the record.  Are you ready to
25 continue?

Page 168

1          THE DEPONENT:  Not really.  No.  I would
2 like to stop now.  I've been here for almost seven
3 hours, and I think it's time to conclude.
4          MR. BURKE:  Well, I -- I'm not ready to
5 conclude yet, so that's not an option right now.
6          THE DEPONENT:  I've given you seven hours
7 today.  That's the maximum allowed.
8          MR. BURKE:  Ma'am, we --
9          THE DEPONENT:  When I agreed to giving you
10 today's date, I agreed to seven hours for today.
11 It's been seven hours.
12          MR. BURKE:  I'm going to continue with my
13 examination.  You understand you're still under
14 oath, correct?
15          THE DEPONENT:  I agreed -- I gave you 10
16 o'clock today for -- and I agreed to a seven-hour
17 deposition.  That's the maximum required.  This is
18 not fair.
19          MR. BURKE:  Okay.
20          THE DEPONENT:  You can't hold me past that
21 time.
22          MR. BURKE:  Let's -- let's go off the
23 record.  I'm not going to have this argument eat up
24 my -- my time, so let's go off the record.
25          THE REPORTER:  Go ahead and go off the

Page 169

1 record.
2          THE VIDEOGRAPHER:  Oh, I see.  The time is
3 4:54.  We are going off the record.
4          (WHEREUPON, a recess was taken.)
5          THE VIDEOGRAPHER:  The time is 5:21 p.m.
6 We are back on the record.
7          MR. BURKE:  Ms. Weathers and I just had a
8 telephone conference with Judge Bryan, and according
9 to the agreement of the parties during that call
10 conference, we will adjourn this deposition for the
11 time being, until the morning of November 19th at 9
12 a.m.  Central.  We will then complete Ms. Weathers'
13 deposition at that time.
14          After completion of her deposition, Ms.
15 Weathers will then be able -- will have the
16 opportunity to depose Sunila Ali as noticed for
17 November 19th.  Do you -- does that state the
18 arrangement correctly in your mind, Ms. Weathers?
19          THE DEPONENT:  Sorry?
20          MR. BURKE:  I'm sorry?
21          THE DEPONENT:  Can you repeat that,
22 please?
23          MR. BURKE:  I'm sorry?
24          THE DEPONENT:  Can you repeat that,
25 please?

Page 170

1           MR. BURKE:  The -- we had a discussion
2  with Judge Bryan off the record, and according to
3  the discussion that we had with Judge Bryan, the
4  parties have agreed to adjourn your deposition for
5  the time being, to be restarted at 9 a.m.  Central
6  on November 19th until my questions are complete or
7  the seven-hour limit is reached, whichever comes
8  first.  And then after the completion of your
9  deposition that morning, you'll have the opportunity
10 to depose Sunila Ali.  And I was asking if that
11 accurately reflects your understanding of what our
12 discussion with the judge was.
13           THE DEPONENT:  Yes.
14           MR. BURKE:  Okay.  Then we will adjourn
15 this deposition at this time, subject to that
16 stipulation.
17           THE VIDEOGRAPHER:  Yeah.
18           THE REPORTER:  Thank you.
19           And before we go off the record, Mr.
20 Burke, would you like to order the original of this
21 transcript?
22           MR. BURKE:  Yes.
23           THE REPORTER:  Thank you, sir.  The
24 videographer will ask --
25           THE VIDEOGRAPHER:  And -- yeah.  And I

Page 171

1  believe Mr. Burke will get automatically the video
2  as part of the appearance fee, right?
3           THE REPORTER:  Yes.
4           THE VIDEOGRAPHER:  And so you were -- you
5  were -- Ms. Weathers, you were mentioning about
6  getting the transcript and video for yourself,
7  possibly.
8           I'll put that in there so the company, the
9  Naegeli will contact you for that, so --
10          THE REPORTER:  I need you to fill out that
11 -- that top portion.
12          THE VIDEOGRAPHER:  Yeah.  You -- you have
13 to fill out that form anyway, okay?  Yeah, and give
14 me a copy for the -- I'll get that one --
15          THE REPORTER:  Okay.  Thank you.
16          THE VIDEOGRAPHER:  -- so I cannot select
17 the company.
18          THE REPORTER:  Okay.  Can we go off the
19 record so this is not all on the record?
20          THE VIDEOGRAPHER:  Yeah.  I'm -- I'm --
21          THE REPORTER:  Thank you.
22          THE VIDEOGRAPHER:  Now, so today, November
23 5th, 2025, this is the end of the deposition of
24 Caitlin Weathers for today, and it is understood
25 that it will be resumed another day, as discussed

Page 172

1  before.
2           And the time is 5:34 p.m.  And we are off
3  the record.
4           (WHEREUPON, the deposition of CAITLIN
5  WEATHERS was adjourned at 5:34 p.m.)

Page 173

1                    CERTIFICATE
2
3       I, the undersigned Narayanan Balu, am a
4  videographer on behalf of NAEGELI Deposition &
5  Trial. I do hereby certify that I have accurately
6  made the video recording of the deposition of
7  Caitlin Weathers, in the above captioned matter on
8  the 5th day of November, 2025 taken at the location
9  of 3511 Shannon Rd, 3rd floor, Durham, NC 27707.
10
11      No alterations, additions, or deletions were
12 made thereto.
13
14      I further certify that I am not related to any
15 of these parties in the matter and I have no
16 financial interest in the outcome of this matter.
17
18
19
20
21
22
23                 Narayanan Balu
24
25

Page 174

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF TEXAS
 3                  HOUSTON DIVISION
 4
 5   CAITLIN WEATHERS,
 6          Plaintiff,
 7   vs.              CIVIL ACTION NO.: 4:22-cv-04085
 8   HOUSTON METHODIST HOSPITAL,
 9   and SUNILA ALI,
10          Defendants.
11
12
13           REPORTER'S CERTIFICATION
14           DEPOSITION OF CAITLIN WEATHERS
15               NOVEMBER 05, 2025
16
17       I, Alessandra De Souza Court Reporter, hereby
18   certify to the following:
19       That the witness, Caitlin Weathers, was duly
20   sworn by the officer and that the transcript of the
21   oral deposition is a true record of the testimony
22   given by the witness;
23       That the deposition transcript was submitted on
24   October 27, 2025, to the witness or to the attorney
25   for the witness for examination, signature and
```

Page 175

```
 1   return to NAEGELI DEPOSITION AND TRIAL by December
 2   21, 2025;
 3       That the amount of time used by each party at
 4   the deposition is as follows:
 5           MICHAEL BURKE — 3hr 50min
 6       That pursuant to information given to the
 7   deposition officer at the time said testimony was
 8   taken, the following includes counsel for all
 9   parties of record:
10           CAITLIN WEATHERS PRO SE FOR PLAINTIFF
11           MICHAEL BURKE ATTORNEY FOR DEFENDANT
12       I further certify that I am neither counsel
13   for, related to, nor employed by any of the parties
14   or attorneys in the action in which this proceeding
15   was taken, and further that I am not financially or
16   otherwise interested in the outcome of the action.
17       Certified to by me this 1st day of December,
18   2025.
19
20
21
22
23           Alessandra De Souza
24
25
```

Page 176

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF TEXAS
 3                  HOUSTON DIVISION
 4
 5   CAITLIN WEATHERS,
 6          Plaintiff,
 7   vs.              CIVIL ACTION NO.: 4:22-cv-04085
 8   HOUSTON METHODIST HOSPITAL,
 9   and SUNILA ALI,
10          Defendants.
11
12
13
14
15       FURTHER CERTIFICATION UNDER RULE 203 TRCP
16       The original deposition of Caitlin Weathers __
17   was ____ was not returned to the deposition officer.
18       If returned, the attached Changes and Signature
19   page contains any charges and the reasons therefor;
20       If returned, the original deposition was
21   delivered to _____, custodial
22   attorney;
23       That _____ is the deposition officer's
24   charges to _____, attorney for
25   the _____, for preparing the original
```

Page 177

```
 1   deposition transcript and any copies of exhibits;
 2       That the deposition was delivered in accordance
 3   with Rule 203.3, and that a copy of this certificate
 4   was served on all parties shown herein on and filed
 5   with the Clerk.  Certified to by me this _____ day
 6   of _____, 2025.
 7
 8
 9
10
11
12           _____
13                   Alessandra De Souza
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 178

```
 1              CORRECTION SHEET
 2  Deposition of: Caitlin Weathers    Date: 11/05/2025
 3  Regarding: Weathers vs Houston Methodist Hospital
 4  Reporter: De Souza/Seaman
 5  _____
 6  Please make all corrections, changes or
 7  clarifications to your testimony on this sheet,
 8  showing page and line number.  If there are no
 9  changes, write "none" across the page.  Sign this
10  sheet on the line provided.
11  Page  Line  Reason for Change
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24          Signature: _____
25                  Caitlin Weathers
```

Page 179

```
 1              DECLARATION
 2  Deposition of: Caitlin Weathers    Date: 11/05/2025
 3  Regarding: Weathers vs Houston Methodist Hospital
 4  Reporter:  Alessandra De Souza
 5  _____
 6
 7  I declare under penalty of perjury the following to be
 8  true:
 9
10  I have read my deposition and the same is true and
11  accurate save and except for any corrections as made
12  by me on the Correction Sheet herein.
13
14  Signed at _____, _____
15  on the _____ day of _____, 20____.
16
17
18
19
20
21
22
23
24          Signature: _____
25                  Caitlin Weathers
```

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

CAITLIN WEATHERS,

      Plaintiff,

v.                         CIVIL ACTION NO. 4:22-cv-04085

HOUSTON METHODIST

HOSPITAL and SUNILA ALI,

      Defendants.

_____

VIDEOTAPED DEPOSITION OF

CAITLIN WEATHERS

DAY 2

TAKEN ON

WEDNESDAY, NOVEMBER 19, 2025

9:58 A.M.

NAEGELI DEPOSITION & TRIAL

3511 SHANNON ROAD, THIRD FLOOR

DURHAM, NORTH CAROLINA 27707

Page 2

```
 1                    APPEARANCES
 2
 3  Appearing on behalf of the Plaintiff:
 4  CAITLIN WEATHERS, PRO SE
 5  2616 Erwin Road, Apartment 2218
 6  Durham, North Carolina 27705
 7  (832) 314-6357
 8  j.weathersca@gmail.com
 9
10  Appearing on behalf of the Defendants:
11  MICHAEL K. BURKE, ESQUIRE
12  Scott Patton, P.C.
13  717 Texas Avenue
14  Houston, Texas 77007
15  (281) 377-3311
16  mburke@scottpattonlaw.com
17
18  Also Present:
19  Sunila Ali, Defendant (via Zoom)
20  Jess Bryan, Naegeli Technician
21
22
23
24
25
```

Page 4

```
 1                    EXHIBIT INDEX
 2  EXHIBIT                                              PAGE
 3
 4     20        EMPLOYEE HANDBOOK ACKNOWLEDGEMENT         59
 5     21        DISCUSSION SUMMARY                        46
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 EXAMINATION INDEX
 2                                                       PAGE
 3
 4  EXAMINATION BY MR. BURKE                               7
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              VIDEOTAPED DEPOSITION OF
 2                  CAITLIN WEATHERS
 3                      DAY 2
 4                    TAKEN ON
 5           WEDNESDAY, NOVEMBER 19, 2025
 6                    9:58 A.M.
 7
 8            THE VIDEOGRAPHER:  We are on the record.  The time is
 9  9:58 a.m.  The date is November 19, 2025.
10            This is the beginning of the deposition of Caitlin
11  Weathers.
12            The case caption is -- one moment -- Weathers versus
13  Houston Methodist.
14            Will Counsel introduce yourselves and state whom you
15  represent.
16            THE REPORTER:  Counsel, you can go ahead.
17            MR. BURKE:  I -- I'm sorry.  I didn't -- I didn't
18  hear what she said.
19            THE REPORTER:  That's okay.
20            THE VIDEOGRAPHER:  I was just doing a read on -- on
21  statement.  I was asking if counsel could introduce themselves.
22            MR. BURKE:  Oh, I'm sorry.  Okay.  Mike Burke on
23  behalf of Houston Methodist and Sunila Ali.
24            THE REPORTER:  Okay.  Thank you, Counsel. Like I was
25  saying, I'm the court reporter for today and I have a quick
```

Page 6

1  statement to make for the record.
2          I would like everyone to please speak loudly, slowly,
3  and clearly so I can make an accurate transcript today. Please
4  do not talk over one another because I can only report one
5  person at a time.
6          I will be recording the Zoom meeting today to solely
7  assist in producing the transcript. Please note that the media
8  will not be available for production for either side.
9          When you see a pop-up prompt in Zoom, please --
10 please click okay or got it. Thank you.
11         I will be administering an affirmation for any
12 testimony given. I would like to stipulate for the record that
13 the affirmation and the testimony will be administered and
14 reported by a professional digital reporter. The testimony
15 will be transcribed and certified.
16         And I know you are ready to go, Mr. Burke?
17         MR. BURKE: I am.
18         THE REPORTER: All right. Ms. Weathers, please raise
19 your right hand.
20         Do you affirm, under penalty of perjury, that the
21 testimony you're about to give will be the truth, the whole
22 truth, and nothing but the truth?
23         THE DEPONENT: I do.
24         THE REPORTER: Thank you.
25         Counsel, you may proceed.

Page 7

1  CAITLIN WEATHERS, having been first duly affirmed to tell the
2  truth, was examined, and testified as follows:
3  EXAMINATION
4  BY MR. BURKE:
5      Q.  Ms. Weathers, we are here today to resume your
6  deposition that we started a couple of weeks ago. You
7  understand that, correct, ma'am?
8      A.  On December 5th or -- sorry -- November 5th was our
9  first.
10         THE REPORTER: Can you just speak a little bit louder
11 for me, please?
12 BY MR. BURKE:
13     Q.  And you understand that you are still under oath,
14 correct?
15     A.  Correct.
16     Q.  I -- I didn't hear that.
17     A.  Correct.
18     Q.  Okay. All right. I'm going to share my screen.
19     A.  I can't read that --
20     Q.  Are you able to see -- are you able to see this
21 document?
22     A.  The computer screen is more than an arm's length away
23 from me. I can't see or read any of that.
24         THE REPORTER: Okay. Go ahead, Counsel.
25 BY MR. BURKE:

Page 8

1      Q.  All right. Are you able to -- are you able to see
2  this document, ma'am?
3      A.  Yes.
4      Q.  And have you seen this before?
5      A.  Correct. I believe this is the second copy after, I
6  think, originally, Sunila Ali had tried to submit a misconduct
7  DCR, and this instead was a performance improvement plan that
8  was issued. I don't know how or why that happened, but this is
9  what they had asked me to sign, but I did not.
10     Q.  You understand this is a disciplinary/counseling
11 report issued on August 23rd, 2021, correct?
12     A.  I can read that it says disciplinary/counseling
13 report.
14     Q.  Okay. Do you see this paragraph that I've
15 highlighted here?
16     A.  All of box one.
17     Q.  Yes. It says, "On 8/19/2021, Caitlin was assigned
18 PCA for bed 35. Patient had an external ventricular drain,
19 (EVD) which was clamped. The bedside RN was at lunch when she
20 received a call from Caitlin that she could sit her patient up
21 to eat. The nurse mentioned to Caitlin that she didn't have to
22 do anything else except sit the patient up and move his tray
23 closer, and the EVD is clamped."
24         Do you remember the situation that's described here
25 in this paragraph, ma'am?

Page 9

1      A.  This was the situation with Cassie Hull.
2      Q.  And you -- you remember this situation?
3      A.  Yes.
4      Q.  Okay.
5      A.  I called her, yes. That's correct. I did call her.
6      Q.  Okay. And did you adjust the EVD as described in
7  this paragraph?
8      A.  I did what I was told to do, which was to turn it a
9  specific way because it was not clamped.
10     Q.  Ma'am, my question is yes or no. Did you adjust the
11 EVD?
12     A.  As I was told by another nurse, yes.
13     Q.  Who was the nurse that told you to touch the EVD?
14     A.  His name was Erin.
15     Q.  Erin what?
16     A.  I can't remember his last name right now.
17     Q.  What did Erin look like?
18     A.  A male -- a male nurse.
19     Q.  What -- what -- how tall was he? What color was his
20 hair? Can you --
21     A.  He was --
22     Q.  -- describe him for me?
23     A.  -- tall. Had brown hair.
24     Q.  Do you know -- had you worked with Erin before?
25     A.  Yes.

Page 10

1    Q.   Was this Erin's patient or was it Ms. Hull's patient?
2    A.   This was Cassie Hull's patient.
3    Q.   Okay.  So you acknowledged that it was Ms. Hull's
4  patient.  Do you remember Ms. Hull telling you not to --
5    A.   She did tell me to take the patient to the next room.
6    Q.   Ma'am, please do not start your answers -- we've been
7  through this before.  Let me finish my question before you
8  start answering, okay?
9         As the court reporter says, she can't take it down
10 when two people are talking.  So please let me finish my
11 question before you start answering.
12   A.   I apologize.  I did hear you say do you remember and
13 it sounded like that was the question.  Do you remember?
14        I was not trying to talk over you.  I was trying to
15 answer your question, do you remember?
16   Q.   Okay.  Did Ms. Hull instruct you to adjust the EVD in
17 any way?
18   A.   She asked me to move the patient to -- yes, get the
19 patient up and take the patient to the restroom.  We're not
20 allowed to do that, to let them drain unless they're locked.
21        I told her, no, I do not see it being locked.  It's
22 still draining.  I told her --
23   Q.   And Ms. Hull --
24   A.   -- she could come and check it, but I did not see.
25 Okay.

Page 11

1    Q.   Did Ms. Hull instruct you to adjust the EVD?
2    A.   No.
3    Q.   Okay.  Did Ms. Hull ask you if you turned the knobs
4  on the EVD when she returned?
5    A.   She just told me I don't care, I'm not coming over
6  there, just take him to the restroom.  I'm not leaving on my
7  lunch.  And I told her I don't think that it's clamped.
8    Q.   After this occurred, did Ms. Hull tell you that you
9  should never touch an EVD?
10   A.   I had asked her I -- I don't understand, can you
11 please provide this in writing.  I'm not understanding exactly
12 what you mean because other PCAs are still performing this
13 task, and it's still being required in certain situations.
14        MR. BURKE:  Objection.  Non-responsive.
15 BY MR. BURKE:
16   Q.   My question is:  Did Ms. Hull on this occasion
17 instruct you to never touch an EVD?
18   A.   Yes and no.  Not in exactly those words, and never in
19 writing.
20   Q.   Okay.  I didn't ask if it was in writing.  Did she
21 orally tell you that you were not supposed to adjust --
22   A.   Not exactly, no.
23   Q.   -- the EVD?
24   A.   No -- no.  Not exactly in writing.  No.
25   Q.   Okay.  What exactly did she say?

Page 12

1    A.   I can't remember.
2    Q.   Okay.
3    A.   It was never written down.
4    Q.   Okay.  It was part of -- it -- as a PCA, you're
5  supposed to follow nurse instructions, correct?
6    A.   Tasks that are carried out by nurses, correct.  But
7  there was no consistency.
8         So what you're asking for is just to carry out tasks
9  that are not written down, that are just completely
10 individually nurse directed on each individual nurse's
11 preferences is not a reasonable expectation.  I'm not
12 understanding.
13   Q.   Is it your contention that every single task that you
14 were supposed to perform as a PCA was supposed to be given to
15 you in writing?
16   A.   A general expectation.  Other PCAs were still turning
17 on and off these clamps.  And if there was a genuine
18 expectation for us to either not touch them or touch them,
19 either way, it would have needed to be in writing.
20        What is this units?  It's something that this unit-
21 specifically needed us to use, and it wasn't anything that was
22 provided in writing to us as PCAs that could be consistently
23 carried out for each PCA to have knowledge.  At least not to
24 me, for me to know that this is what we expect for this
25 specific tool that we use on this unit.  So --

Page 13

1    Q.   So do you --
2    A.   -- no, I was never given any of those instructions.
3    Q.   Is it your position that as a PCA, you were only
4  required to follow written instructions from nurses?
5    A.   That's the assumption I am drawing from the question
6  and how you're poising this answer.
7    Q.   I -- I'm -- I'm asking in general now.  I'm not
8  asking about this particular instance.  Is it your position
9  that as a PCA at Houston Methodist, you were only required to
10 follow written instructions by nurses?
11   A.   I think that's a very pointed question that's
12 requesting a very specific answer.  That you're looking for a
13 specific answer.
14   Q.   I'm asking for your answer.  I'm asking for an answer
15 from you.  My question, again, is:  Is it your position that as
16 a PCA, you were only required to follow written instructions
17 from nurses?
18   A.   I don't know if it was specifically written or stated
19 that I'm specifically only supposed to ever follow just what
20 was written, but I think to at least have a standard guideline
21 for consistency for PCAs is necessary, essential, and what the
22 accrediting agency requires.  That's what the --
23   Q.   But do you --
24   A.   -- job description stated would be given to me, and
25 it was -- it was not.

Page 14

1    Q.    Is it your position that PCAs --
2    A.    Sunila told me that she would give me what I --
3    Q.    Ma'am --
4    A.    -- needed for the --
5    Q.    -- please do not interrupt me when I'm talking.  This
6  is a problem at the -- your first deposition.  You have to let
7  me finish my question --
8    A.    You're not letting me finish answering the questions
9  that you're asking me.  If -- I'm -- I'm giving you many
10 answers in many sentences, and I'm trying to give you complete
11 answers and you're not accepting them.  And then you talk over
12 me and tell me to stop talking and to answer a new question, a
13 new compound question.
14   Q.    I don't -- I don't need you arguing with me.  I just
15 need you to answer my question.
16   A.    But you're arguing with my answers that I'm giving
17 you.
18   Q.    Okay.  I'm going to ask the question again, Ms.
19 Weathers, is it your position that you were only required to
20 follow written instructions from nurses, yes or no?
21   A.    I don't know how to answer that question.  That's --
22 what I had already stated.  Asked and answered.
23   Q.    Is it your position that every nurse had to give
24 every PCA the same exact instruction?
25   A.    I'm not -- I've already answered this question.

Page 15

1    Q.    You haven't answered that question, and I'm asking
2  you the question now.  Give me an answer to that question.
3    A.    I think you're trying to ask a question that is
4  requiring a specific answer, that you're looking for a specific
5  answer, and I don't feel comfortable.
6    Q.    Give me your specific answer to that question.
7    A.    I think you're intending to harass me at this point.
8  We've been arguing, and I've answered the question the best
9  that I can.
10   Q.    You haven't answered the question at all, ma'am.  I'm
11 -- I'm trying to get to the basis of your claims here, and you
12 keep telling me you don't understand my questions.
13        I'm asking a simple question: Do you agree with me
14 that it was part of the PCA job to follow instructions from
15 nurses?
16   A.    Yes.
17   Q.    Yes or no?  Okay.
18   A.    Follow instructions -- yes -- yes.
19   Q.    Okay.  Does -- do those instructions from nurses have
20 to be in writing?  Yes or no?
21   A.    Yes.
22   Q.    Okay.  So oral instructions from nurses were invalid
23 to you; is that correct?
24   A.    Again, I think you are mischaracterizing.  I didn't
25 specifically say that.  And it's kind of a compound question

Page 16

1  that you're trying to combine here and no.
2    Q.    It's not a compound question.  Is it your position
3  when you worked as a PCA at Houston Methodist, that oral
4  instructions from nurses were invalid?  Yes or no?
5    A.    Oral instructions that are supposed to come from --
6  derived from written instructions.  They're not supposed to ask
7  questions or give directives that would be outside of what
8  would be written guidelines.
9    Q.    Okay.  Do you see Paragraph 2, here, that I've
10 highlighted?  Do you see what I've highlighted, ma'am?
11   A.    I see section two is highlighted.
12   Q.    Okay.  Are you familiar with the situation that's
13 described here in Paragraph 2?
14   A.    Do you want me to read it first?
15   Q.    I'll read it for you if that's the way you want to do
16 it.  "On 8/17/2021, Caitlin worked night shift and was assigned
17 PCA for bed 36.  The bedside RN went to the -- went to CT scan
18 with one of her patients, and when she came back from CT, she
19 saw Caitlin and RT in her other patient's room.  She went to
20 bed 36 and made sure everything was okay.  And the RT said she
21 was putting her patient back on his BiPAP machine."
22        Do you know what a BiPAP machine is?
23   A.    It helps the patient with their breathing.
24   Q.    Okay.  "The RN asked the RT if the patient had had
25 taken it off, and the RT replied that PCA Caitlin was giving

Page 17

1  patient ice chips."
2        Do you remember this situation?
3    A.    I remember that date.  And I --
4    Q.    Ma'am, yes or no?
5    A.    I -- no.  I --
6    Q.    Do you remember --
7    A.    -- do not remember ever giving a patient -- patient
8  ice chips because I never did give a patient ice chips.  That's
9  a flat no.  I do not remember that, but I think I understand the
10 general situation to what she's referring to, the date and who
11 that was, and the respiratory therapist being there.  But no, I
12 never gave a patient ice chips.
13   Q.    Did you adjust the BiPAP machine in any way?
14   A.    No, I didn't adjust it in any way.  I did touch it so
15 that it started beeping and the respiratory therapist came
16 over, but that was it.  I did what the respiratory therapist
17 told me to do.  And she came over and I left.
18   Q.    What did the respiratory therapist tell you to do?
19   A.    He was, like, convulsing and shaking, and she told me
20 to help him.
21   Q.    Who was convulsing and shaking, the patient?
22   A.    The patient was, like, as soon as he saw that the
23 nurse was coming in with the next patient, he started moving.
24        So I walked over closer toward him.  I could see when
25 I was, like, walking across the foot of his bed that what was

Page 18

1  ice chips was now water.
2          But I didn't pick it up or take it over to him. I
3  stood beside him in case something could have happened. The
4  respiratory therapist was telling me to help him with the
5  machine, and I told her, I can't do that. I don't know how to
6  do that.
7          She's like, just try to get it. I'm like, what are
8  you wanting me to do? I'm like -- and I touched the Velcro,
9  and she's like, okay, I'm coming because it started beeping.
10 But then --
11     Q.  Did you touch the knob?
12     A.  -- the scenario that she created that I took it off
13 and I was giving him ice chips is preposterous. I wouldn't have
14 been capable, especially because the respiratory therapist was
15 right there.
16     Q.  Who was the respiratory therapist that was right
17 there?
18     A.  I can't remember what her name was. She wasn't
19 someone that I worked with daily. It was someone who was
20 assigned to this specific patient.
21     Q.  You mentioned you touched the BiPAP machine. What did
22 you do when you touched the BiPAP machine?
23     A.  I touched the Velcro.
24     Q.  For what reason?
25     A.  Because the respiratory therapist was telling me to.

Page 19

1      Q.  The respiratory therapist told you to touch the
2  Velcro on the BiPAP machine?
3      A.  Yes.
4      Q.  Okay. You see, I've highlighted Paragraph 3?
5      A.  Yes.
6      Q.  Are you familiar with this situation that's
7  described?
8      A.  Do you want me to read it or do you want to read it?
9      Q.  What would you like to do? Would you like to read it
10 and tell me whether you're familiar with it?
11     A.  I would rather be done with our depositions, whatever
12 makes this --
13     Q.  That's not an option. So --
14     A.  Whatever is smoother.
15     Q.  Okay. First paragraph -- I mean, this paragraph
16 says, "First situation happened with a patient who had an EVD
17 in place." It's an EVD that we talked about earlier, correct?
18 External ventricular drain.
19     A.  On another occasion, or --
20     Q.  Is that correct? Ma'am?
21     A.  I'm reading because I do not know what you're
22 referring to.
23     Q.  You don't know what an EVD is?
24          THE REPORTER: Ma'am, you have to do it silently
25 because every word you say, I have to record.

Page 20

1          THE DEPONENT: Okay.
2          THE REPORTER: Thank you so much.
3          THE DEPONENT: I don't know who this is. No. I don't
4  know what this is referring to.
5  BY MR. BURKE:
6      Q.  You don't remember this situation at all?
7      A.  I think I may vaguely remember who it might have
8  been, but no, I don't recall that situation.
9      Q.  What is your vague recollection of who you think it
10 might have been?
11     A.  I think based on other things that I have read, that
12 this might have been from someone named Savannah, where she
13 stated that I talked to her and she was crying, referring to
14 me, she was talking to me, and I cried, and she thought that
15 that must have meant that I was understanding of the situation.
16          But again, if I was moving a patient to ambulate and
17 they had an an EVD in place, and it needed to be clamped. If
18 it wasn't already clamped and they told me not to touch it, and
19 I didn't touch it and it was draining, then I don't think that
20 that was my fault. So I'm thinking that's what this situation
21 looks like to me.
22     Q.  On the situation you think it looks like, did you
23 adjust the EVD?
24     A.  I don't think so, no.
25     Q.  Do you remember for sure?

Page 21

1      A.  If it was draining, no. If I touched the EVD, it was
2  simply just to move the patient to walk them to the bathroom.
3          And I'm thinking what happened is I -- she was
4  talking to doing hand-off and I asked, do you want this patient
5  to get out of bed, is it okay. And she probably was like,
6  yeah, yeah, yeah. And then realized, oh, wait, never mind. I
7  didn't want to do that.
8      Q.  All right. Do you see the next paragraph that I've
9  highlighted here?
10     A.  Correct.
11     Q.  Okay. It says, "Same day, second situation occurred
12 with a patient that had a lumbar drain in place. The patient
13 had an order to drain 10 milliliters an hour and was also good
14 about calling before getting up. RN was helping the neighbor
15 nurse as her patient was in tachycardia and all their
16 electrolytes were low."
17          "For this reason, RN did not hear the patient's call
18 light go off immediately. After a few minutes, another RN
19 responded to the call light and walked into the patient's room.
20 She witnessed that Caitlin had gotten the patient out of bed,
21 and the patient had drained 30 milliliters of cerebral spinal
22 fluid (CSF). RN contacted the bedside RN and told her what had
23 happened."
24          "The bedside RN clamped the lumbar drain and
25 contacted neurosurgery. Patient complained of minor headaches

Page 22

1 but did not display any other abnormal symptoms. RN waited to
2 step outside to reeducate the PCA about the situation that had
3 just occurred."
4        "RN emphasized that only the nurse should be managing
5 the lumbar drain and that the nurse needs to be there to adjust
6 the lumbar drain before any position changes are made. This
7 PCA verbalized understanding. Per RN, the PCA understood the
8 severity of getting that patient out of bed and the risks
9 involved."
10        As I read it, do you -- are you familiar with the
11 situation that this paragraph describes, ma'am?
12        A.   I'm thinking it's very similar to what happened
13 before, that it wasn't communicated, and I was performing a
14 routine task that I'm supposed to carry out, and either because
15 the nurse didn't clamp it or yeah.
16        What -- didn't communicate with me that the patient
17 wasn't supposed to be getting out of bed. Obviously, they were
18 a patient that could ambulate and were supposed to be walking
19 to the bathroom. They didn't have a catheter or anything, so
20 --
21        Q.   My question is: Do you remember this specific --
22        A.   I don't. I don't know who that was. I do not.
23 There's not a name there. I don't know who that was, but
24 that's what I'm thinking that -- that's --
25        Q.   Did -- did -- have you ever adjusted a lumbar drain

Page 23

1 on a patient? As a PCA at Houston Methodist.
2        A.   In the case with Cassie, yes. But this situation,
3 no.
4        Q.   Okay. All right. We started to get into this last
5 time, but we didn't get very far, so I'm going to try again.
6 You've sued Houston Methodist for discrimination based on you
7 being a Caucasian, non-Hispanic, white female, correct?
8        A.   Correct.
9        Q.   Okay. I want you to tell me every incident that you
10 claim was discrimination on Houston Methodist part based on the
11 fact that you're a Caucasian, non-Hispanic, white female, that
12 you are pursuing in this lawsuit.
13        A.   I don't know if I'm going to be able to tell you
14 every single instance, that's overly burdensome.
15        Q.   Ma'am, it's not overly burdensome. You brought a
16 lawsuit, and if this case goes to trial, you're going to have
17 to testify about what you claim was discrimination. And so
18 that's what I'm --
19        A.   And for me --
20        Q.   -- asking here.
21        A.   -- to answer the question --
22        Q.   Ma'am, please don't interrupt. I'm asking you, if we
23 go to trial, what are you going to get up on the stand and say
24 were the discriminatory acts that Houston Methodist took
25 against you because of the fact that you're a Caucasian, non-

Page 24

1 Hispanic white female? What's the first one that you can think
2 of?
3        A.   Retaliation.
4        Q.   Retaliation is different. I'm talking about
5 discrimination. We'll get to retaliation. I want to know what
6 you -- what you are contending in this lawsuit was
7 discrimination on behalf of Houston Methodist.
8        A.   In the reports that they made about me, after I filed
9 reports of discrimination, they said, again, we don't like her.
10 She's crazy, she's flat. And -- yeah.
11        Q.   Who said that?
12        A.   I think it was nurses and PCAs, but I can recall one
13 PCA specifically saying that, the other PCAs, we don't like
14 her.
15        Q.   So a PCA told you that other PCAs --
16        A.   No.
17        Q.   -- don't like you?
18        A.   In her interview about what was going on after I had
19 filed reports.
20        Q.   Okay. "Her interview," who are you talking about?
21        A.   I can't remember her name. It was a PCA.
22        Q.   Okay. A PCA was interviewed by someone?
23        A.   Right.
24        Q.   By who?
25        A.   Sunila Ali and Mariana Mondragon.

Page 25

1        Q.   And so in this interview, this PCA said she didn't
2 like you?
3        A.   Yes.
4        Q.   And you feel that's discrimination from Houston
5 Methodist?
6        A.   Yes.
7        Q.   Because a PCA said she didn't like you?
8        A.   Because instead of coaching the person or trying to
9 take action on the complaints to make things like that not
10 happen again. I was placed on a performance improvement plan.
11 Because they didn't like me.
12        Q.   And you were placed on a performance improvement plan
13 because other PCAs didn't like you?
14        A.   Where Sunila Ali's expectations were just to job-
15 shadow and didn't provide any written instructions to me, my
16 job heavily depended on them liking me and providing me with
17 what I was going to need to actually perform these skills. And
18 because they didn't like me, it raises the question whether my
19 training was really adequate.
20        Q.   Okay. So PCAs didn't like you. That's
21 discrimination from Houston Methodist. What's the next thing
22 you can tell me about that was discrimination on behalf of
23 Houston Methodist?
24        A.   Cameron Shonk being really loud and calling me names
25 and nobody doing anything about it.

Page 26

1    Q.   Okay.  When did -- when did that occur?
2    A.   Ongoingly throughout the duration that I worked with
3 him.
4    Q.   Did you work with him as a patient transporter or as
5 a PCA?
6    A.   That was in my role as a PCA.
7    Q.   Okay.  Cameron Shonk, I believe you said he called
8 you white trash?
9    A.   Yes.
10   Q.   Okay.  What's the next thing you can tell me about
11 that you are claiming in this lawsuit is discrimination on
12 Houston Methodist's part?
13   A.   Being given a communication record after filing a
14 report of someone smoking marijuana in the hospital.
15   Q.   That happened in 2020 when you were a patient
16 transporter, correct?
17   A.   Correct.
18   Q.   Okay.  What's the next thing you can tell me about
19 that was discrimination on Houston Methodist part?
20   A.   Sharon Agwaye and reporting her touching me
21 inappropriately and then calling me crazy, and then Houston
22 Methodist firing me the next day.
23   Q.   So is this the incident you're talking about where
24 she rubbed her chest up against you?
25   A.   Yes.

Page 27

1    Q.   And so that happened on October 3rd of 2021. Is that
2 what you're telling me?
3    A.   Yes.
4    Q.   Did you report that?
5    A.   Yes.
6    Q.   To whom?
7    A.   I reported both -- both instances. I reported first
8 to -- I can't remember, someone management in the Neuro ICU,
9 and then again to someone in HR.
10   Q.   Okay.  Was there -- so this incident, did -- she
11 rubbed her chest against you and called you crazy. Did she do
12 anything else at this time that you reported?
13   A.   Yeah.  In the -- in the last instance before I was
14 fired, she called me more than one name. I mean -- yeah.
15   Q.   What -- what names did she call you?
16   A.   Psychotic, crazy, gay.
17   Q.   Okay.  What -- I want to go back to the first
18 incidence. You said the PCA didn't like you.  Why did -- do
19 you know why they didn't like you?
20   A.   I was different being the only white, Caucasian, non-
21 Hispanic employee in that job role.
22   Q.   Why -- what are you basing that on?  When you say you
23 think they didn't like you because you were the only white
24 Caucasian, non-Hispanic female, what are you basing that on?
25   A.   Because they treated me differently.

Page 28

1    Q.   What -- what are you basing your conclusion that it
2 was because you were a white Caucasian, non-Hispanic female?
3 Just because you were the only one?
4    A.   Because they excluded me from things.  They left me
5 out of, like, important information that I needed to do my job.
6 When I asked them for material that would help me to perform my
7 job, they didn't provide it to me.
8         When I asked them to stop gossiping, whether about me
9 or other employees, they would roll their eyes at me.  When
10 they spelled my name wrong and I asked them to stop, they
11 scoffed at me.
12   Q.   I mean, you're telling me what they did, but what my
13 question is -- is: What -- where does your belief come from
14 that they did those things because you were a Caucasian, white,
15 non- Hispanic female?
16   A.   I --
17   Q.   Is it just -- ma'am, let me finish.  Is it just
18 because you were the only white Caucasian, non-Hispanic female?
19   A.   Because I was the only person who would get yelled at
20 if I didn't do things in a way that -- I don't know.  I don't
21 even think it was the way that I did things because they would
22 be accepting of other people who they did like, who were of
23 their same race.
24         But if I did the same thing, they were not accepting
25 of it.  If someone had only three blankets in the linen closet,

Page 29

1 it's fine.  But if I only had three instead of four blankets in
2 the linen closet, suddenly, we need to report it to upper
3 management.
4    Q.   But it's just your belief that that's the reason,
5 correct?
6    A.   (No audible response.)
7    Q.   Is that a yes?
8    A.   I don't think it's just my belief.
9    Q.   Okay.  What evidence do you have that it's anything
10 other than just your belief? Are you able to answer that
11 question?
12   A.   By experience, my experience there.  I was the only
13 one treated that way.
14   Q.   Okay.  You told me about Sharon Agwaye.  What's the
15 next thing that you claim was discrimination on Houston
16 Methodist part as a part of this lawsuit?
17   A.   Repeat the question.
18   Q.   Remember, we're going through the things that you
19 were going to testify about in this case that were incidents of
20 discrimination that you were suing Houston Methodist for.
21        The last one we talked about was the Sharon Agwaye
22 incident.  I want to know what's the next one you can testify
23 about.
24   A.   Again, I've answered this question and not that
25 there's not other instances, but I've answered that question

Page 30

1 the best that I can at this time.
2     Q.   So are you telling me you -- there aren't any other
3 specific instances --
4     A.   That's not what I'm telling you.
5     Q.   Ma'am, please let me finish, okay?  This is going to
6 make this more difficult if you keep interrupting me, okay?
7 Are you telling me that as you sit here today, you can't
8 testify to any more specific instances?
9     A.   No.
10    Q.   Then, can you testify about more specific instances?
11    A.   Not at this moment.  I'm very tired.
12    Q.   So no, you cannot, as you sit here today, tell me any
13 more instances of discrimination on Houston Methodist's part.
14 Is that -- am I understanding your testimony?
15    A.   During my interviews with Sunila Ali, when I finally
16 got to sit down and speak with her about the discrimination
17 that had happened, instead of approaching the situation with
18 opportunities for coaching or even to console in, I'm sorry to
19 hear that these things are happening or that they could have
20 happened.
21         She said, I don't think it's -- this is a good fit
22 for you.  Gave me an opportunity to leave.  You don't have to
23 work here if you don't want to.  I mean, right off the bat, as
24 soon as we sat down.
25    Q.   Okay.  What's the next incidence of discrimination

Page 31

1 that you could talk to me about today?  That's discrimination on
2 Houston Methodist's part?
3     A.   When I told them in HR that I felt like this -- the
4 reason that this was happening was because I was white, they
5 told me, we're just not even going to do this.  We're -- again,
6 dismissive, didn't want to hear me.
7     Q.   Who in HR did -- are you talking about in this
8 instance?
9     A.   Andrew Taulton.
10    Q.   Okay.  What did you tell Andrew Taulton?
11    A.   Exactly what I just said, that I feel like this is
12 happening because of my race.
13    Q.   Okay.  Did you tell him anything else?
14    A.   Not that I can recall right now.
15    Q.   Do you recall when that -- when that conversation
16 happened?
17    A.   That was the day of -- that I was terminated when I
18 finally got to speak with him in-person.
19    Q.   Okay.  Are there any other instances of
20 discrimination on Houston Methodist part that you can testify
21 about today?
22    A.   Again, I think that it's overly burdensome.  I can't
23 recall everything, but that's what I can recall at this time.
24    Q.   Okay.  You've also sued Houston Methodist for
25 retaliation, correct?

Page 32

1     A.   Correct.
2     Q.   Ma'am?
3     A.   Correct.
4     Q.   Okay.  I'm going to do the same thing.  I want to
5 talk about every instance of retaliation that you are claiming
6 as part of this lawsuit against Houston Methodist.
7          What's the first instance of retaliation that you can
8 talk to me about?
9     A.   The first instance at Houston Methodist was the day
10 that I received my letter of recommendation, receiving a
11 communication record from the assistant manager.
12    Q.   When did this -- are you talking about the -- when
13 you were a patient transporter?
14    A.   Yes.
15    Q.   And that was back in 2020?
16    A.   Yes.
17    Q.   Okay.  What's the next instance of retaliation that
18 you're claiming in this lawsuit on behalf of Houston Methodist?
19    A.   After filing reports about being called names and
20 where -- instances where I was feeling like I was being
21 harassed, having to wait until Sunila Ali came back from
22 vacation only to be reprimanded and given a performance
23 improvement plan.
24         Throughout that whole duration, never having received
25 any kind of written instructions or guidelines or sheets that

Page 33

1 would have helped me to perform my job duties while she was
2 away in my job role.
3     Q.   What complaints --
4     A.   After I had asked her --
5     Q.   Okay.
6     A.   Sorry.  Do you -- what do you -- are you taking that
7 as a complete answer or are you going to let me finish?
8     Q.   Ma'am, you paused.  I thought you were done.  I
9 apologize if you weren't.  Please continue your answer.
10    A.   I had asked Sunila Ali when I first started in my
11 role as a patient care assistant what I would need, and she
12 told me that I would be given two separate things, that I would
13 be given PCA orientation instructions and unit orientation
14 instructions.
15         The only unit orientation instructions that I
16 received were just shadow and follow your job description.  I
17 don't think I did anything outside of those guidelines.
18    Q.   Are you done?
19    A.   Sorry?
20    Q.   Are you done with your answer?
21    A.   Sure.
22    Q.   Okay.  This retaliation that you're talking about
23 from Sunila Ali, when you complained to her and she put you on
24 a performance improvement plan, what was it that you complained
25 to her about?

Page 34

1   A.   One of the things that I complained about was not
2  having a -- a handbook or some --
3      Q.   Okay.
4      A.   -- kind of written instructions.
5      Q.   All right.  What else did you complain about?
6      A.   The way I was treated from PCAs.
7      Q.   Tell me specifically what you told her about how you
8  were treated from PCAs.
9      A.   I think there was an issue that we were arguing over
10  linens and being upset about how I was yelled at in public.
11     Q.   Okay.  Any other instances you brought to her
12  attention?
13     A.   I know I tried to talk to her about there being a guy
14  and a guy being really loud and not feeling really comfortable
15  about sharing the specifics of what he had called me at that
16  time.
17     Q.   So you didn't -- you -- you were not comfortable
18  sharing the specifics of what he called you at that time?
19     A.   He said a lot of things that were inappropriate that
20  I don't think I was really able to even process all of them.
21  Like, he was very loud and said a lot of inappropriate things,
22  frequently.
23     Q.   Right.  But I'm -- I'm --
24     A.   Not just white trash.
25     Q.   -- I'm -- I'm trying to understand what you're

Page 35

1  telling me.  Did you -- were -- when you were having this
2  discussion with Sunila Ali, are you telling me you were not
3  comfortable, at that time, sharing with her all the things he
4  called you?
5      A.   Correct.
6      Q.   Okay.  All right.  What else did you bring to Sunila
7  Ali's attention during this meeting?
8      A.   The issue with Sharon Agwaye having touched me
9  inappropriately.
10     Q.   I thought you said that happened the day before you
11  were fired.
12     A.   There were two instances that I reported both of
13  them.  So yes, there was an instance that happened the day
14  before I was fired, but there was also another instance.
15     Q.   Okay.  Tell me about the other instances that you
16  talked to Sunila Ali about when you had this meeting with her.
17     A.   Sorry, repeat the question.
18     Q.   You told me there were two instances of Sharon Agwaye
19  touching you.  The -- the -- there was one the day before you
20  were fired and there's one that you discussed with Sunila Ali
21  during this meeting.
22          So I want to know -- I want you to tell me what you
23  told her -- told Sunila Ali in this meeting about the other
24  instance of Sharon Agwaye touching you.
25     A.   I believe I wrote in just said someone had touched me

Page 36

1  inappropriately and it was unwelcomed, and that I didn't want -
2  - I didn't want that.  I didn't like it and was concerned or
3  worried about it potentially escalating into something else.
4      Q.   Okay.  And between that date and the day before you
5  were fired, did it happen any more times?
6      A.   She didn't touch me again, but the next instance that
7  I did work with her, there was another incident I had to report
8  -- incident.
9      Q.   What was that and -- strike that.
10          Let's get back to this meeting you had with Sunila
11  Ali.  What else did you bring to her attention during this
12  meeting?
13     A.   I've already said that I needed a handbook or a
14  coaching of some kind, yes.
15     Q.   And we've covered that.  So is -- is there anything
16  else?
17     A.   Not that I can think of right now.
18     Q.   Okay.  And -- so is it your testimony that the
19  retaliatory act was putting you on a performance improvement
20  plan?
21     A.   Yes.
22     Q.   Okay.  All right.  What's the next act of retaliation
23  on Houston Methodist's part that you are -- you can tell me
24  about that you were bringing as part of this lawsuit?
25     A.   Termination.

Page 37

1      Q.   Okay.  We'll get back to the termination, but is
2  there anything else?  Any other retaliatory acts on Houston
3  Methodist part that you can tell me about today?
4      A.   That -- I already mentioned that in the reports after
5  I filed my complaints, they -- they said that they didn't like
6  me and then Sunila Ali reaffirming that, you know, not everyone
7  is going to like you and this might not be a good fit, instead
8  of trying to work with me constructively.
9      Q.   And we already talked about that, correct?
10     A.   Correct.
11     Q.   Was there any other retaliatory act from Houston
12  Methodist that you are bringing as part of this lawsuit other
13  than termination, that you can tell me about?
14     A.   I know I reported when I moved into the new job role
15  that they didn't adjust my position correctly, so they weren't
16  giving me the correct pay rate or the correct benefit rates.
17  And I don't know.  I -- they corrected it after I brought it to
18  their attention, but that was also a red flag to me.
19     Q.   Well, I mean, you just testified they corrected it
20  after you brought it to their attention, correct?
21     A.   Right.  But only to be fired, you know, a couple of
22  weeks later.
23     Q.   Okay.  Who did you report this -- this incident to?
24     A.   Mariana Mondragon.
25     Q.   Okay.  Did Mariana Mondragon fire you?

Page 38

1    A.  She was in the room with Sunila Ali.  I think that
2 they orchestrated it together.
3    Q.  And do you think -- what makes you think that?
4    A.  They both signed the termination letter that they
5 issued to me.
6    Q.  Okay.  Anything other than the fact that they both
7 signed the termination letter?
8    A.  They were both in the room as they were handing me
9 the letter.  They were communicating --
10    Q.  Okay.
11    A.  -- with each other as they were designing this
12 termination strategy.
13    Q.  Okay.  Tell me why you believe your termination was a
14 retaliatory act on Houston Methodist's part.
15    A.  I don't think that they liked me complaining.
16    Q.  Any other reasons you think it was retaliatory?
17    A.  It's a very broad question, and I think that I've
18 answered it.  Can you ask this in another way?
19    Q.  What other reasons than you said they didn't like you
20 complaining, do you believe Houston Methodist retaliated
21 against you by terminating your employment?
22    A.  I don't think they liked me, and I don't think they
23 liked me because I don't think that I was part of their DE&I
24 initiatives.
25    Q.  Okay.  I mean, are you including Sunila Ali in that

Page 39

1 when you say that you don't think they liked you because you
2 weren't part of their DEI initiatives?
3    A.  I don't think that I was prioritized.  So yes, yeah.
4 I was not a priority.
5    Q.  Well, my question is this:  You said you -- you think
6 Houston Methodist's fired you because you did not fit into
7 their DEI initiatives; is that correct?
8    A.  In part, yeah.  Because of my race and gender.
9    Q.  Okay.  But you would agree with me that Sunila Ali
10 hired you in the first place, correct?  Into the PCA role?
11    A.  But if she hadn't hired me into that role, I would
12 have still been a transporter in my job role there and would
13 have still been able to complete my nursing program there, that
14 -- where I would have been able to do my clinicals with UT
15 Arlington.
16        MR. BURKE:  Objection.  Non-responsive.
17 BY MR. BURKE:
18    Q.  My question was:  Sunila Ali is the person who hired
19 you into the PCA role, correct?
20    A.  Correct.
21    Q.  Okay.  All right.  You've also sued Sunila Ali
22 personally in this case.  You understand that, ma'am?
23    A.  Yes.
24    Q.  You sued her for discrimination, correct?
25    A.  Correct.

Page 40

1    Q.  All right.  I'm going to go through the same drill.
2 Tell me the first discriminatory act from Sunila Ali that you
3 can tell me about today that you are bringing as part of your
4 lawsuit against her.
5    A.  Repeat?
6    Q.  You are suing Sunila Ali individually, separate from
7 Houston Methodist, for discriminating against you.
8        I want to know -- I want to go through all the acts
9 of discrimination that Sunila Ali committed against you that
10 you are bringing as part of this lawsuit.  What's the first one
11 that you can tell me about today?
12    A.  She didn't provide unit-specific requirements.
13    Q.  Okay.  What's the -- what's the next one that you can
14 tell me about?
15    A.  She placed me on a performance improvement plan.
16    Q.  The -- the unit-specific requirements you're talking
17 about, you -- I think you testified earlier that they -- they
18 didn't exist, correct?
19    A.  Not in any written format.
20    Q.  Okay.  And -- and you -- you believe you were
21 entitled to written instructions?
22    A.  Correct.
23    Q.  And so because --
24    A.  The --
25    Q.  -- Sunila Ali did not give you --

Page 41

1        THE REPORTER:  I'm sorry --
2 BY MR. BURKE:
3    Q.  -- those written --
4        THE REPORTER:  -- what was that?
5 BY MR. BURKE:
6    Q.  -- instructions, that's her discriminating against
7 you?
8    A.  So she asked me to complete my sentence.  I said, no,
9 I was not provided with any written defined limits.
10    Q.  And because Sunila Ali did not provide you with these
11 written defined limits, you're claiming that is discrimination
12 on her part, correct?
13    A.  Correct.
14    Q.  But you would agree with me that if these written
15 defined parameters didn't exist, then none of the other PCAs
16 received those either, correct?
17    A.  Did not exist -- when I say does not exist, which is
18 what she said, it does not exist, I think that's just for me.
19 I think that there are limits and expectations that the other
20 PCAs who are of a different race and ethnicity than me all
21 accept and -- accept among themselves, but would not include me
22 in being able to be a part of that.
23    Q.  Well, what's your evidence that other PCAs --
24    A.  Whose --
25    Q.  -- were given --

Page 42

1    A.   Paige Savoldi.
2         THE VIDEOGRAPHER:  My apologies.
3  BY MR. BURKE:
4    Q.   What -- what is your evidence that other PCAs
5  received these written requirements -- written directives that
6  you did not receive?
7    A.   Sorry, I was distracted.  The screen changed and is
8  frozen.
9    Q.   Okay.
10   A.   I did not hear what you said.
11   Q.   What is your evidence that other PCAs received these
12 unit-specific requirements that you did not receive?
13   A.   According to Det Norske Veritas, for Sunila Ali's job
14 role as a supervisor, it's her expectation to provide her
15 staff, which would be PCAs.  She manages the role of the PCA
16 staff with written instructions.
17        MR. BURKE:  Objection.  Non-responsive.
18 BY MR. BURKE:
19   Q.   Ma'am, my question was: What evidence do you have --
20 what evidence do you have that other PCAs received these
21 written unit-specific instructions that you did not receive?
22   A.   The answer is in Det Norske Veritas accreditation.
23 That is -- that -- that is evidence that it is that expectation
24 that staff members do receive them from their managers.  And
25 for Sunila Ali to still be a manager, the assumption would be

Page 43

1  that she's meeting that expectation.
2    Q.   Is that the only evidence you have that -- do you
3  think it's required by Det Norske Veritas?  Ma'am?
4    A.   Sorry.  Are you correcting me on my pronunciation or
5  is it --
6    Q.   No --
7    A.   -- that matter --
8    Q.   -- ma'am, I'm not asking --
9    A.   -- I don't know --
10   Q.   You -- you answered --
11   A.   -- what you're asking me.
12   Q.   -- that that was your evidence.  I'm asking, is that
13 the only evidence that you have that other PCAs received these
14 unit-specific requirements?
15   A.   No.  That's not my only evidence.
16   Q.   Okay.  What is your other evidence?
17   A.   Because other PCAs were allowed to perform tasks
18 outside of the task that I was being told that I could or could
19 not perform.
20        So in what they're saying that I am not allowed to
21 touch the clamps, not -- or not the clamp, but not been allowed
22 to roll the device that takes them to the restroom.  To say
23 that I can't walk them to the restroom, which is a usual PCA
24 task that was performed by the other PCAs.
25        And they're specifically saying, I can't perform that

Page 44

1  task, and I can't perform my job because I can't perform that
2  task, and being the only white person to not be allowed to
3  perform that task, after asking for a book, I think it's
4  retaliatory.
5         MR. BURKE:  Objection.  Non-responsive.
6  BY MR. BURKE:
7    Q.   I'm not asking what you think is retaliatory, ma'am.
8    A.   We're talking about retaliation, correct?
9    Q.   No, ma'am.  That's -- that's not what we're talking
10 about.  You told me it was discrimination on Sunila Ali's part,
11 that you didn't get written specific unit requirements.
12   A.   Yes.  It's both retaliation and discrimination.
13   Q.   We're talking about discrimination right now, okay?
14   A.   Okay.
15   Q.   And I'm asking you: What -- your evidence is that
16 other PCAs received these written requirements that you did not
17 receive.  You told me Det Norske Veritas.  I want to know -- I
18 asked what other evidence you have.
19        You told me you had evidence, but I haven't heard any
20 yet.  So what other evidence than this Det Norske Veritas
21 standard that you're talking about, do you have that other PCAs
22 received these unit-specific requirements?  Is it because they
23 were performing tasks that you were told you shouldn't perform?
24   A.   Somehow all the PCAs were able to have congruency on
25 what their tasks were.

Page 45

1    Q.   Somehow?
2    A.   Somehow.
3    Q.   Okay.  All right.  What is -- what is -- because I
4  don't know what you're talking about.  What is Det Norske
5  Veritas?
6    A.   It's an accreditation agency, similar to the Joint
7  Commission.  So the most common accrediting agency is the Joint
8  Commission for hospitals.
9    Q.   And do you believe that these unit-specific
10 requirements are required by these accrediting agencies?
11   A.   Correct.
12   Q.   Okay.
13   A.   To maintain accreditation.
14   Q.   Okay.  So so far, discrimination from Sunila Ali,
15 we've got failure to give you written unit-specific
16 requirements and putting you on a performance improvement plan.
17        What else can you tell me today that you're claiming
18 was discrimination by Sunila Ali individually against you?
19   A.   Sorry, compound question.  Can you re-word the
20 question or --
21   Q.   What's the next instance of discrimination that you
22 can testify about today from Sunila Ali individually?
23   A.   Yeah.  Failure to take action on my complaints.
24   Q.   The complaints that you raised with her during your
25 meeting with her and Mariana Mondragon?

Page 46

1    A.   Mm-hmm.
2    Q.   Is that a yes?
3    A.   Right.  The complaints that I filed to Sunila Ali and
4  Mariana Mondragon.
5    Q.   And the ones that you discussed when you had a
6  meeting with Sunila Ali and Mariana Mondragon?
7    A.   Correct.
8    Q.   Okay.  What's the next instance of discrimination
9  from Sunila Ali that you can tell me about today?
10   A.   I can't think of any right now.
11   Q.   Okay.  All these acts of discrimination from Sunila
12  Ali, were they because you were a Caucasian, non-Hispanic,
13  white female?
14   A.   I think so, yes.
15   Q.   You think so?  Did it have anything to do with you
16  being female?
17   A.   Yes.
18   Q.   Okay.  So you're -- you're suing in part, Sunila Ali
19  for discriminating against you because you were female.  Am I
20  understanding you correctly?
21   A.   Correct.
22   Q.   Is that a yes?
23   A.   Yes.
24   Q.   Okay.  And I'm going to show you what is Exhibit 21.
25        THE REPORTER:  Counsel, would you like me to mark

Page 47

1  this as Exhibit 21?
2        MR. BURKE:  Yes, please.  And I don't think you have
3  a copy of this, so I'll e-mail you anything any copies that you
4  don't already have after the deposition.
5        THE REPORTER:  Yes, sir.  Exhibit 21 marked.
6        (WHEREUPON, Exhibit 21 was marked for
7  identification.)
8  BY MR. BURKE:
9    Q.   Are you able to read this document, ma'am?
10   A.   Yes.
11   Q.   Okay.  You'll see down here at the bottom, it says --
12  it's a what's called a Bates number.  It's HMH 00300.  That
13  indicates it's been produced from Houston Methodist's to you as
14  a part of this lawsuit.
15        I want to go through this document and you let me
16  know if these are the issues that you raised in your meeting
17  with Sunila Ali and Mariana Mondragon, right?  You see this
18  Incident number 1 that I've highlighted?
19   A.   Yes.
20   Q.   And do you remember raising this instance with them
21  in this meeting?
22   A.   I need a second to read.
23   Q.   Sure.
24   A.   I'm not understanding there's too many hers, and I
25  don't know whether the hers are referring to me or the nurse.

Page 48

1    Q.   Do you -- do you remember discussing an incident like
2  this with Mariana Mondragon and Sunila Ali during this meeting
3  that we've been talking about?
4    A.   I can't recall this right now.
5    Q.   Okay.  I'll tell you what, let's skip forward. I see
6  number six.  Are you able to read what's under number six
7  there, ma'am?
8    A.   I'm reading.
9    Q.   I understand.  I'm asking if it's big enough for you
10  to read.
11   A.   Oh, yes.
12   Q.   Okay.
13   A.   I don't remember exactly who that was.  I know things
14  like that happened in passing.
15   Q.   Do you recall this event that's described here?
16   A.   I don't recall the exact instant.  It sounds like I
17  was just reporting kind of being scared in that moment and --
18  yeah.
19   Q.   Do you remember discussing an incident like this with
20  Sunila Ali and Mariana Mondragon?
21   A.   I don't remember ever discussing it with them. Not
22  Mariana.  This is in my role as a transporter, so I don't
23  recall ever discussing this with Mariana and Sunila together.
24  I think at one point, I discussed because they issued the
25  communication record, Mariana Mondragon was there.

Page 49

1        So this might have been something that I discussed
2  with them, but I don't think it was a topic that was addressed.
3  I think it was really specific and pointed to that outcome
4  regarding drug use.
5    Q.   Okay.  Now number seven.
6    A.   This is -- yeah, more relevant to -- yeah.
7    Q.   Is this one of the complaints that you shared --
8  ma'am, is this one of the complaints that you shared with
9  Sunila Ali and Mariana Mondragon?
10   A.   Yes.
11   Q.   Okay.  This kind of goes here.  This is number eight,
12  and then it describes.  This may be a cut and paste from an e-
13  mail that you sent to Dante, but take a minute and read through
14  this.
15   A.   Yeah.  This is, I think, like, an issue with hand-
16  off, probably -- I'm only a few sentences -- sentences in, but
17  --
18   Q.   Well, I really, my question is: Is this one of the
19  complaints that you talked about earlier that you raised with
20  Sunila Ali?
21   A.   I believe I tried to address this, but I was trying
22  to address it with her in a way where if we were to try to
23  focus on constructively how to work on it with written
24  instructions, like, can we find a better way so that we can all
25  -- can have consistency, that something we can agree on so

Page 50

1 we're not arguing.
2            And just -- I mean, obviously, I still haven't
3 received four years later any unit-specific requirements.
4      Q.   All right.  But my question is:  Is this one of the
5 complaints you were talking about earlier that you raised with
6 Sunila Ali?
7      A.   I believe so yes.  Yes.
8      Q.   Okay.  In the meeting that you had with her?
9      A.   Yes.
10      Q.   Okay.  Number nine.  Does this incident sound
11 familiar to you as something that you raised as a complaint to
12 Sunila Ali in your discussion with her?
13      A.   Let me see.  This is from Morgan.  That was more
14 vague because I didn't really work a lot of night shifts.  I
15 was just picking up shifts during COVID.
16           So I don't know if I recall who Morgan was exactly,
17 but I think she must have been either a charge on the unit that
18 night or someone who would have been a manager or --
19      Q.   My question is:  This incident of somebody making
20 comments --
21           THE REPORTER:  What was that?
22 BY MR. BURKE:
23      Q.   -- about your physical appearance and your genetics,
24 is that one of the complaints that you raised with Sunila Ali
25 during your conversation with her?

Page 51

1      A.   Repeat?
2      Q.   I'm -- I'm trying to go through the complaints that
3 you mentioned that you complained to Sunila Ali that she failed
4 to take action on.  The ones that you raised in this discussion
5 that we had with her.
6           I'm asking:  Do you remember discussing this instance
7 with her in that meeting?  Is this one of the complaints you
8 raised with her?
9      A.   Yes.  And just as part of a general, like, I'm being
10 called names and --
11      Q.   Okay.
12      A.   Yes.
13      Q.   All right.  Do you remember -- this is a long one,
14 but it's an incident about your -- you thought maybe your cell
15 phone had been stolen.  Does that ring a bell?
16      A.   Yeah.  And I -- I -- yeah.
17      Q.   Is that something is that one of the complaints that
18 you raised with Sunila Ali in this meeting that you had with
19 her?
20      A.   Not directly, no.
21      Q.   Okay.  All right.  Number 11.  Do you remember an
22 incident with a Lysette?
23      A.   Lysette?  Yes.  I worked with her more frequently and
24 -- yeah.
25      Q.   Okay.  So this instance that's described in number 11

Page 52

1 on HMH 306, is this one of the complaints that you raised with
2 Sunila Ali during your meeting with her?
3      A.   Yes.
4      Q.   Okay.  We just went through these -- well, we
5 started, I think, with number 7, 8, 9, 10, and 11.  Are there
6 any complaints that you can remember as you're sitting here
7 today, that you raised with Sunila Ali during this meeting that
8 we didn't just talk about in Exhibit 21?
9      A.   I don't think that what I'm looking at now in these
10 files you just showed me shows the reports that I filed with
11 regard to Sunila or not -- with regard to Sharon Agwaye.
12      Q.   Okay.  The --
13      A.   I don't know if you intentionally -- that's not the
14 point you're trying to prove with this.  I don't -- I don't
15 know.
16      Q.   I -- I'm not -- ma'am, I'm not trying to prove
17 anything.  I'm -- I'm trying to you -- you told me that you
18 made some complaints to Sunila Ali and I want to make sure we
19 cover them all.
20           And so I -- I believe these are complaints that you
21 made, and I want to and you -- now you've told me Sharon
22 Agwaye, and I'm trying to get to the bottom of whether you can
23 think of any others that you raised during your conversation
24 with her?
25      A.   I did.  I think I've said that I talked about Sharon

Page 53

1 already.  I think I already he stated that, but --
2      Q.   Okay.  You -- you added that one.  Other than the
3 ones we just went through on Exhibit 21 and Sharon Agwaye, are
4 there any other complaints that you remember raising with
5 Sunila Ali during your meeting with her?
6      A.   Not that I can think of right now, but I -- I didn't
7 -- I didn't remember all of these as detailed as I am reading
8 them now.  But -- yes, yeah.  More being called names.
9      Q.   Okay.  You've also sued Sunila Ali for retaliation in
10 this case, correct?
11      A.   Correct.  Yes.  Correct.
12      Q.   Okay.  I take it termination is one of the ways that
13 you believe Ms. Ali retaliated against you, correct?
14      A.   Correct.
15      Q.   And do you believe she retaliated against you by
16 terminating you because you raised all these complaints that we
17 talked about?
18      A.   Yes.
19      Q.   Is there anything else that you did that you believe
20 caused Sunila Ali to retaliate against you by terminating you?
21      A.   I don't believe so, no.
22      Q.   Okay.  Are there -- did -- do you believe that Ms.
23 Ali retaliated against you in any other way other than
24 terminating your employment?
25      A.   Repeat the question.

Page 54

1    Q.   Sure.  We covered terminating your employment is one
2  way that Sunila Ali retaliated against you, correct?
3       A.   Termination was retaliatory, yes.
4       Q.   Okay.  Did -- do you believe Ms. Ali retaliated
5  against you in any other way other than terminating you?
6       A.   Filing the performance improvement plan.
7       Q.   Okay.  Any other way that you believe she retaliated
8  against you?
9       A.   Ignoring my complaints or failing to take action on
10  my complaints.
11       Q.   The same complaints you're talking about when we were
12  discussing say she discriminated against you?
13       A.   Yeah.
14       Q.   Okay.  Any other ways you believe that Sunila Ali
15  retaliated against you?
16       A.   Failure to provide the requested defined limits or
17  prior to a PIP criteria that would have been measurable -- a
18  measurable tool to fulfill requirements for a PIP.
19       Q.   So her failure to give you unit-specific
20  requirements, you believe was retaliatory?
21       A.   After being asked for, yes.
22       Q.   Okay.  So -- so you asked for the unit-specific
23  requirements and she retaliated against your request by
24  refusing to give them to you?
25       A.   Yes.

Page 55

1       Q.   Okay.  Any other ways that you believe Ms. Ali
2  retaliated against you that we haven't covered so far?
3       A.   I don't think that she treated me in a way that
4  allowed me to be a part of the team, to be a -- like, a full
5  member of the team.
6       Q.   What do you mean by that -- well, let me ask you
7  this: Did she cut your pay?
8       A.   She didn't let me do, like, any additional training
9  or I guess, like, get signed off on skills that would be
10  required for the job role.
11       Q.   Well, she voiced to you that she thought you should
12  get some more on the job experience before you took on those
13  trainings, correct?
14       A.   Right.
15       Q.   Okay.  Did -- you -- you mentioned you she didn't let
16  you be part of the team.  The trainings one, did she -- did she
17  keep you from being part of the team by cutting your pay?
18       A.   My goal there -- no, not to -- cutting my pay, but --
19  at my pay.  But my goal was I -- and I expressed to her, do you
20  think that there would be anything that would help me or any
21  certifications I should try to get or what -- what should my
22  goals be here.  What should I focus my attention on.  What
23  would you like from me.  And she just said nothing.
24            But I didn't understand, like, if I'm supposed to be
25  doing everything in my job training or on the job training

Page 56

1  under the other PCAs who are outside of my race, what skills or
2  qualifications did they have that would allow them to perform
3  skills that you're not allowing me to perform.
4       Q.   What about work experience?  Would that be one reason
5  you could think of?
6       A.   And if it's work experience and she's wanting me to
7  get on the job work experience, why can't I get in writing,
8  like, a skills check off that this is what we're requiring, you
9  need to meet this expectation prior to giving me a PIP.
10       Q.   You just didn't agree with the way she was managing
11  you; is that correct?
12       A.   There was no real management.  It was just getting
13  negative reports and goodbye.  There was no set criteria for
14  me.
15       Q.   Set written criteria.
16       A.   Well, you're telling me -- she told me to do what I
17  was -- to follow the -- to -- to do -- I can do everything that
18  my trainers are doing, but then, no, sorry, you can't actually
19  do it.  That's -- that -- I mean, there's something not right
20  there.
21       Q.   You used the term "trainers," why do you use that
22  term?
23       A.   She had me shadow-follow trainers.  I don't know what
24  her expectations of the trainers were.  I don't know if they
25  were paid more or not.

Page 57

1            I think that typically they are, but I haven't been
2  provided that information from Houston Methodist, just to pick
3  up on what they were doing.
4            MR. BURKE:  Okay.  Well, we've been going a little
5  over an hour.  Why don't we take a short break?
6            THE VIDEOGRAPHER:  Okay.  Counsel, stand by.  The time
7  is 11:20 a.m.  We are off the record.
8            (WHEREUPON, a recess was taken.)
9            THE VIDEOGRAPHER:  Please stand by.  The time is
10  11:31 a.m.  We are on the record.
11  BY MR. BURKE:
12       Q.   Ms. Weathers, we -- we took a short break off the
13  record.  We're back on the record.  Are you ready to continue,
14  ma'am?
15       A.   Yes.
16       Q.   You understand that you're still under oath, correct?
17       A.   Correct.
18       Q.   I'm going to quickly show you what I'm going to mark
19  as Exhibit 21.
20            THE REPORTER:  I think we already did 21, Counsel.
21  22?
22  BY MR. BURKE:
23       Q.   Let's see here.  Are you able to see this document,
24  ma'am?
25       A.   Yes.

Page 58

1    Q.  Do you recognize that document?
2    A.  This is when I was hired as a transporter, an
3  employee handbook.
4    Q.  Okay.  So you acknowledge that you got a Houston
5  Methodist employee handbook, correct?
6    A.  Yes.
7    Q.  Okay.  So when you're talking about handbooks, you're
8  referring to a handbook that is specific to the unit that you
9  worked in as a PCA?
10   A.  Correct.
11   Q.  Okay.  Did you review the Houston Methodist employee
12 handbook?
13   A.  Correct.
14   Q.  I'm sorry?
15   A.  Yes.
16   Q.  Okay.  Are you familiar with the contents of the
17 handbook?
18   A.  It's a big handbook.  I don't remember just off the
19 top of my head, every single line for line, but I know it does
20 not contain all the -- the unit requirements for each
21 individual unit.
22   Q.  I understand that.  I'm just saying you -- you
23 acknowledge receiving the handbook and you had the opportunity
24 to familiarize yourself with the contents of the handbook at
25 any time during your employment, correct?

Page 59

1    A.  Yes.  I've read through it.
2    Q.  Okay.
3        THE REPORTER:  Counsel, would you like to mark this
4  as 22?  I believe we're on 22.
5        MR. BURKE:  I think this is 20.  I -- it's going to
6  be out of order, and there are going to be some that I haven't
7  used that are smaller numbers.  So I think -- I believe this is
8  20.
9        THE REPORTER:  20?
10       MR. BURKE:  Yeah, this is 20.
11       THE REPORTER:  Yes, Counsel.  Exhibit 20 marked.
12       (WHEREUPON, Exhibit 20 was marked for
13 identification.)
14 BY MR. BURKE:
15   Q.  Okay.  All right.  What damages are you claiming in
16 your lawsuit, ma'am?
17   A.  Are you referring to, like, the monetary losses,
18 like, lost wages?
19   Q.  Well, I --
20   A.  Or are you referring --
21   Q.  I want to know --
22   A.  -- to harm?
23   Q.  I want to know about all of them.  Tell me,
24 generally, what damages you're claiming as part of this
25 lawsuit.

Page 60

1    A.  Lost wages.
2    Q.  Okay.  What else?
3    A.  Loss of benefits.
4    Q.  Okay.
5    A.  To include loss of tuition benefits.
6    Q.  Okay.
7    A.  Which resulted in a $0 paycheck and not having health
8  coverage for the duration until I found a new job.  Once I did,
9  I was able to go see a healthcare provider, and they gave me a
10 diagnosis with having severe MDD.
11   Q.  Let's -- let's just cover the general areas first and
12 then we'll get into the details.  So lost wages, lost benefits,
13 what else?
14   A.  And consequential damages for emotional harm.
15   Q.  So -- okay.  What else?  Any other categories?
16   A.  Prejudgment interest.
17   Q.  Okay.  Anything else?
18   A.  Not that I can think of right now.
19   Q.  Okay.  How much are you asking for in lost wages?
20   A.  I believe it was around -- and I don't have the exact
21 number, but around $1,000 for a month.  So it was just in the
22 three months that I was unemployed, so around 3,000.
23   Q.  So you lost about $1,000 a month between the end of
24 your employment with Houston Methodist and the beginning of
25 your employment with Boston Scientific; is that correct?

Page 61

1    A.  Correct.
2    Q.  Okay.  Any other lost wages?
3    A.  Loss of benefit, if counting that, if you're
4  referring to benefit being as part of wage, yes.
5    Q.  Okay.  Let's just go -- we'll go to loss of benefits.
6  What benefits did you lose?
7    A.  Health coverage.
8    Q.  Okay.  What other benefits did you lose?
9    A.  Tuition.
10   Q.  Anything else?
11   A.  Not that I can think of.
12   Q.  How much are you claiming for loss of health
13 benefits?
14   A.  Cobra was 1- to $2,000 a month, so somewhere between
15 3 - 6000, I think, for health benefits.
16   Q.  And this is during the time that you were unemployed
17 between Houston Methodist and Boston Scientific?
18   A.  Correct.  For the three months that I was unemployed,
19 right?
20   Q.  Okay.  How much are you claiming for loss of tuition?
21   A.  I believe the tuition benefit was $8,000.
22   Q.  Lump sum 8,000?  How are you calculating the 8,000?
23   A.  I think it was an even 8,000.  I don't know what it
24 is today, but when I was employed, it was 8,000.
25   Q.  Well -- okay.  Explain that to me.  What do you mean,

Page 62

1  "it was an even 8,000"?

2     A.  A tuition benefit provided to complete your program,
3  and I was in a nursing program taking classes and I had to drop
4  out, and then they deducted that amount from my paycheck, and I
5  didn't get a paycheck. I got a $0 paycheck when I left there.

6     Q.  Let me see if I understand this.  You -- did they
7  deduct $8,000 from your last paycheck?

8     A.  They didn't deduct 8,000 from my last paycheck, but
9  it's supposed to be up to $8,000 awarded. So had I still been
10  employed, I would have been able to receive $8,000 a year.

11     Q.  How much had you been awarded at the time your
12  employment with Houston Methodist ended for 2021; do you know?

13     A.  Enough that I didn't get a paycheck.  I'm not sure
14  exactly.

15     Q.  How much should your last paycheck have been if
16  tuition --

17     A.  I don't know off the top of my head. I don't have it
18  off the top of my head.

19     Q.  Ma'am, you have to let me please finish my question
20  before you start answering, okay? Did you -- did Boston
21  Scientific not offer similar tuition benefits?

22     A.  They did.

23     Q.  Okay. How much per year in tuition benefits did you
24  receive at Boston Scientific?

25     A.  I didn't have to use them. I ended up going to a

Page 63

1  different school.

2     Q.  But I'm asking how much did Boston Scientific offer
3  or could you have used at Boston Scientific?

4     A.  5,000.

5     Q.  Okay. Per year?

6     A.  Correct.

7     Q.  Do you know how much of the 8,000 in tuition benefits
8  at Houston Methodist's, you had attempted to use in 2021?

9     A.  I don't recall.

10     Q.  Do you have records of that?

11     A.  I can try to find them, but I don't have them off the
12  top of my head, and I will have to look for them.

13     Q.  Have you produced those to Houston Methodist in this
14  lawsuit?

15     A.  I think it should be in the records of my salary and
16  --

17     Q.  Well, that -- that's not what I asked.  I asked if
18  you produced whatever records you have to Houston Methodist in
19  this lawsuit?

20     A.  Of how much benefit I used?

21     Q.  Yes, ma'am.

22     A.  I -- I haven't.

23     Q.  Okay. You also mentioned consequential damages for
24  emotional damages. Are those two separate things or are you
25  talking about the same thing?

Page 64

1     A.  I think consequential covers both emotional and
2  punitive. I think that was just to reiterate, to include
3  emotional damages.

4     Q.  How much are you claiming in emotional damages?

5     A.  I'm asking for the maximum that they allow.

6     Q.  And emotional damages?

7     A.  Correct.

8     Q.  What are you basing your request for emotional
9  damages on?

10     A.  Percentage of or I -- I think the rule says a certain
11  percentage or times -- up to five times the amount of the lost
12  wages.

13     Q.  My question is: What is -- what are you claiming was
14  your emotional damage? How were you harmed emotionally?

15     A.  My physical evidence of emotional harm is the
16  diagnosis that I received once I got healthcare coverage.

17     Q.  You said that was MDD?

18     A.  Severe MDD.

19     Q.  What is severe MDD?

20     A.  Severe major depressive disorder.

21     Q.  And who diagnosed you with severe MDD?

22     A.  I believe this was at UTHealth.

23     Q.  In Houston?

24     A.  Correct.

25     Q.  Do you remember who the -- the provider was that

Page 65

1  diagnosed you with --

2     A.  I can't remember --

3     Q.  -- severe MDD?

4     A.  -- the name right now.

5     Q.  Do you have records of this?

6     A.  Yes.

7     Q.  Have you produced those to Houston Methodist?

8     A.  I believe so yes. They are in the record.

9     Q.  And I want to be clear. I'm not talking about
10  something you think Houston Methodist already had. As a part
11  of this lawsuit, have you provided copies --

12     A.  Yes.

13     Q.  -- of that documentation to -- ma'am, please. Before
14  you answer, let me finish my question, okay? Have you provided
15  copies of that documentation to Houston Methodist as a part of
16  this lawsuit?

17     A.  Yes.

18     Q.  Any other -- strike that.

19         Did the provider tell you that you -- your severe MDD
20  was due to being terminated from Houston Methodist?

21     A.  That would be a separate doctor that I can't afford.

22     Q.  My question is: Did the provider that diagnosed you
23  with severe MDD, did that provider tell you that it was a
24  result of being terminated from Houston Methodist?

25     A.  What you're asking for is a doctor who specializes in

**Page 66**

1  lawsuits and those -- and that's not the kind of doctor that I
2  saw.  So I can't afford the kind of doctor that you're
3  requesting a document from.
4      Q.   And so the answer is no.  The doctor that diagnosed
5  you with severe MDD did not tell you it's because of your
6  experience at Houston Methodist that you are now suffering from
7  this disorder, correct?
8      A.   It's in proximate cause, and other circumstantial
9  evidence that that conclusion can be drawn.
10          MR. BURKE:  Objection.  Non-responsive.
11 BY MR. BURKE:
12      Q.   Ma'am, my I'm asking you specifically about the
13 doctor that diagnosed you with severe MDD.  That doctor did not
14 tell you:  You now have severe MDD because of your experience at
15 Houston Methodist, did they?  Ma'am?
16      A.   Objective -- objection -- sorry.  Seeking a certain
17 response.
18      Q.   You didn't answer the question.  My question is --
19      A.   I did answer the question.
20      Q.   -- answer my question.  I'm sorry?
21      A.   I did answer the question.
22      Q.   So the doctor did not tell you that, correct? Is that
23 the answer?
24      A.   Speculation.
25      Q.   No, it's not speculation.  He either the doctor --

**Page 67**

1  excuse me, the provider, whether it was a female or male,
2  either told you -- you are suffering from severe MDD because of
3  your experience at Houston Methodist or they didn't?  Ma'am?
4      A.   I told them what happened and what I was going
5  through with Houston Methodist, and they gave me that
6  diagnosis.
7      Q.   But did they tell you that it's because of that
8  experience at Houston Methodist?  Yes or no?
9      A.   I don't recall.
10      Q.   Okay.  If they did, would it be in the records that
11 you say you provided to Houston Methodist?
12      A.   I'm not sure.
13      Q.   Okay.  Other than this provider that diagnosed you
14 with severe MDD, have any other healthcare professionals
15 diagnosed you with severe MDD?
16      A.   Repeat?
17      Q.   I'll -- I'll strike that question.
18          Other than this doctor who diagnosed you with severe
19 MDD, have you seen any other healthcare professionals for
20 conditions that you believe are attributed to your experience
21 at Houston Methodist?
22      A.   Yes.
23      Q.   Okay.  Who?
24      A.   I don't feel comfortable sharing it on record, a
25 specific doctor.

**Page 68**

1      Q.   Ma'am, if you're going to claim that as part of your
2  damages in this lawsuit, then --
3      A.   I have a -- it's private.  Private healthcare
4  information.  I'm sorry.  I can't answer it.
5      Q.   Ma'am, these other healthcare providers, are you
6  seeking damages for emotional harm based on treatment you
7  received from these healthcare providers? Yes or no?
8      A.   Yes.
9      Q.   Then tell me who the providers are.
10      A.   I can't give you that name without -- it's private.
11      Q.   So are you -- are you refusing to answer that
12 question?
13      A.   I -- not refusing to answer the question, but because
14 it's public, I don't feel comfortable sharing that.  I can't
15 it's my private health information.
16      Q.   So are you not going to answer my question?
17      A.   I will answer the question for you.  I can provide it
18 to you another way, but I can't provide it in a form that's
19 going to be made public.
20      Q.   Are you refusing to answer my question under oath at
21 your deposition today?
22      A.   I'm not refusing.  I just -- I can't give you a
23 specific doctor's name.
24      Q.   Why not?
25      A.   Because it's private.

**Page 69**

1      Q.   Any other reasons?
2      A.   Doctor-client privileges.  I'm sorry.
3      Q.   Ma'am, if you're going to claim emotional harm as a
4  part of this lawsuit, then you are waiving physician-client/
5  patient privileges.  So if you are telling me --
6      A.   I don't agree with that interpretation of the law.
7      Q.   Okay.  Are you asserting privilege?  Is that what
8  you're doing?
9      A.   Yes.
10      Q.   Okay.  And because based on that privilege, you are
11 not going to answer any more questions about providers at your
12 deposition today under oath; is that correct?
13      A.   Correct.
14      Q.   Okay.  Is that true with any other providers or are
15 there other providers whose treatment you are seeking to use as
16 part of your lawsuit today that you will talk about?
17      A.   I don't feel comfortable doing that.
18      Q.   Okay.  So are you asserting -- are you asserting that
19 privilege as to any -- any and all other providers other than -
20 -
21      A.   At this time, yes.
22      Q.   -- the provider at UT?
23      A.   Correct.
24      Q.   All right.  What are the consequential damages that
25 you're claiming as a part of this lawsuit?

Page 70

1     A.    The punitive damages, whatever they allow, I'm asking
2  for maximum.
3     Q.    So are you distinguishing between punitive damages
4  and -- and consequential damages, or are you telling me that's
5  what you meant when you said consequential damages.
6     A.    That's what I meant when I said consequential
7  damages, but --
8     Q.    Okay.
9     A.    Punitive and --
10     Q.    Do you know what amount in punitive damages you're
11  going to ask for?
12     A.    Maximum.
13     Q.    I'm sorry?
14     A.    Based on a percentage of the wages.
15     Q.    What percentage of wages?
16     A.    I believe five percent is the maximum.
17     Q.    Five percent of the wages that you lost between your
18  --
19     A.    Lost wages and benefits, yes.
20     Q.    Ma'am, let me finish my question, please.
21           Five percent of the wages that you lost between
22  Houston Methodist and Boston Scientific?
23     A.    Right. Five percent adjusted in addition to added
24  onto the damages, yes.
25     Q.    Okay. Talked about lost wages, lost benefits,

Page 71

1  consequential damages, emotional damages. Are there any other
2  damages that you are going to be asking for as part of this
3  lawsuit?
4     A.    Not that I can think of right now.
5     Q.    Okay. You mentioned there was about three months in
6  between your the end of your employment at Houston Methodist
7  and when you started at Boston Scientific, correct?
8     A.    Right.
9     Q.    How how far in advance of your start at Boston
10  Scientific did you receive a job offer from Boston Scientific?
11     A.    I took the first job offer that I got, which was at
12  Boston.
13     Q.    Okay. And -- and --
14     A.    I don't know --
15     Q.    -- how long?
16     A.    -- the exact date.
17     Q.    I'm sorry?
18     A.    I don't know the exact date. And I know the day of
19  -- the day that I was terminated, I started looking and I
20  started reaching out to ask to be added onto job search
21  opportunities.
22     Q.    Yeah. My question is: Do you recall how long a time
23  there was between you accepting the job offer at Boston
24  Scientific and the date that you actually started?
25     A.    Probably about a month, estimating.

Page 72

1     Q.    About a month. So about two months after your
2  employment at Houston Methodist ended, approximately, is when
3  you received the job offer from Boston Scientific?
4     A.    Right.
5     Q.    Okay. When you received the job offer from Boston
6  Scientific, was there a gap of time between the time you
7  received the offer and the time you accepted the offer?
8     A.    Just looking, I think I found this job offer through,
9  like, a job searching company that helps link you, and I just
10  followed a flyer.
11     Q.    And -- but my question is this: When you got the job
12  offer about a month before you started, did you accept the job
13  offer that same day, or did you wait a week or --
14     A.    There's a training process I had to complete first.
15  But I think -- yeah, I was -- I mean, they offer the training
16  program. You have to be approved to join the training program
17  and contingent on completing the training program, then there's
18  another timeline for when you can start.
19     Q.    I understand that, ma'am. But in order to be trained
20  by Boston Scientific, you would have already had to have
21  accepted the job offer, correct? I mean, they're not going to
22  train you unless you've accepted the job offer, correct?
23     A.    I think the official job offer comes after you
24  complete their training. This is just, like -- yeah.
25     Q.    Okay. So that was there -- was there a contingent

Page 73

1  job offer about a month before you started that was --
2     A.    Right.
3     Q.    -- contingent on you -- ma'am, please. Please let me
4  finish. I understand you know where I'm going, but it's hard
5  for the court reporter to keep the record clear if you keep
6  talking over me, all right?
7           So I'm going to -- I'm going to start the question
8  again. The job offer that you were talking about about a month
9  before you started, was that a job offer that was contingent on
10  you completing a training?
11     A.    Correct.
12     Q.    Okay. The contingent job offer that you received
13  about a month before you actually started at Boston Scientific,
14  did you accept that contingent job offer the same day you
15  received it?
16     A.    I don't know if it was exactly the same day, but I
17  knew that it was the training that I had -- part of the
18  training that I had asked for with Sunila, and I had really
19  wanted had wanted it. So I -- I can imagine that relatively
20  soon I was trying to -- to get that training.
21     Q.    I'm just trying to understand how much time --
22     A.    I don't know exactly the date.
23     Q.    I'm not asking for dates. I'm trying to understand
24  approximately how much time passed between receiving the
25  contingent job offer and you accepting it.

Page 74

1    A.   I would say promptly within at least a week, probably
2  dependent on how quickly they responded to my inquiries.
3       Q.   Okay.  Once you received the contingent job offer
4  from Boston Scientific, did you continue looking for other jobs
5  or did you stop your job search at that point?
6       A.   No.  I maintained -- you know, I didn't know if I
7  would even complete the training or not, so I stayed connected
8  with other job search companies.
9       Q.   Did you receive any other job offers between the time
10 that you received your contingent job offer at Boston
11 Scientific and the time you actually started?
12      A.   No.
13           THE REPORTER:  Is that a no?
14 BY MR. BURKE:
15      Q.   Did you go on any job interviews during that period?
16           THE REPORTER:  I need verbal -- Counsel, hang on.  I
17 need a verbal --
18 BY MR. BURKE:
19      Q.   Okay.
20      A.   I said no, I didn't receive any other job offers.
21      Q.   Okay.  Did you go on any job interviews during that
22 period?
23      A.   I believe I sent off applications and I -- but I
24 don't know if I went to any job interviews.
25      Q.   Do you recall -- do you recall where you sent job

Page 75

1  interview -- excuse me, job applications during this month
2  period?
3       A.   I know I sent my applications through Dress for
4  Success to have them forward my applications out, but I don't
5  remember all the companies.
6       Q.   Okay.  How about the two months between the end of
7  your employment at Houston Methodist and the time that you
8  received the contingent job offer from Boston Scientific,
9  during that period, did you go on any job interviews?
10      A.   I don't think so, no.
11      Q.   Did you submit any job applications?
12      A.   Yes.
13      Q.   Do you recall how many?
14      A.   I'm not sure how many.
15      Q.   Did -- did you fill out specific job applications or
16 did you submit your information to a job search company and
17 they then sent your information to employers looking for work?
18 Is that how it worked?
19      A.   Yes.  Yeah.  That's what I was using, job search
20 assistance.  So I was -- I gave them my resume and worked with
21 them on, you know, critiquing my resume and getting interview
22 prepared, and, yeah, sending out applications and applying for
23 programs such as this training one.
24           But I don't know if I got to that point because it
25 was two or three months.  It wasn't -- yeah, six months.

Page 76

1       Q.   Were you -- did you tell the job search firm what
2  kind of job you were looking for?
3       A.   Yes.  I was interested in staying in healthcare.
4       Q.   Just in healthcare or specific positions in
5  healthcare?
6       A.   Just in healthcare.  The -- the position that I got
7  was ideal.  Was my most ideal.  I really wanted that training.
8       Q.   The position you got at Boston Scientific?
9       A.   Yes.
10      Q.   And you preferred that position over a similar PCA
11 position at another healthcare facility?
12      A.   There, I don't think were other PCA positions
13 available at other facilities.
14      Q.   Well, I'll get to that in a second.  But my question
15 is: Given the choice, would your preference have been to take
16 the job that you got at Boston Scientific over another PCA job
17 at another healthcare facility?
18      A.   Not necessarily.  If there were opportunities that
19 paid equal or more in a PCA role that was similar to what I had
20 at Methodist or at what I was hired into at Boston, I would
21 have taken it.
22      Q.   I'm just trying to understand why you described it as
23 ideal.
24      A.   I -- I -- like I said before, I have wanted to be a
25 nurse for a long time.  That's been my goal.  So the additional

Page 77

1  skills have been important to me.
2       Q.   You said you don't think there were any other PCA
3  jobs open during this period when you were looking for another
4  job.  What are you basing that on?
5       A.   I think just the job market and also given the
6  situation, I didn't feel comfortable having the same thing
7  occur again, where I might be in a situation where they might
8  not have unit-specific requirements in a PCA role.  I would --
9  I think it's important that this gets resolved first.
10      Q.   Okay.  So are you telling me that you specifically
11 did not look for another --
12      A.   No.
13      Q.   -- PCA --
14      A.   I -- I think that I did, but if you're asking --
15      Q.   Ma'am --
16      A.   -- you're asking --
17      Q.   -- please.
18      A.   -- about preference.
19      Q.   Ma'am, you have to let me finish my question before
20 you interrupt, okay?  So I'm going to go back and I'm going to
21 ask my question.
22           My original question is: What are you basing your
23 statement that there weren't other PCA jobs available?
24      A.   I don't think that there were other jobs available at
25 that time for PCA roles.  I just -- I don't think that I saw

Page 78

1 any available, but I -- not that I wouldn't have applied or
2 that I wouldn't be interested.  I just I don't know if I -- I
3 don't know if there were any.  I don't recall.
4       Q.   You don't -- you don't recall if there were any in
5 Houston area or did you look outside the Houston area?
6       A.   I don't know if I looked outside of the Houston area.
7 I'm fairly new to LinkedIn.  I think that had LinkedIn sent me
8 something that was a good opportunity, then I could have
9 afforded to do it, I would have applied and taken it.
10      Q.   You said it's your belief that at the time there were
11 no other PCA jobs available.  Are you saying in the Houston
12 area?
13      A.   Yes.
14      Q.   Okay.  Did you specifically look for open PCA
15 positions in the Houston area?
16      A.   Yes.
17      Q.   And when I say you, I mean you personally, not
18 through the job search firm.
19      A.   Right.  I -- I have stayed on LinkedIn.  I have
20 stayed connected through community resources.  I definitely was
21 looking.
22      Q.   Okay -- okay.  My question was whether you personally
23 specifically looked for other PCA positions.  And now, what I
24 want to know is what it is you did, personally, to look for
25 other open PCA positions in Houston.  You said you looked on

Page 79

1 LinkedIn or you stayed connected on LinkedIn, correct?
2       A.   Right.
3       Q.   Did you search for jobs within LinkedIn, or did you
4 just stay connected on LinkedIn?
5       A.   They have tools designed built in that automatically,
6 like, you say, I'm looking for these roles with this criteria,
7 send them to me, and they'll send you jobs daily if it matches,
8 if and when they see any matches.
9       Q.   And so did you specifically input a PCA position into
10 the --
11      A.   Yes.
12      Q.   -- LinkedIn -- ma'am, again.  You have to let me
13 finish so we can keep the record clear, all right? I know
14 you're eager to answer, but you got to let me finish my
15 question.
16           Did you specifically input into the LinkedIn system
17 that you were looking for a PCA position in Houston?
18      A.   Yes.
19      Q.   Okay.  And it's your recollection that you received
20 no hits?
21      A.   I think sometimes they try to match if there's not an
22 exact match.  And so if you could define a hit.  I don't know
23 exactly what you mean.
24           I think that they always find something, but it's not
25 really an exact match.  And a lot of -- very frequently, most

Page 80

1 times, that you need to be an exact match to really qualify for
2 certain positions.  So I don't know what you mean by hit.
3       Q.   Is it your recollection that you did not find any
4 open PCA jobs through LinkedIn?
5       A.   That I was a perfect match for, I don't think so.
6       Q.   Did it have to be a perfect match in your mind?
7       A.   Well, to meet the qualifications and specifications
8 or -- yeah.  the needs for certain job roles that they're
9 specifically looking for at that specific time.
10      Q.   Were there -- okay.  Were there any PCA jobs that you
11 discovered that were open through LinkedIn during this period,
12 whether they were perfect matches or not?
13      A.   Not that I recall.
14      Q.   Okay.  So we talked about LinkedIn.  What other
15 efforts did you personally make to look for another job for the
16 first two months after your termination from Houston Methodist?
17      A.   I went through community resources.
18      Q.   What do you mean by, "community resources"?
19      A.   I don't know exactly what their titles are, but,
20 like, consultants of sorts that help job seekers get connected
21 to employers.
22      Q.   Is community resources a name of a company or are you
23 using that as a general term?
24      A.   Like a general term for what that job role is for job
25 seekers and how they connect them to employers and tools that

Page 81

1 they provide them to get jobs.
2       Q.   What community resources did you use during this time
3 period, the two months after your termination from Houston
4 Methodist?
5       A.   Dress for Success, Houston.
6       Q.   Okay.  Any others?
7       A.   I think Memorial Assistance Ministries.
8       Q.   Any others?
9       A.   Not that I can think of right now.  I'm not sure if
10 there weren't any others, but there might have been -- there
11 might have been.  I just can't recall right now.
12      Q.   Okay.  Dress for Success, did you specifically seek
13 open PCA positions through Dress for Success?
14      A.   I think I was just asking to get signed up to be
15 included in their job search program.
16      Q.   And were you included in their job search program?
17      A.   I believe they added me, yes.
18      Q.   Did you receive any results from being added to their
19 job search program?
20      A.   I don't think that they gave me any direct links that
21 were -- that resulted in the outcome that I had.  But I think
22 that they did try to help me with applications and things.
23      Q.   Did you apply for any PCA jobs through your address
24 --
25      A.   I'm not sure I'm not sure exactly that happened, but

Page 82

1  I know that they --
2      Q.   Did you apply for -- I'm sorry.  Go ahead.
3      A.   No, it's okay.  Ask your question.
4      Q.   Did you apply for any jobs through Dress for Success?
5      A.   Yes.
6      Q.   What jobs did you apply for through Dress for
7  Success?
8      A.   I don't remember exactly what they had offering.
9  Whatever -- I think they would send us, like, we have this job
10 opening, if you want to apply for it, send us your resume.  And
11 I think I forwarded them my information to other job offers,
12 but I'm not sure exactly what they were.
13     Q.   Do you have any records of your job search efforts
14 through Dress for Success?
15     A.   Yes.
16     Q.   Have you produced those to Houston Methodist in this
17 lawsuit?
18     A.   I haven't.
19     Q.   Do you have records of your job search efforts
20 through LinkedIn?
21     A.   Not any that I have printed anywhere, no.
22     Q.   Do you have any that you haven't printed?
23     A.   I just access to the site.
24     Q.   Have you provided any of those records to Houston
25 Methodist as part of this lawsuit?

Page 83

1      A.   I haven't been asked for them.
2      Q.   Memorial Assistance Ministries, what -- describe for
3  me what job search efforts you made through Memorial Assistance
4  Ministries.
5      A.   I think they had, like I said, a consultant or
6  coordinator, someone who was sending me information to be job
7  search prepared.  And I think through Memorial Assistance
8  Ministries is where I saw the job opportunity for Boston to --
9  for the training for Boston.
10     Q.   Okay.  Did you apply to any other jobs besides Boston
11 Scientific through your job search efforts at Memorial
12 Assistance Ministries?
13     A.   Sorry.  Excuse me?
14     Q.   You -- you just said you believe you became aware of
15 the opportunity at Boston Scientific through Memorial
16 Assistance Ministries, correct?
17     A.   Yes.  I believe so.  I think that's where I found it.
18 I think they had a --
19     Q.   Other -- other than Boston Scientific, did you apply
20 to any other jobs through Memorial Assistance Ministries?
21     A.   I'm not sure I applied anywhere through them.  I think
22 I did a lot of job search effort preparedness activities with
23 them.
24     Q.   What do you mean by, "job search prepared --
25 preparedness activities"?

Page 84

1      A.   Like, working on my CV letter and sending
2  applications and, like -- yeah, I just --
3      Q.   So do you -- do you not know whether you actually
4  applied for any jobs through Memorial Assistance Ministries?
5      A.   I know what Dress for Success I did, and I think that
6  it's likely that I also applied through Memorial Assistance
7  Ministries, but I'm not sure if they sent me, like -- I
8  probably did.
9           I think they probably did send me links to certain
10 jobs, and I forwarded my resume out through them.  I just can't
11 remember what they are.
12     Q.   Okay.  Do you have records of your job search efforts
13 through Memorial Assistance Ministries?
14     A.   I might only just have a flyer.  I think I have
15 records of my communications with the consultant back and forth
16 to get prepared for job roles.  But as far as, like, specific
17 applications that were sent out, I'm not sure, and I'll have to
18 look for the flyer.
19     Q.   Have you produced any of the records you might have
20 to Houston Methodist as a part of this lawsuit?
21     A.   Not with Memorial Assistance Ministries, no.
22     Q.   Other than LinkedIn or Community Resources, did you
23 utilize any other avenues to look for jobs during the two-month
24 period -- approximate two-month period between the end of your
25 employment at Houston Methodist and Boston Scientific's

Page 85

1  contingent offer?
2      A.   Not that I can think of right now.
3      Q.   Okay.  Are you familiar with the name Tiffany Hardin?
4      A.   Yes.
5      Q.   Was Tiffany Hardin a PCA in your department when you
6  were employed at Houston Methodist?
7      A.   She was.
8      Q.   As a part of your lawsuit, do you contend that
9  Tiffany Hardin was treated more favorably than you were?
10     A.   Yes.
11     Q.   Okay.  Tell me all the ways Tiffany Hardin was
12 treated more favorably than you were that you're alleging in
13 this lawsuit.
14     A.   I didn't see her get subjected to other PCAs who were
15 of her same race yell at her inappropriately or refuse to work
16 with her.
17     Q.   Any other ways?
18     A.   Not that I can think of at the moment.
19     Q.   Okay.  Are you familiar with the name Roberto
20 Palomeras?
21     A.   Yes.
22     Q.   Was he a PCA in your department when you were
23 employed at Houston Methodist?
24     A.   Yes.
25     Q.   As a part of your lawsuit, are you claiming that

Page 86

1 Roberto Palomeras was treated more favorably than you were?
2     A.   Yes.
3     Q.   Okay.  Tell me the ways that Mr. Palomeras --
4 Palomeras was treated more favorably than you were.
5     A.   He was allowed to perform tasks that other PCAs were
6 not allowed to perform.  But I had asked him if he had any
7 special -- special certifications or training or had been
8 signed off on a skills for, where they given him permission to
9 perform that specific skill.  And he said no, but it was a
10 specific skill that they were asking him to -- to perform.
11    Q.   You said that you witnessed him performing skills
12 that other PCAs were not allowed to perform.  Were there other
13 PCAs besides yourself who were not allowed to perform the tasks
14 you're referring to?
15    A.   When I say, "not allowed to," like, they would
16 specifically seek him out to perform, like, condom catheters.
17    Q.   Who's "they"?  Other PCAs?
18    A.   Nurses, who said that they hadn't been performing the
19 skill or hadn't been trained on it, and so they would just ask
20 him to do it.
21    Q.   Okay.  Any other ways that Mr. Palomeras was treated
22 more favorably than you?
23    A.   Again, the same.  I never witnessed him being called
24 names.  I never saw anyone yell at him.
25    Q.   Okay.  So the same thing as Ms. Hardin?

Page 87

1     A.   I don't know if she -- if people sought her out
2 specifically to perform condom catheters.
3     Q.   But -- but I mean, in the sense that you didn't
4 witness anybody yell at her or refuse to work with her?
5     A.   Correct.
6     Q.   Okay.  Anything else that -- how Mr. Palomeras was
7 treated more favorably than you?
8     A.   Not that I can think of right now.
9     Q.   Are you familiar with the name Tawanda
10 Derouen?
11    A.   Repeat?
12    Q.   Are you familiar with the name Tawanda Derouen?
13    A.   I don't recall.
14    Q.   D-E-R -- I'm sorry?
15    A.   I can't recall right now.  Maybe if I saw it written.
16    Q.   Last name is spelled D-E-R-O-U-E-N.
17    A.   O-U-N?
18    Q.   O-U-E-N.
19    A.   O-U-E-N.  I don't recall.  Just off the top of my
20 head, no.
21    Q.   Do you recall any PCA named Tawanda?
22    A.   Tawanda.  Maybe vaguely, maybe she went by a nickname
23 or something.  I don't recall.
24    Q.   Okay.  Do you recall a -- I mean, are you familiar
25 with the name Cynthia Navarro?

Page 88

1     A.   Vaguely, yes.  I didn't work with her very directly.
2 I don't think that she was a trainer at that time, so I
3 probably didn't get to work with her as much.
4     Q.   As part of this lawsuit, are you claiming that Ms.
5 Navarro was treated more favorably than you?
6     A.   Correct.
7     Q.   In which way?
8     A.   Was not placed on a performance improvement plan,
9 wasn't called names, wasn't treated to daily routine derogatory
10 comments, wasn't terminated in the time that I was there with
11 her.
12    Q.   Okay.  Do you have any evidence that Ms. Navarro did
13 anything to --
14    A.   I think that she --
15    Q.   Do you have any evidence that she did anything that
16 she should have been terminated for?
17    A.   If ambulating patients who are on EVD drains is part
18 of her daily task, then I would think that she, like me, should
19 be terminated too.  If -- I mean --
20    Q.   You said you didn't really work with her, right?
21    A.   That's why I say if that's -- I didn't train with
22 her.  I didn't shadow her.  I shadowed with another nurse named
23 Gloria or a PCA named Gloria.  Not a nurse.  She was not --
24 Gloria was not a nurse.  She was a PCA.  Sorry.
25    Q.   Do you have -- did you ever witness Cynthia Navarro

Page 89

1 ambulate a patient?
2     A.   I'm sure I did.  I don't recall specifically training
3 with her, so I might -- I didn't observe her practice as
4 closely.  I don't really know --
5     Q.   Did you ever witness Cynthia Navarro adjust an EVD
6 clamp?
7     A.   I wasn't again, I've never trained with her, so I'm
8 not sure.
9     Q.   Did you ever witness her touch a BiPAP machine?
10    A.   I'm not sure.  She might have.  I don't know.
11    Q.   Did you ever witness her disregard instructions from
12 a nurse?
13    A.   There were a lot of times, a lot of the PCAs.  I don't
14 know if it was specifically that particular PCA, but I know
15 that the PCA that I trained with, Gloria said she just couldn't
16 or she would disappear and not do things.
17    Q.   I'm talking -- we're talking about Cynthia Navarro
18 right now.  My question is: Did you ever witness Cynthia
19 Navarro disregard instructions from a nurse?
20    A.   I didn't train with her.  I don't know.  I didn't
21 work with her.  I didn't go into rooms with her.  I worked
22 independently except for when I was training.
23    Q.   So the answer is no, correct?
24    A.   I don't think it's a fair question.  I think it's a
25 very pointed question, asking for a certain response.  And I

Page 90

1 wouldn't have been able to really do that unless it's during a
2 hand-off or, you know, working in the halls on something. But
3 no.
4      Q.   Okay.  Are you familiar with the name Elbertlina
5 Bouie?
6      A.   Alberta?
7      Q.   Elbertlina Bouie.  I don't know if she went by
8 Elberta.  Are you familiar with that name?  Do you know who
9 that person is?
10     A.   I think I vaguely might recall, but I -- I am not
11 putting name to face.
12     Q.   Does the -- does the last name Bouie.  Ring a bell
13 with you?  B-L-U-I-E (sic).
14     A.   Vaguely.
15     Q.   Are you claiming that Ms. Bouie was treated more
16 favorably than you as part of this lawsuit?
17     A.   During my -- during my time at Houston Methodist
18 Hospital and as a PCA, it is not my knowledge from my
19 experience that any of the other PCAs ever received a
20 performance improvement plan, and none of them were terminated
21 during my time there.
22          MR. BURKE:  Objection.  Non-responsive.
23 BY MR. BURKE:
24     Q.   My -- my question is --
25     A.   I don't know.

Page 91

1      Q.   As part of this -- ma'am not interrupt me, okay?  My
2 question is: As part of this lawsuit, are you claiming that Ms.
3 Bouie was treated more favorably than you?
4      A.   Can I see the record that you're referring to?
5      Q.   I'm looking at her name.  Do you know who that is?
6      A.   If she was a PCA during my time there as a PCA and we
7 were working together, yes.
8      Q.   Okay.  How was she treated more favorably than you?
9      A.   Same thing.
10     Q.   Okay.  Are you familiar with the name, I think you
11 mentioned, Gloria Gomez?
12     A.   Correct.
13     Q.   Was she a PCA during your time at Houston Methodist ?
14     A.   Yes.
15     Q.   Are you claiming as party of this lawsuit, that Ms.
16 Gomez was treated more favorably than you?
17     A.   Yes.
18     Q.   In what ways was Ms. Gomez treated more favorably?
19     A.   She was allowed to perform tasks that I was
20 reprimanded for and She was not placed on a performance
21 improvement plan for performing those tasks.  She was not
22 terminated for performing those tasks.
23     Q.   How long do you know how long Ms. Gomez had been a
24 PCA?
25     A.   I have asked for these records and I have not been

Page 92

1 provided them from Houston Methodist.  I don't have that --
2 have that specific record, no.
3      Q.   Was she -- did you refer to her as your one of your
4 trainers, one of the people that you shadowed?
5      A.   Yes.
6      Q.   Okay.  What tasks specifically did Ms. Gomez perform
7 that you were not allowed to perform?
8      A.   She was definitely allowed to touch the EVD clamps.
9      Q.   Okay.  Anything else?
10     A.   She was allowed to go on extended breaks.
11     Q.   Okay.  Any -- anything else?
12     A.   She was not subjected to daily derogatory comments.
13 She was allowed to gossip.
14     Q.   Okay.  Anything else?
15     A.   She wasn't terminated or --
16     Q.   Okay.  Anything else?
17     A.   Not that I can think of right now.
18     Q.   Did you ever witness her touch a BiPAP machine?
19     A.   I don't recall.
20     Q.   Did you ever witness her disregard instructions from
21 a nurse?
22     A.   Yes.
23     Q.   Okay.  Tell me about that.  When did she disregard
24 instructions from a nurse?
25     A.   Regularly.

Page 93

1      Q.   Okay.  Tell me all the instances you can remember
2 where you witnessed her disregard instructions from a nurse.
3      A.   With regard to daily scheduling, when a nurse would
4 ask, can you be here at this time.  No.  Can you do this bath
5 at this time.  No.  Can you get me this.  I need this.  Ask
6 someone else.
7      Q.   Any other examples?
8      A.   Not that I can think of right in this moment.
9      Q.   Okay.  Are you familiar with the name Jordan Jackson?
10     A.   Yes.
11     Q.   Jordan Jackson a PCA during the time you were at
12 Houston Methodist?
13     A.   Yes.
14     Q.   As part of this lawsuit, are you claiming that Jordan
15 Jackson was treated more favorably than you?
16     A.   Yes.
17     Q.   How was Jordan Jackson treated more favorably than
18 you?
19     A.   She was allowed to log things into Epic and had
20 access to chart things on her own.  They would ask her to
21 chart.
22     Q.   Okay.  Any other ways she was treated more favorably
23 than you?
24     A.   I believe she was hired to stay there as a nurse.
25     Q.   Okay.  What -- what makes you believe she was hired

Page 94

1  to stay there as a nurse?
2      A.   I believe I saw something posted on social media.
3      Q.   Do you remember where?
4      A.   I think through Houston Methodist or maybe, like, a
5  -- I'm not sure exactly.
6      Q.   Okay -- okay.  Any other ways Jordan Jackson was
7  treated more favorably than you?
8      A.   I think that she got to be part of communication and
9  trying to arrange for team meetings, which I was I never got to
10 be in a team meeting during my time there.
11     Q.   Okay.  Any other ways Jordan Jackson was treated more
12 favorably than you?
13     A.   Again, was not subjected to daily derogatory
14 comments, was not put on a PIP, was not terminated.
15     Q.   Did you ever witness Jordan Jackson adjust EVD
16 clamps?
17     A.   I don't recall possibly, I think, just moving them.
18 I don't know if she was, you know, turning them on or off, but
19 I definitely had seen her ambulate a patient rolling the EVD
20 device.
21     Q.   Have you ever did you ever witness her touch a BiPAP
22 machine?
23     A.   I don't recall.
24     Q.   Did you ever witness her disregard instructions from
25 a nurse?

Page 95

1      A.   I think -- yes.  I think at one point, there was
2  something about she left a linen cart outside of the door, and
3  they're not supposed to be just sitting out in the hallways.
4           And I think I was asking for her help, like, can I
5  please take this since it's not in use, and there's nothing on
6  it and it needed to be used, and she wasn't using it.  And the
7  nurse was telling her to ignore me.
8           I think it was Cameron who was in the room.  And
9  instead of ignoring -- instead of just ignoring me, she said,
10 yes, okay, you can take it.  But it was, like, she wasn't
11 supposed to be talking to me.
12     Q.   Okay.  Any other instances that you witnessed Jordan
13 Jackson disregarding instructions from a nurse?
14     A.   Not that I can think of.
15     Q.   Okay.  Are you familiar with the name Adelle Flores?
16     A.   Yes.
17     Q.   Ms. Flores, a PCA at Houston Methodist during your
18 employment there?
19     A.   Yes.
20     Q.   As part of this lawsuit, are you claiming that Adelle
21 Flores was treated more favorably than you?
22     A.   Yes.
23     Q.   Okay.  How was Ms. Flores treated more favorably than
24 you?
25     A.   Was not subjected to daily derogatory comments, was

Page 96

1  not subjected to a PIP, was not subjected to termination.  And
2  definitely was allowed to perform tasks such as moving EVD
3  drains.
4      Q.   You personally witnessed her move EVD drains?
5      A.   Correct.
6      Q.   Are you aware of any time that you witnessed her move
7  an EVD drain when she had been instructed not to by a nurse?
8      A.   I didn't work with her that closely, but I can recall
9  times when I witnessed Gloria doing it, yes.
10     Q.   Talking about Ms. Flores.
11     A.   Okay.  No, I didn't work with her that closely.
12     Q.   Okay.  Any other ways that Ms. Flores was treated
13 more favorably than you?
14     A.   Not that I can think of right now.
15     Q.   Did you ever witness Ms. Flores disregard a nurse's
16 instruction?
17     A.   Not that I can recall.
18     Q.   Did you ever witness Ms. Flores touch a BiPAP
19 machine?
20     A.   Not that I can recall.
21     Q.   Okay.  Are you familiar with the name Chrisshunda
22 Jamerson?
23     A.   No.  I don't recall the name.
24     Q.   Okay.  Are you familiar with the name Abigail Gomez?
25     A.   I don't recall exactly that name, no.

Page 97

1      Q.   Okay.  Did you work the day shift or the night shift?
2      A.   Day shift.
3      Q.   How often did you work at the same time as other PCAs
4  who were assigned to the night shift?
5      A.   Just in hand-off, which would last maybe about an
6  hour.
7      Q.   Okay.  Just for the benefit of the court and -- and
8  the jury, what takes place during the one-hour hand-off?
9      A.   Just letting them know who has and has not had a bath
10 for the day, who still needs to be bathed, who still needs
11 blood sugars.  Does anyone need more blood sugars an hour as
12 opposed to every three hours?  Just things that they're going
13 to need that might change their routine.
14     Q.   Is this just done PCA to PCA or are there others
15 involved?
16     A.   PCA to PCA.
17     Q.   Okay.  Are you familiar with the name Latonya Posey?
18     A.   I don't recall.
19     Q.   Are you familiar with the name Latrivia Beverly?
20     A.   Vaguely, yes.
21     Q.   Do you recall her being a night PCA at Houston
22 Methodist during your employment?
23     A.   Sounds right.
24     Q.   Did you ever work with Ms. Beverly?
25     A.   Maybe, like, once or twice.  I'm not sure, but maybe

Page 98

1  during hand-off more directly.
2       Q.  As part of this lawsuit, are you claiming that Ms.
3  Beverly was treated more favorably than you?
4       A.  Yes.
5       Q.  Okay.  Tell me the ways that you believe Ms. Beverly
6  was treated more favorably than you.
7       A.  Same thing.  Not subjected to daily derogatory
8  comments.  Was not placed on a performance improvement plan,
9  was not placed on a PIP.
10      Q.  Anything else?
11      A.  Not that I can think of right now.
12      Q.  How do you know one way or another whether Ms.
13 Beverly, for example, was ever placed on a PIP?
14      A.  When I was placed on a PIP, they rounded people and
15 made sure, like, people knew about it.  They were interviewing
16 people.
17           MR. BURKE:  Objection. Non-responsive.
18 BY MR. BURKE:
19      Q.  That's not my question.  I wasn't asking about when
20 you were put on a PIP.  I'm asking how do you know one way or
21 another, if Ms. Beverly, for example, was ever placed on a PIP?
22      A.  Because they would have been seeking feedback from
23 the other coworkers.
24      Q.  That's your only evidence that she was never placed
25 on a PIP?

Page 99

1       A.  She wasn't reprimanded, just in general.  I don't
2  think that she was reprimanded for filing reports, whereas I
3  was directly reprimanded in retaliation for talking about being
4  harassed.
5       Q.  My question is this, do you have any evidence one way
6  or another if Ms. Beverly was ever placed on a PIP?
7       A.  I have asked Houston Methodist numbers of times to
8  provide evidence of others, if so, if that's the case, if there
9  are other similarly situated employees to Weathers, please
10 provide them if they've been placed on any disciplinary action
11 or performance improvement plans.
12           MR. BURKE:  Objection. Non-responsive.
13 BY MR. BURKE:
14      Q.  Do you know one way or another if she was ever placed
15 on a PIP, no?
16      A.  Objection. Leading.
17      Q.  I'm allowed to lead you, ma'am.
18      A.  Argumentative.  Speculative.
19      Q.  I -- I agree you're speculating.  So did you ever
20 witness Ms. Beverly adjust an EVD clamp?
21      A.  That was part of the practice that I was trained with
22 my trainer.  I did not go into every room with every similarly
23 situated coworker.
24           Sir, this is really exhaustive and burdensome to ask
25 if -- through each and every employee who I -- who was ever

Page 100

1  employed that was similarly situated to me that I did not
2  directly work with in the rooms with him because we work
3  independently.
4            I feel like it's an inappropriate question and it's
5  overly burdensome.  It's not an appropriate question.
6            MR. BURKE:  Objection --
7            THE DEPONENT:  And it's leading to -- to get a
8  certain answer that I -- I just don't think it's appropriate.
9            MR. BURKE:  Objection. Non-responsive.
10 BY MR. BURKE:
11      Q.  Ma'am you told --
12      A.  -- and speculative.
13           MR. BURKE:  Objection. Non-responsive.
14 BY MR. BURKE:
15      Q.  Ma'am, you told me, you testified that part of your
16 lawsuit is that Ms. Beverly was treated more favorably than
17 you.  So that's why I'm asking you questions about her, okay?
18 So let me do it this way.  Did I have it correctly that you only
19 ever worked with --
20      A.  Every --
21      Q.  Ma'am, quit interrupting me.  Did I have your
22 testimony correctly that you only ever worked with Ms. Beverly
23 during hand-offs?
24      A.  Argumentative.
25      Q.  Is it true that you only ever worked with Ms. Beverly

Page 101

1  during hand-off?  Yes or no?
2       A.  No.
3       Q.  When did you work with Ms. Beverly outside of hand-
4  offs?  Is there a single instance during the time you were a
5  PCA at Houston Methodist that you worked with Ms. Beverly
6  outside of a daily hand-off?  Yes or no?
7       A.  We've been doing this over two hours.  You were only
8  allowed two more hours.
9       Q.  That's incorrect, ma'am.
10      A.  That isn't incorrect.
11      Q.  It is incorrect.
12      A.  I think we're done.
13      Q.  I'm asking a question: Is there a single instance
14 when you ever worked with Ms. Beverly outside of a hand-off,
15 daily hand-off situation?  Yes or no?
16      A.  I don't recall.
17      Q.  Okay.  Do -- during hand-off, daily hand-offs, do
18 PCAs adjust EVD clamps?
19      A.  Yes.  If they need to --
20      Q.  During a hand-off --
21      A.  -- ambulate the patient before they leave and they
22 need to go to the bathroom, yes.
23      Q.  Okay.  During a hand-off, did you ever witness Ms.
24 Beverly adjust an EVD clamp?
25      A.  I don't recall who Beverly is right now.  I think I

Page 102

1  vaguely remember who that person is, but -- I know who I was
2  training with and what my trainers did.
3      Q.  And I'm asking you about other people, which I'm
4  entitled to do because you just told me that you're making her
5  part of your lawsuit.  So did you ever witness Ms. Beverly
6  touch a BiPAP machine?
7      A.  Not very many patients have BiPAP machines, so I
8  don't know if I got a chance to see her do that.  It's a --
9  you're speculating and you're leading, and you want a certain
10 answer.
11          And I didn't work that closely.  I trained with
12 Gloria.  That's who I -- that's who I was supposed to -- my
13 practice was supposed to be based off of what she did, not what
14 every other single PCA did.  My job was specifically just to
15 learn what Gloria did.
16          MR. BURKE:  Objection.  Non-responsive.
17 BY MR. BURKE:
18     Q.  Ma'am, my question is:  Did you ever witness Ms.
19 Beverly touch a BiPAP machine?
20     A.  I can't -- I already answered this question.  Asked
21 and answered.  I told you I don't recall who Beverly was.
22     Q.  Okay.  So then if you don't recall who Beverly was,
23 and you can't tell me you ever witnessed her disregard a
24 nurse's instruction, correct?
25     A.  I don't know who that is right now.  I can't recall.

Page 103

1  Give me a document so I can see who you're referring to.
2      Q.  You -- are you familiar with the name Elise Edwards?
3      A.  Yes.
4      Q.  Was Elise Edwards a PCA at Houston Methodist during
5  the time that you worked there?
6      A.  Yes.
7      Q.  Was she in -- did she work on a night shift or day
8  shift?
9      A.  I think she might have worked nights or maybe she
10 switched from nights to days.
11     Q.  Okay.  Are you claiming as part of this lawsuit that
12 Elise Edwards was treated more favorably than you?
13     A.  Yes.
14     Q.  Okay.  How was Ms. Edwards treated more favorably
15 than you?
16     A.  When she filed reports, she was not reprimanded.
17     Q.  Do you have personal knowledge that she filed
18 reports?
19     A.  Yes.  She went to -- what was his name?  One of the
20 leaders on the unit.  I can't remember what his name is right
21 now.
22          I think she was one of the PCAs who was having a
23 problem with the linens and linen count.  And instead of
24 communicating with me on trying to, you know, hand off report,
25 she started yelling at me and humiliating.

Page 104

1          And I asked if she could please stop talking to me
2  that way.  And then she said, oh, no, I'm not doing this, and
3  started, you know, going and yelling at the leader that we had
4  on duty that day.
5      Q.  Is this the report you're talking about that she
6  filed?
7      A.  Right.
8      Q.  Okay.  So the report had to do with a disagreement
9  that you and she had over linens?
10     A.  Yeah.  And then there was another issue where she was
11 bringing up a problem with me, and I think Adelle had come over
12 and suddenly it wasn't a problem anymore.
13     Q.  Okay.  Who's Adelle?
14     A.  We just -- Adelle Flores you asked, she was another
15 PCA.
16     Q.  Okay.  Other than these two instances, are you aware
17 of any other reports that Ms. Edwards made?
18     A.  Not that I can recall right now.
19     Q.  Okay.  How else was Ms. Edwards treated more
20 favorably than you?
21     A.  Same thing.
22     Q.  I'm sorry?
23     A.  Same thing.  Was not subjected to daily derogatory
24 comments.
25     Q.  Okay.  Anything beyond not subjected to daily

Page 105

1  derogatory comments?
2      A.  Right.  Was not placed on a performance improvement
3  plan, was not terminated.
4      Q.  Did you ever witness Ms. Edwards adjust an EVD clamp?
5      A.  All of the PCAs had to adjust the EVD clamps to
6  ambulate the patients.
7      Q.  Did you ever witness Ms. Edwards adjust an EVD clamp?
8      A.  No.
9      Q.  Did you ever witness Ms. Edwards touch a BiPAP
10 machine?
11     A.  No.
12     Q.  Did you ever witness Ms. Edwards disregard
13 instructions from a nurse?
14     A.  Yes.
15     Q.  Okay.  Tell me about all the times you witnessed her
16 disregard instructions from a nurse.
17     A.  When she was first yelling at me in the hallway and
18 didn't want to stop and had to be talked down.
19     Q.  Okay.  That's the confrontation about the linens?
20     A.  I believe so, yes.
21     Q.  Okay.  Any other times that you witnessed her
22 disregard a -- an instruction from a nurse?
23     A.  Not that I can recall at the moment.
24     Q.  Are you familiar with the name Ashley Smith?
25     A.  I think she was one of the new hires.

Page 106

1    Q.  Did you ever work with Ms. Smith?
2    A.  I believe on the unit, but again, she wasn't one of
3  my trainers and I did not train her.
4    Q.  As part of this lawsuit, are you claiming that Ms.
5  Smith was treated more favorably than you?
6    A.  Yes.
7    Q.  Tell me how Ms. Smith was treated more favorably than
8  you.
9    A.  Was not subjected to daily derogatory comments.
10   Q.  Okay.  Anything else?
11   A.  Not that I can think of right now.
12   Q.  Okay.  Did you ever witness Ms. Smith adjust an EVD
13  clamp?
14   A.  Yes.
15   Q.  Okay.  Did you ever witness her touch a BiPAP
16  machine?
17   A.  I don't recall.
18   Q.  Did you ever witness her disregard instructions from
19  a nurse?
20   A.  I don't recall.
21   Q.  You -- are you familiar with the name Fola Oladun?
22   A.  Yes.  You're saying F-O-L-A?
23   Q.  F-O-L-A, yes.  You're familiar with her?
24   A.  Yes.
25   Q.  Was she a PCA at the time you were employed as a PCA

Page 107

1  at Houston Methodist?
2    A.  Yes.
3    Q.  Okay.  Was she -- did she work night shift or the day
4  shift?
5    A.  I think she worked night shifts.
6    Q.  I'm sorry, the day?
7    A.  I don't recall.  I can't remember right now if she
8  was night or day.  I think she might have --
9    Q.  Okay.
10   A.  -- been night shift.
11   Q.  As part of this lawsuit, are you claiming that Ms.
12  Oladun Pola was treated more favorably than you?
13   A.  Yes.
14   Q.  Tell me all the ways Ms. Oladun was treated more
15  favorably than you.
16   A.  Was not retaliated against, was not discriminated
17  against.  Did not -- was not subjected to daily derogatory
18  comments, was not put on a performance improvement plan, was
19  not terminated, was allowed to speak to me inappropriately
20  without being reprimanded.
21   Q.  How did Ms. Oladun speak to you inappropriately?
22   A.  Yelling at me.
23   Q.  What did she yell at you about?
24   A.  I think probably the same thing.
25   Q.  Same thing as what?  The linens?

Page 108

1    A.  Yeah.
2    Q.  Did you ever witness Ms. Oladun adjust an EVD clamp?
3    A.  Yes.
4    Q.  Ever witness Ms. Oladun touch a BiPAP machine?
5    A.  No.
6    Q.  Did you ever witness Ms. Oladun disregard
7  instructions from a nurse?
8    A.  Yes.
9    Q.  Okay.  Tell me all the times you witnessed her
10  disregard instructions from a nurse.
11   A.  Sorry.  Same thing.
12   Q.  What do you mean by, "same thing"?  I'm asking about
13  --
14   A.  Allowed to -- allowed to treat me dis-favorably,
15  allowed to yell at me, or allowed to --
16        MR. BURKE:  Objection.  Non-responsive.
17        THE DEPONENT:  -- speak to me inappropriately without
18  being reprimanded.
19  BY MR. BURKE:
20   Q.  Ma'am, my question was about you -- you told me you
21  witnessed her disregard instructions from a nurse --
22   A.  I need a break.
23   Q.  Let's answer the question that I have on the table
24  and we can take a break.  Because I asked you if you ever
25  personally witnessed her disregard instructions from a nurse,

Page 109

1  and you said yes.  And so I want to know all the instances that
2  you witnessed her disregard instructions from a nurse.
3    A.  I'm done.
4    Q.  I'm sorry?
5    A.  I'm done.  I -- asked and answered.
6    Q.  You have not told me any instances that you witnessed
7  Ms. Oladun disrespect -- disregarding --
8    A.  I've already given you three hours when you only
9  needed two more hours.  I'm done.
10   Q.  Ma'am, it's three hours on the record.  We have not
11  been on the record for three hours.
12   A.  I'm allowed to have breaks.  There's, like, 3 minutes
13  left.  I'm telling you, I'm done.  I've only had one break and
14  we've been here three hours.  I'm done.
15   Q.  I have a question on the table.  When we first
16  started your deposition, we went through the instructions --
17  all right.  It appears the witness has left the room without --
18   A.  I gave you three hours.
19   Q.  Are you leaving the room, ma'am?
20   A.  Yes, I'm done.  I've given you three hours.  I'm
21  leaving.
22   Q.  You're leaving the deposition entirely?
23   A.  It's been three hours.
24   Q.  Are you leaving the deposition entirely?
25   A.  I need to get home to take Sunila Ali's deposition.

Page 110

1 I have less than an hour to get there and prepare for it.
2 You're giving me no extra breaks. I've had one break in the
3 last three hours.
4          There's five minutes left. I'm breaking and going to
5 head back so I can get prepared for the next deposition.
6          You said you also wanted to ask additional questions
7 to meet and confer for production requests, third party
8 subpoenas. You also want to do that, right? I don't have time
9 for all of it.
10    Q.   You're the one --
11    A.   I'm done. I'm allowed a five-minute break. It's been
12 an hour. I didn't get another five-minute break. There's only
13 been one other.
14          I'm done. You're asking the same question over and
15 over and over again for each every -- each and every individual
16 staff I worked with night and day.
17          I didn't get to work directly with each and every
18 single one. I get the point that you're getting at, but it's
19 leading in every single question and speculative to every
20 single question.
21          It's argumentative to every single question, and I'm
22 doing it with you. But break. We're done. You've had your
23 three hours.
24    Q.   Ma'am, all I -- all I said was, I want the answer to
25 my --

Page 111

1    A.   You don't need the same answer over and over and
2 over. For employees I don't even know -- just stop. It's
3 done.
4    Q.   You don't get to decide when it's done, ma'am.
5    A.   It's three -- you're allowed seven hours. Two hours
6 is all you needed today, and I gave you three because you said
7 you needed three. It's now been three hours and you're not
8 letting me go.
9    Q.   It has not been three hours on the record, ma'am. If
10 you want to take a break, that's fine. But I'm going back to
11 my question.
12          THE REPORTER: Ms. Caitlin, are you coming back?
13          THE DEPONENT: Is there a reason --
14          MR. BURKE: Did she waive?
15          THE DEPONENT: Do you really need more time? We've
16 had -- it's been seven hours. Over seven hours.
17 BY MR. BURKE:
18    Q.   Ma'am, do you want to take a break or do you want to
19 keep going?
20    A.   So can you give me the time? Because I'm pretty sure
21 it's been more than seven hours. Are you -- do y'all --
22          MR. BURKE: Let's go off --
23          THE DEPONENT: -- want some time?
24          MR. BURKE: Let's go off the record while she carries
25 on like this.

Page 112

1          THE VIDEOGRAPHER: The time is 12:56 p.m., we are off
2 the record.
3          (WHEREUPON, a recess was taken.)
4          THE VIDEOGRAPHER: The time is 1:07 p.m., we are on
5 the record.
6 BY MR. BURKE:
7    Q.   Ms. Weathers, we're back on the record. You
8 understand you're still under oath, correct?
9    A.   Correct.
10    Q.   Before you stormed out of the room, we were talking
11 about Oladun.
12    A.   What is a storm?
13    Q.   My question at the time was: Did you ever witness Ms.
14 Oladun disregard instructions from a nurse?
15    A.   Sorry, repeat.
16    Q.   Did you ever personally witness Ms. Oladun disregard
17 an instruction from a nurse?
18    A.   And what was my answer that you didn't accept before?
19    Q.   You didn't answer.
20    A.   What is on the record, may I ask?
21          THE REPORTER: Let me go back.
22          MR. BURKE: All right. Hang on a second. Let's --
23 let's go off the record.
24 BY MR. BURKE:
25    Q.   We're not going to do this for 15 minutes, ma'am.

Page 113

1 You're not going to -- you're not going to finagle your way out
2 of not answering my question.
3    A.   I don't know. What do you -- what is your
4 terminology of finagle? Oh, I also have another question.
5 Sorry. Since we're cutting --
6    Q.   You don't --
7    A.   -- into the time.
8    Q.   Hang on. You don't -- ma'am, you don't ask
9 questions.
10    A.   You had sent a third party deposition or third party
11 notice --
12          MR. BURKE: All right. Let's go off --
13          THE DEPONENT: -- subpoena.
14          MR. BURKE: -- the record.
15          THE DEPONENT: Sorry. A third party subpoena. We
16 don't have time. I have to --
17          MR. BURKE: We're going off the -- we're going off
18 the record.
19          THE VIDEOGRAPHER: Good. The time is 1:08 p.m.
20          (WHEREUPON, a recess was taken.)
21          THE VIDEOGRAPHER: The time is 1:10 p.m. We are on
22 the record.
23 BY MR. BURKE:
24    Q.   Ms. Weathers, yes or no, did you ever witness Ms.
25 Oladun disregard an instruction from a nurse?

Page 114

1    A.   Yes.
2    Q.   All right.  Tell me all the times you witnessed her
3  disregard an instruction from a nurse.
4    A.   When asked to stop yelling at me.
5    Q.   Okay.  Any other times you witnessed her disregard a
6  instruction from a nurse?
7    A.   Not that I can recall right now.
8    Q.   Okay.  Familiar with the name Laurisha Faurisma?
9    A.   No.  Laurisha Faurisma?
10   Q.   Yes, ma'am.
11   A.   I don't know who Laurisha Faurisma is.
12   Q.   Okay.  You're familiar with the name Brenda Gallegos?
13   A.   I am familiar with someone named Brenda.  I don't
14  know if that was her last name or not, but I do recall working
15  with someone named Brenda.
16   Q.   Brenda, are you familiar with a PCA at Houston
17  Methodist?
18   A.   Yes.
19   Q.   Did she work the day shift or night shift?
20   A.   Day shift.
21   Q.   As part of this lawsuit, are you claiming that Ms.
22  Gallegos was treated more favorably than you?
23   A.   Yes.
24   Q.   Tell me how Ms. Gallegos was treated more favorably
25  than you.

Page 115

1    A.   Because she was allowed to say that she didn't like
2  me and she's allowed to call me names, like, flat, and nobody
3  gives her any coaching.
4         And nobody gave her a PIP, and nobody told her that
5  she needed to correct anything, and she didn't get terminated
6  for it.  Generally, the rest of her team was okay with working
7  with her.
8    Q.   Any other ways Ms. Gallegos was treated more
9  favorably than you?
10   A.   Nobody called her white trash.  Nobody called her
11  crazy.  Nobody called her gay.  I certainly never would have
12  said those things.
13   Q.   Any other ways she was treated more favorably than
14  you?
15   A.   Not that I can think of right now.
16   Q.   Did you ever personally witnessed Ms. Gallegos
17  disregard an instruction from a nurse?
18   A.   Just when trying to tell her to stop gossiping about
19  me or stop yelling at me.  Those things just never stopped.
20   Q.   So the nurse instructed her to stop gossiping about
21  you and stop talking about you?  Is that the instruction?
22   A.   Correct.
23   Q.   And it's your testimony that he got these
24  instructions from a nurse and continued gossiping and talking
25  about you?

Page 116

1    A.   Correct.
2    Q.   Any other instances where you personally witnessed
3  Ms. Gallegos disregard an instruction from a nurse?
4    A.   Brenda's last name is Gallegos, correct?
5    Q.   We're talking about Ms. Gallegos right now, yes.
6    A.   Correct.
7    Q.   Well, it's correct.  You told me that she was
8  instructed by a nurse to stop gossiping and stop talking about
9  you.
10   A.   Correct.
11   Q.   Are there any other instances where you witnessed her
12  disregard a nurse's instruction?  Ma'am?
13   A.   I just feel so --
14        THE REPORTER:  Yeah, it did.  It sure did.  Is yours
15  still working?  Let's go off the record.
16        THE VIDEOGRAPHER:  The time is 1:16 p.m., we off the
17  record.
18        (WHEREUPON, a recess was taken.)
19        THE VIDEOGRAPHER:  The time is 1:27 p.m., we are on
20  the record.
21  BY MR. BURKE:
22   Q.   Ms. Weathers, we are back on the record.  Are you
23  ready to continue?  Ms. Weathers, are you ready to continue?
24   A.   Yes.
25   Q.   You understand you're still under oath, correct?

Page 117

1    A.   Correct.
2    Q.   Before we went off the record, you mentioned that one
3  way you saw Ms. Gallegos disregard an instruction from the
4  nurse and wanted her -- told her to stop gossiping and to stop
5  talking about you, correct?
6    A.   (No audible response.)
7    Q.   Do you remember that?  Did you witness any other
8  instances beyond that of Ms. Gallegos disregarding an
9  instruction from a nurse?
10   A.   Not that I can recall at this time.
11   Q.   Did you ever witness Ms. Gallegos touching or
12  adjusting a BiPAP machine?
13   A.   Correct.  Yes.
14   Q.   You did?
15   A.   Yes.
16   Q.   Okay.  Did you ever witness Ms. Gallegos adjusting or
17  touching an EVD clamp?
18   A.   Correct.
19   Q.   Is that a yes?
20   A.   Correct.
21   Q.   All right.  Other than the list of PCAs that we just
22  went over, do you recall any other PCAs who worked in your
23  department when you worked as a PCA at Houston Methodist?
24   A.   Sorry.  Repeat.
25   Q.   We just went through a list of a number of PCAs who

Page 118

1  worked at Houston Methodist at the same time you did.  Other
2  than those people that we talked about, do you recall any the
3  names of any other PCAs with whom you worked at Houston
4  Methodist during your time as a PCA?
5       A.   Not that I can recall right now.
6       Q.   Okay.  Other than what we've already discussed, can
7  you recall any instance during your employment as a PCA that
8  you witnessed any other PCA disregard an instruction from a
9  nurse?
10      A.   Sorry.  Can you go back to the last question?
11      Q.   The one I just asked, or the one before that.
12      A.   The one before that.
13      Q.   I said, other than the list of PCAs that we've talked
14 about, can you recall the names of any other PCAs that you
15 worked with during your time as a PCA at Houston Methodist?
16      A.   Can I remember anyone other than the names that have
17 been listed that were called names or were not called names?
18      Q.   Any PCA that we didn't talk about already that you
19 remember you worked with?
20      A.   Oh, just if I worked with them.
21      Q.   All right.  Let -- let me go ahead and start again.
22           We just went through an entire list of PCAs.  Most of
23 them you recall, but some of them you didn't recall their
24 names.
25           As you're sitting here today, do you recall the any

Page 119

1  -- the names of any other PCAs who you worked with during your
2  time as a PCA at Houston Methodist that we did not already talk
3  about?
4       A.   No, not at this time.
5       Q.   There were a number of PCAs that we just talked
6  about, and you said you witnessed them disregard instructions
7  from a nurse.  Other than those instances, do you recall any
8  other instances during your time as a PCA that you witnessed
9  personally another PCA, disregard an instruction from a nurse?
10      A.   Other than what's already been stated?
11      Q.   Other than what we already talked about with this
12 list of people you just went through.
13      A.   Not that I can think of right now.
14           MR. BURKE:  Okay.  All right.  Ms. Weathers, those
15 are all the questions I have for you.
16           THE DEPONENT:  Okay.
17           MR. BURKE:  Counsel, would you like to order the
18 original of this transcript?
19           MR. BURKE:  Yes, please.
20           THE REPORTER:  Thank you.
21           And you would like a copy, Caitlin?
22           THE DEPONENT:  Yes.
23           THE VIDEOGRAPHER:  All right.  This is the end of the
24 deposition of Caitlin Weathers. The court reporter will now
25 take orders for the transcript, as you already have. Can I also

Page 120

1  get orders for the video, deposition video.
2           MR. BURKE:  If there is a video, we'll order a copy,
3  yes.
4           THE VIDEOGRAPHER:  Okay.  All right.  The time is
5  1:32 p.m., we are off the record.
6           (WHEREUPON, the deposition of CAITLIN WEATHERS was
7  concluded at 1:32 p.m.)

Page 121

1                    CERTIFICATE
2
3        I, the undersigned Paige Savoldi, am a videographer on
4  behalf of NAEGELI Deposition & Trial. I do hereby certify that
5  I have accurately made the videorecording of the deposition of
6  Caitlin Weathers in the above captioned matter on the 19th day
7  of December, 2025 taken at the location of Shannon Road
8  Conference Center, 3511 Shannon Rd., 3rd Flr., Durham, NC
9  27707.
10
11       No alterations, additions, or deletions were made thereto.
12
13       I further certify that I am not related to any of these
14 parties in the matter and I have no financial interest in the
15 outcome of this matter.
16
17
18                    *Paige R Savoldi*
19                    Paige Savoldi
20
21
22
23
24
25

CAITLIN WEATHERS                    November 19, 2025                    122 to 124
91295

---

Page 122

```
 1                    CERTIFICATE
 2
 3         I, Alessandra De Souza, do hereby certify that I reported
 4    all proceedings adduced in the foregoing matter and that the
 5    foregoing transcript pages constitutes a full, true and
 6    accurate record of said proceedings to the best of my ability.
 7
 8         I further certify that I am neither related to counsel or
 9    any party to the proceedings nor have any interest in the
10    outcome of the proceedings.
11
12         IN WITNESS HEREOF, I have hereunto set my hand this 4th
13    day of December, 2025.
14
15
16
17
18                    Alessandra De Souza
19
20
21
22
23
24
25
```

---

Page 123

```
 1                  CORRECTION SHEET
 2    Deposition of: Caitlin Weathers      Date: 11/19/25
 3    Regarding: Weathers vs. Houston Methodist Hospital
 4    Reporter: De Souza/Seaman
 5    _____
 6    Please make all corrections, changes or clarifications
 7    to your testimony on this sheet, showing page and line
 8    number.  If there are no changes, write "none" across
 9    the page.  Sign this sheet on the line provided.
10    Page  Line  Reason for Change
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24            Signature: _____
25                    Caitlin Weathers
```

---

Page 124

```
 1                    DECLARATION
 2    Deposition of: Caitlin Weathers      Date: 11/19/2025
 3    Regarding: CAITLIN WEATHERS vs HOUSTON METHODIST HOSPITAL
 4    Reporter:  Alessandra De Souza
 5    _____
 6
 7    I declare under penalty of perjury the following to be
 8    true:
 9
10    I have read my deposition and the same is true and
11    accurate save and except for any corrections as made
12    by me on the Correction Sheet herein.
13
14    Signed at _____, _____
15    on the _____ day of _____, 20____.
16
17
18
19
20
21
22
23
24            Signature: _____
25                    Caitlin Weathers
```

---