# Exhibit 10

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---

CAITLIN WEATHERS,
Plaintiff,
v. Civil Action No.:
HOUSTON METHODIST 4:22-CV-04085
HOSPITAL, ET AL.,
Defendants.

---

VIDEOTAPED DEPOSITION

---

WITNESS: SUNILA ALI
DATE: Wednesday, November 19, 2025
START TIME: 2:08 p.m., ET
END TIME: 3:26 p.m., ET
REMOTE LOCATION: Remote Legal platform
PROCEEDINGS OFFICER: Olivia Wright, CER-4891
JOB NO.: 42817

# A P P E A R A N C E S

CAITLIN WEATHERS
2614 Erwin Road
Suite 2218
Durham North Carolina 27705
j.weathersca@gmail.com
Pro Se Plaintiff

SCOTT PATTON PC
5301 Katy Freeway
Suite 201
Houston, Texas 77007
By: MIKE K. BURKE, ESQUIRE
mburke@scottpattonlaw.com
Appearing for Defendants and Witness

INDEX OF TESTIMONY


EXAMINATION OF SUNILA ALI: PAGE

By Ms. Weathers 6


INDEX OF EXHIBITS

(none marked)

P R O C E E D I N G S

THE PROCEEDINGS OFFICER: Good afternoon. We are now on the record. Today's date is November 19, 2025 and the time is approximately 2:08 p.m., Eastern.

My name is Olivia Wright, and I'm the officer designated by Remote Legal, 11 Broadway, Suite 468, New York, New York, to take the record of this proceeding.

This is the video recorded deposition of Sunila Ali, taken in the matter of Caitlin Weathers versus Houston Methodist Hospital, et al., Case Number 4:22-CV-04085, filed in the United States District Court for the Southern District of Texas, Houston Division.

Would all counsel please identify themselves for the record and state who they represent, starting with the noticing party.

MS. WEATHERS: My name is Caitlin Weathers. I'm the pro se litigant in the case.

MR. BURKE: I'm Mike Burke. I represent Defendants, Houston Methodist Hospital and Sunila Ali.

MS. ALI: My name is Sunila Ali, and I represent Houston Methodist Hospital myself.

THE PROCEEDINGS OFFICER: As such, all parties agree to this means of capturing the official record, which may include recording by audio,

audiovisual, and/or stenographic means and agree not to oppose admissibility of the testimony in this proceeding on the basis of the personnel or method by which the testimony was captured.

Further, all parties agree that the proceedings officer or person administering the oath may be authorized to administer the oath under the rules where they reside.

Do the parties so stipulate?

MR. BURKE: Yes.

MS. WEATHERS: Yes.

THE PROCEEDINGS OFFICER: I will now swear in the witness.

You can raise your right hand for me, please.

Please state and spell your name for the record.

MS. ALI: Sunila Ali, S-U-N-I-L-A last name is Ali, A-L-I.

THE PROCEEDINGS OFFICER: Do you swear or affirm that the testimony you shall give today in this proceeding will be the truth, the whole truth, and nothing but the truth?

MS. ALI: I do.

WHEREUPON,

S U N I L A A L I,

having been called as a witness, being duly sworn by the notary public present, testified as follows:

THE PROCEEDINGS OFFICER: Thank you.

Counsel, you may proceed.

EXAMINATION

BY MS. WEATHERS:

Q Okay. Can you please state your full name for the record and your position at Houston Methodist, Sunila?

A Sunila Ali. My current position at Houston Methodist is the director of Neurosurgical ICU and Guest Relations Administration.

Q How long have you been employed with Houston Methodist? In what positions have you held?

A 17 years. I started as a graduate nurse. I moved up to being a charge preceptor -- sorry. I would say RN1 and RN2. And then manager of the Neurosurgical ICU and then director of Neurosurgical ICU and then director of Guest Relations Administration as well --

Q What --

A -- you know, ICU.

Q And your background qualifications?

A I have a bachelor's degree in nursing, and I also have -- I also obtained master's -- master's in --

in business administration.
Q An MBA?
A Yes.
Q What are your primary responsibilities as a supervisor at Houston Methodist and the Neuro ICU?
A My primary responsibility is to oversee the department operations. I have managers under me that help me with that expectation. Hiring and, you know, retention, operationals, budgeting, making sure the quality and safety of the patients are up to the par, make sure we are meeting the, you know, accreditation body requirements we have for -- for our units, and pretty much that's it.
Q Okay. How long have you known Caitlin Weathers?
A I have known her four months -- four or five months. I don't remember the whole time, but five months while she was afraid. I do some methods in the ICU.
Q What was Caitlin's position and were your -- what were her job responsibilities during her employment?
A Even though there was a patient care assistant, her job responsibility in Neuro ICU was to take patients' blood sugars, to do give baths, do very

and folic care, and help assist patients and nurses and when the -- and whenever the nurse delegates the task which is within her scope of practice to complete that task.

Q Are you aware of the allegations that whether it has claimed in this wrongful termination lawsuit?

A Yes.

Q Did Caitlin ever raised any concerns or complaints about harassment or discrimination?

A Yes.

Q What steps did you take to address the complaints that were taken?

A Can you repeat the question and can you clarify? Does it mean one particular incident or all the incidents?

Q What steps were taken to address Caitlin's reports or complaints, just generally?

A In general, if -- if any employee brings a concern of -- you know, any concern, then it gets investigated to understand where, you know, the concerns are coming from, you know, are the expectations that -- that were met, is their knowledge deficit, is there, you know, lack of, you know, their behavior issue, what it is. And then once we investigate, then we, you know, circle back with the employees that -- that are part of

the concerns. And we don't disclose what exactly has been shared or any employment, you know, communication record or any -- any disciplinary action. But we did circle back on what the expectation should be moving forward.

Q Can you explain the PIP that Caitlin was placed on?

A Do you mind pulling up the PIP for me?

Q Not at this time. Do you recall the Performance Improvement Plan that you placed Caitlin Weathers on?

A Yes. I remember placing her on Performance Improvement Plan, but I would love to see the documented report.

Q We do have exhibits, but that's -- I will connect. What criteria did you use to evaluate Caitlin's performance prior to the negative reviews?

A Can you explain that to me? Because I don't -- I didn't -- I don't understand the question.

Q Did you evaluate whether it's performance and if your work criteria did you use to evaluate her prior to releasing her on a Performance Improvement Plan?

A Do you mean a specific details, specific situation?

Q If you had a sheet or handbook or guide or any

criteria that you used or that you provided to whether for her to meet prior to the Performance Improvement Plan?

A I'm still trying to understand your question. If I may -- if you are asking -- I know you were on orientation with a preceptor. And if you're asking if we evaluated if you are ready to be off orientation, yes. We did have a sit-down conversation with the preceptor and orientee and it is part of a normal process with any preceptor in orientee to have check-ins, to sit down, to make sure that if the orientee is progressing well and at the end of the orientation there is a sit-down again to make sure that the orientation has, you know, progressed well and the orientee is, you know, safely able to come off orientation and that was done in this case.

Q What was that criteria?

A Criteria was that you are able to manage your patient load, making sure doing your blood sugar, prioritizing patient care, making sure that the patients are safe -- patients are safe under your care. And you are able to give that and able to manage the workload that will be provided to you -- provided to Ms. Caitlin.

Q Were there any discussions with HR or upper management prior to taking disciplinary action?

A Yes.
Q Can you explain those discussions?
A In regards to specific situation or in regards to the DCR and Performance Improvement Plan?
Q On the topic of performance.
A Performance? Yes. It is. Anytime we have an employee that needs Performance Improvement Plan, we always go with HR just to get their guidance on is -- are we taking the proper step or not as a management team. So yes. It is discussed with HR anytime we put employee on Performance Improvement Plan.
Q In the claims, Caitlin Weathers states that she faced adverse actions following protected activity. What is your response?
MR. BURKE: Objection. Vague. Assumes that -- facts not in evidence.
If you understand the question, you can answer.
THE WITNESS: I do not understand.
BY MS. WEATHERS:
Q Are you aware of the claims that Weathers is made with regard to retaliation regarding the adverse actions that were taken against her after she engaged in protective activity?
MR. BURKE: Objection. Vague and

ambiguous.

If you understand the question, you can answer.

THE WITNESS: I -- I didn't understand it.

BY MS. WEATHERS:

Q Are you aware of the allegations that whether it was just made in her -- complaints against you as an individual regarding the adverse actions that were taking against her after she engaged in protected activity?

A And I think if you can elaborate further or if you can break down this question further, or ask me differently?

Q Are you aware of the factual allegations that are in the complaint?

MR. BURKE: Objection. Vague and ambiguous.

Are you asking about specific allegations? I mean, I think that is the problem here.

BY MS. WEATHERS:

Q When do you remember first receiving complaints from Weathers about harassment and discrimination?

A I don't remember the exact date.

Q Was it before or after she completed orientation?
A This was after she completed orientation if I recall. But I don't remember the date and -- you know, to be honest with you, I don't remember.
Q Okay. What was the nature of the complaint that she had filed about?
A Do you have any specific complaint that you are asking about or in general?
Q Just the general nature of the complaints.
A As far as I remember, it was more of how she is being treated by others. She mentioned that she -- that staff is, you know, talking about her, you know, specifically remember that, you know, some staff may have called you -- called her like trash in that -- in that sense about -- about her -- her appearance. Those are the things that I remember.
Q Do you recall ever hearing anyone calling her any names or being loud and having to ask them to stop?
MR. BURKE: Objection. Compound.
BY MS. WEATHERS:
Q Do you recall anyone ever calling Caitlin any names or harassing her?
A I personally did not witness anyone calling escapement anymore or harassing her.

Q So you never heard anyone calling her any names or harassing her?

MR. BURKE: Objection. Asked and answered.

BY MS. WEATHERS:

Q Okay. How do you ensure that all employees are treated fairly for the Neuro ICU unit?

MR. BURKE: Objection. Vague and ambiguous.

If you understand what she is asking, you can answer.

BY MS. WEATHERS:

Q So now, Ali, how do you ensure employees are treated regardless of the protected characteristics?

MR. BURKE: Vague and Ambiguous. Objection.

BY MS. WEATHERS:

Q Do you have any guidelines or rule book or a handbook, any kind of sheet that would allow for consistency for the unit? Do you provide any guidelines for your PCAs?

MR. BURKE: Objection. Compound. Vague and ambiguous.

If you understand, you can answer.

BY MS. WEATHERS:

Q Do you have any rules for the PCAs in writing?
A In regards to rules for explaining the question for them -- can you break it down? I -- I don't understand what exactly you are asking. So --
Q The criteria that you said that you used to allow Weathers to have completed her orientation, do you have that in writing somewhere?
A It's -- it's basic expectation. It's unique protocol. So it's basic expectation. And that's why -- yeah. And orientees assigned a preceptor. So they learned the basic expectation of the department.
Q So is your answer yes or no?
A You're asking for written guidelines?
Q Correct.
A Again, it depends on what are you asking for because not every single expectation is in -- in written format.
Q So when Caitlin was hired -- when you said that you would provide unit orientation expectations, were you referring to on-the-job training or were you referring to defined limits?
MR. BURKE: Objection. Assumes facts not in evidence. Lack of foundation. Compound.
BY MS. WEATHERS:
Q Do you have defined limits that you provided

to Weathers during her orientation?
MR. BURKE: Objection. Vague and ambiguous.
If you understand, you can answer.
BY MS. WEATHERS:
Q Did you provide whether it's defined limits during orientation or did you assume that those are just general expectations?
MR. BURKE: Objection. Vague and ambiguous.
BY MS. WEATHERS:
Q Did you provide defined limits to whether it's during her orientation?
MR. BURKE: Objection. Vague and ambiguous.
If you understand what she's asking, you can answer.
BY MS. WEATHERS:
Q Did you provide written limit to whether it's during her orientation?
MR. BURKE: Same objection.
BY MS. WEATHERS:
Q For her scope of practice as a PCA, did you provide written unit requirements during her orientation?

A Trying to understand your question. There are some written requirements. However, I would like to know, what exactly are you -- which -- which skill set are you referring to? There are -- there are requirements that, you know, the -- the orientees go through hospital orientation and there are requirements employee is given a handbook.

Q I'm going to look and see. I'm going to go back and try and provide an exhibit.

MR. BURKE: You can finish your answer if you want to finish it.

THE WITNESS: I mean, employees have the handbook --

BY MS. WEATHERS:

Q Here it says, I will provide you info on --

MR. BURKE: Ms. Weathers, she's not done with her question yet. She's --

MS. WEATHERS: Okay.

MR. BURKE: -- not done with her answer yet.

You can go ahead and finish your answer.

THE WITNESS: Yeah. Employees are -- have -- go through their elite training, and they did -- they do get trained, they do get checked off on -- on that training, and then they are -- they come to the --

that's the hard part of hospital orientation. And when the orientees come back to the unit, then there is a unit orientation that is provided which is specific to the unit protocols, engines, and do's and don'ts on the unit. So it's actual hand-on training that, you know, gets provided and there is check-ons that -- that gets done multiple times during the orientation to make sure that the orientee is progressing at the right -- in the right direction at the right pace.

Q There are check opts, you said?

A During orientation, there are -- the check offs is the verbal check off. The -- the -- your -- your preceptor is checking you off as you are going, doing your handoff. So when we sit down and ask preceptor, it's this orientee meeting, the requirement. That means that the preceptor has assessed that the orientee is at the level to become off orientation and its competence.

Q So it's up to the preceptor to decide whether the orientee comes off of orienting?

MR. BURKE: Objection. Mischaracterizes testimony.

BY MS. WEATHERS:

Q Can you please say who decides whether the orientee comes off of orientation or leadership is

involved in making that decision?

A So there are multiple factors. We do talk to preceptor to make sure that if the preceptor is seen and, you know, safe practices and making sure that the Orient is ready. Also, you know, there are assessments done by the, you know, unit leader to make sure that, you know, we are not hearing any concerns during for -- for the preceptor because then we are not seeing any practices that are not saved during that orientation. But yes. We do ask preceptors if the orientee is ready to be a off orientation, and if not, they have to provide a reason why.

Q Do you recall this document?

A I don't see the document.

Q You can't see it?

MR. BURKE: There's no document on our end.

THE WITNESS: This is an email to HR.

BY MS. WEATHERS:

Q Did you issue a misconduct DCR on Caitlin Weathers?

A Yes.

Q So are you aware of the stated reason that Houston Methodist has given in their answer to Caitlin's complaint and allegations, claiming performance for

their reason for terminating Caitlin's employment?

MR. BURKE: Objection. Compound. Vague and ambiguous.

BY MS. WEATHERS:

Q What is the Houston Methodist and your reason -- your answer that you've given for your -- for terminating Weathers?

A I would like to see the termination document. You can pull that up.

MR. BURKE: I think her video is frozen. Oh, yeah.

MS. WEATHERS: It froze. I didn't get an answer.

MR. BURKE: And didn't hear a question. You were frozen.

BY MS. WEATHERS:

Q There was an answer filed to whether it's complaint. Are you aware of what Houston Methodist has filed on your behalf, Sunila Ali being held in your individual capacity, what your answer is to this complaint?

MR. BURKE: Objection. Vague and ambiguous.

If you can understand, you can answer.

BY MS. WEATHERS:

Q What was the reason for -- whether it's termination, was it misconduct or performance?

A It was performance, patient safety issues.

Q So why did you say misconduct here in this letter to HR?

A Can I please see the actual DCR that was sent?

Q I don't have it in front of me. Can you please answer the question? Why did you send this to Mariana Mondragon?

A The reason that this was sent to Mariana is Mariana is her HR journalist and there were -- there are concerns of serious patient safety. When Ms. Caitlin Weathers were touching devices and drains without notifying or without informing or without nurses' involvement, which is not part of -- a part of her job description, and that considers a huge patient safety issue. In order to make sure that our patients are safe, this was sent to Mariana for her guidance and advice on what -- how -- what she would do.

Q So what happened in response to this? Was a misconduct DCR issued?

A I would like to look at the -- I would like to look at the actual document.

Q Was a misconduct's DCR issued to Weathers?

A DCR was issued. And if you can please pull up

the DCR, I can further answer the question.
Q In your answer in the complaint to whether it's claimed, have you -- do you still continue to believe that it was due to misconduct?
MR. BURKE: Objection. Vague and ambiguous.
If you understand, you can answer.
BY MS. WEATHERS:
Q Do you still believe that it was due to misconduct that you terminated Weathers?
A I would like to see the document. If you would --
Q I don't have the document.
MR. BURKE: You can answer if you know.
THE WITNESS: I -- I don't remember. And I've seen a document may jog my memory. I know the reason Ms. Weathers were terminated is because of serious patient safety concern and practicing out of scope of that.
BY MS. WEATHERS:
Q Did she have any serious patient safety concerns before orientation?
A Before orientation, Caitlin Weathers was not on our unit -- on our department.
Q Before completing orientation. Sorry. There

were no safety issues?

A I -- I don't remember.

Q In response to this email, did Mariana Mondragon contact you to add or delete any content?

A I -- I don't remember. And if there -- if it was, it has to be in an email format.

MR. BURKE: Is this exhibit marked as Number 1?

MS. WEATHERS: Sorry. Can you see what I'm sharing on the screen? I'm pulling up another exhibit.

MR. BURKE: It's the same as the first one.

MS. WEATHERS: It looks like -- it's saying another participant is sharing it.

MR. BURKE: All we see on our end is the first exhibit you put up.

THE PROCEEDINGS OFFICER: Did you -- I'm sorry. Did you close for all? Do you have that button?

BY MS. WEATHERS:

Q Okay. Here in the job summary for PCAs -- for the neurosurgical ICU, it says the PCA , Patient -- Performance Patient -- basic Patient's Care Activities of daily living within unit specific defined limits and job scope. Can you please describe for me your

interpretation of unit specific defined limits?

A In regards to exactly what?

Q To Caitlin's job role as a PCA, for Houston Methodist when she worked for you this is her job description. It says, the PCA position performs basic Patient's Care Activities of daily living within unit specific defined limits. Can you please provide your interpretation of what unit specific defined limits is?

MR. BURKE: Objection. Vague and ambiguous.

You can answer if you understand.

BY MS. WEATHERS:

Q What are unit's specific defined limits for the PCA role on the Neurosurgical ICU for Houston Methodist Texas Medical Center?

MR. BURKE: Same objection.

MS. WEATHERS: Objection. Nonresponsive.

BY MS. WEATHERS:

Q Can you see this?

A Yes.

Q It says, I will provide you info on unit orientation in may of 2020?

MR. BURKE: Objection. Mischaracterizes the document.

BY MS. WEATHERS:

Q Do you recall this -- writing this? Do you remember the text message?

A I'm seeing it. It has my name on it. So, yes.

Q Do you remember telling Caitlin that you would provide her with information on unit orientation?

A Yes. Specific to when to come to the event she reported the unit, when to come to the unit who will be the preceptor, and just welcome to the unit.

Q So when you wrote this, you were just meaning that you were going to have her get a preceptor?

MR. BURKE: Objection. Mischaracterizes testimony.

BY MS. WEATHERS:

Q Have you seen this document before?

A Yes. Previously when you were showing it earlier with the -- if you're you are -- maybe you were -- you were wrong.

Q At the end of this document, it says that a departmental handbook does not exist and that you had referenced the job description in PCA scope of work and orientation training in lieu of a handbook; is that --

MR. BURKE: There -- that -- that's part of the document is not showing on our end. You need to scroll down.

MS. WEATHERS: Sorry?

MR. BURKE: Whatever you're reading is not on the screen here. I don't know if you need to scroll down, but --

BY MS. WEATHERS:

Q It says at the very bottom here. After an interview with, I believe, the three of us, if you recall meeting with me and Mariana Mondragon when you came back from vacation, do you recall that day?

MR. BURKE: Ms. Weathers, I think you need to scroll down because you're talking about the very end of the document and we have -- I don't think we're seeing the same thing. Can you scroll down?

THE PROCEEDINGS OFFICER: There possibly -- is there a button that says, like, Bring All to Me? Okay.

MS. WEATHERS: Can you see the bottom of the page here?

MR. BURKE: Not Yet. The lowest thing we see is a heading that says, meeting discussion points. And then 1, 2, 3. Anything below that is cut off on our side. And it's just the first sentence of three. Anything below the first sentence that starts Caitlin also demonstrates is not visible on our end.

MS. WEATHERS: Is it better now?

MR. BURKE: It -- it hasn't moved.
MS. WEATHERS: This screen is just frozen.
MR. BURKE: It scrolled down a little bit just a second ago, but it still is -- where I just said, it's under the meeting discussion points heading.
MS. WEATHERS: Any better?
MR. BURKE: Still on the -- it's still on the same -- there's a slide on the side. It looks like you could scroll the document down so we can see further down on our end. But it's still at the top of the document.
THE PROCEEDINGS OFFICER: I have someone joining to help with exhibits if that's okay, Ms. Weathers?
MS. WEATHERS: Yes. Thank you.
THE PROCEEDINGS OFFICER: You're welcome.
If you want, we can all go off the record. No objections?
MS. WEATHERS: Yes.
MR. BURKE: (Indiscernible - audio disruption).
THE PROCEEDINGS OFFICER: All right. No objections, we are going off the record. The time is now 2:46 p.m., Eastern.

(Off the record.)

THE PROCEEDINGS OFFICER: Okay. We are now back on the record. The time is now 2:55 p.m., Eastern.

MS. WEATHERS: Can you see it?

MR. BURKE: Okay. Now it's scrolled down to the bottom.

BY MS. WEATHERS:

Q At the bottom of this document, it says, after I had asked during this meeting with Mariana Mondragon and you, do you recall meeting with Mariana Mondragon when you came back from vacation?

A Yes. I remember.

Q During that meeting, I had asked for a handbook of some kind. If you could provide any guidelines or anything in written format to help so that I could meet expectations? And at that time, you had said, it does not exist. And you had referenced the job description and scope of work and orientation training?

MR. BURKE: Objection. Compound.

BY MS. WEATHERS:

Q Is it true that you do not have a departmental handbook or any kind of written guidelines for the unit?

MR. BURKE: Objection. Compound.

BY MS. WEATHERS:

Q Do you have a departmental handbook for the Neuro ICU at Methodist Hospital Texas Medical Center?
A There is no departmental handbook.
Q Do you have departmental guidelines?
MR. BURKE: Objection. Vague and ambiguous.
BY MS. WEATHERS:
Q Do you have departmental guidelines for the Neurosurgical ICU for use of Methodist Hospital Texas Medical Center?
A I still don't understand. You are talking about guidelines specific to what? Specific to skills? Specific to -- it's -- it's no way --
Q Specific to your department where you are the supervisor, do you have departmental guidelines?
A There are departmental guidelines, but it depends on what you are asking for. Like if you're asking for a skill, asking for PTOs, asking for callings, there are different guidelines. The department --
Q For her job role -- for Caitlin Weathers, for my job role --
MR. BURKE: Ms. Weathers -- Ms. Weathers, she wasn't done with her answer. Please don't talk over her.

Go ahead and finish your answer.

THE WITNESS: You asked for Department of Health. There is no departmental handbook when you ask for guidelines. The guidelines that we -- we follow is a PCA scope of work, the -- the job description and orientation training.

BY MS. WEATHERS:

Q So are these written?

A PCA scope of job description, yes. It is written. Orientation training is on hand on-job training.

Q Are there written guidelines for the PCAs?

MR. BURKE: Objection. Vague and ambiguous. Asked and answered.

MS. WEATHERS: I didn't finish the question.

BY MS. WEATHERS:

Q You're saying that there are guidelines for PCAs for your unit, the Neurosurgical ICUs. Are they written and provided to PCAs when they are hired onto your unit?

MR. BURKE: Objection. Mischaracterizes testimony. Vague and ambiguous.

You can answer if you understand.

BY MS. WEATHERS:

Q Are you saying, yes. You have unit guidelines?

MR. BURKE: Objection. Vague and ambiguous. Asked and answered.

BY MS. WEATHERS:

Q Did you provide Weathers anything in writing when she was hired?

MR. BURKE: Same objection. Vague and ambiguous.

BY MS. WEATHERS:

Q Did you provide any unit expectations to whether it's when she was hired for her job role as a PCA, for the unit where you are the supervisor?

A I will have to look at the employee file that was sent to HR.

MR. BURKE: Objection. Nonresponsive.

BY MS. WEATHERS:

Q Do you have any sheets that you provide?

MR. BURKE: Objection. Vague and ambiguous.

You can answer if you understand the question.

BY MS. WEATHERS:

Q Prior to placing Weathers on a Performance Improvement Plan I asked earlier, if there was any

criteria that you had evaluated her on? In the guidelines that you're saying that you have for your unit, were any of those -- any of that criteria used to evaluate whether it's before completing orientation?

MR. BURKE: Objection. Vague and ambiguous.

BY MS. WEATHERS:

Q Did you use the written guidelines for your unit to evaluate Weathers --

MR. BURKE: Objection.

BY MS. WEATHERS:

Q -- before, during, or after orientation?

MR. BURKE: Objection. Mischaracterizes testimony. Vague and ambiguous. Compound.

MS. WEATHERS: Objection. Nonresponsive.

BY MS. WEATHERS:

Q Well, Caitlin was hired or worked for you as a PCA, were there any other PCAs who had any complaints?

MR. BURKE: Objection. Vague and ambiguous.

You can answer if you can.

BY MS. WEATHERS:

Q How many PCAs as a supervisor of the Neuro ICU, have any PCAs that I've worked under you ever filed any complaints of discrimination or harassment?

A I don't remember.

MS. WEATHERS: Objection. Nonresponsive.

MR. BURKE: (Indiscernible - audio disruption) question.

BY MS. WEATHERS:

Q It's a yes or no question. Has that ever happened? Or is Caitlin the only employee as a PCA that has worked on you -- under you who has ever filed a complaint of discrimination or harassment?

MR. BURKE: Objection. Asked and answered.

BY MS. WEATHERS:

Q Have any of your PCAs that I've worked under you since you've been a supervisor with Houston Methodist Hospital, ever filed a complaint with the EEOC?

A One -- and maybe it's you. Other -- maybe it's Caitlin Weathers. Other than that, I don't remember and I don't recall.

Q So no?

MR. BURKE: Objection. Mischaracterizes her testimony.

BY MS. WEATHERS:

Q Okay. We'll go back to this again.

Have you ever had to write any misconduct DCRs

as you described here for any of your other PCAs that have worked under you as a supervisor for the Neuro ICU?
A (Indiscernible - audio disruption).
Q Is that a no?
MR. BURKE: Objection. Mischaracterizes testimony.
MS. WEATHERS: It's a question. I asked if she said no.
MR. BURKE: She said she has.
BY MS. WEATHERS:
Q And I hear you say, whether you have or you have not written a misconduct DCR for your PCAs as a supervisor for Houston Methodist?
A As stated earlier I said I have.
Q You have written a misconduct DCR. Do you --
MR. BURKE: Objection.
BY MS. WEATHERS:
Q -- remember the reason?
MR. BURKE: Objection. Vague and Ambiguous.
BY MS. WEATHERS:
Q Have you ever given a Performance Improvement Plan to any of the other employees that were similarly situated to Weathers during her employment?
MR. BURKE: Objection. Vague and

ambiguous.

BY MS. WEATHERS:

Q Did any of Caitlin Weathers' coworkers -- during your -- under your supervision ever receive Performance Improvement Plans outside of Caitlin Weathers, did any of the coworkers that were PCAs alongside her also receive Performance Improvement Plans?

MR. BURKE: Objection. Compound.

MS. WEATHERS: It's not a compound question.

MR. BURKE: Starting the objection.

BY MS. WEATHERS:

Q Did any of Weathers' coworkers during her employment under you as a supervisor in her role of Caitlin as a PCA -- did any of the coworkers receive Performance Improvement Plans?

MR. BURKE: Objection. Compound.

MS. WEATHERS: It's not a --

BY MS. WEATHERS:

Q Did Caitlin Weathers' coworkers during that period that she was employed with you ever received Performance Improvement Plans?

A I don't remember.

MS. WEATHERS: Objection. Nonresponsive.

Okay. That's -- I guess that's all I can do for today.

MR. BURKE: Are you passing the witness?

MS. WEATHERS: It's -- it -- her screen is frozen.

THE WITNESS: All of those (indiscernible - audio disruption) --

MR. BURKE: Oh, well, I guess let's go off the record and see if we can fix this.

THE PROCEEDINGS OFFICER: Okay. No objections, I'll call us off the record. The time is now 3:09 p.m., Eastern. We're going off the record.

(Off the record.)

MS. WEATHERS: Okay. The time is now 3:11 p.m., Eastern. We are back on the record.

MR. BURKE: I just want to clarify that I didn't -- were you passing the witness, Ms. Weathers?

MS. WEATHERS: Sorry?

MR. BURKE: I -- you said that's all you had. Were you passing the witness? I'm trying to understand. I want to clarify if that's what you were doing.

MS. WEATHERS: I had one more question I think I want to ask at least.

BY MS. WEATHERS:

Q Prior to completing her orientation, did you ever provide any specific instructions or information or anything in writing, whatsoever as far as expectations with regard to unit specific devices?

MR. BURKE: Objection. Vague and ambiguous. Compound.

You can answer if you understand.

MS. WEATHERS: It's very specific and it's not compound. It's a very direct question.

BY MS. WEATHERS:

Q Prior to Weathers' completion of orientation, did you provide any kind of information, instructions, guideline, anything in writing that would pertain to specific devices and equipment to include EVDs, clamps, drains, STDs? Was any of that provided to her whether she could or could not use them prior to completing orientation?

MR. BURKE: Same objections. Vague and ambiguous. Compound.

BY MS. WEATHERS:

Q What did you give to Weathers prior to completing orientation on the use of unit specific devices?

MR. BURKE: Same objection. Vague and ambiguous.

MS. WEATHERS: Objection. Nonresponsive.

BY MS. WEATHERS:

Q Do you recall whether it's ever asking you how she could better meet the expectations during the PIP, if you could provide anything in writing to help her better understand the guidelines that were in the PIP?

A If you can bring up the PIP document and refer to which -- exactly what you're talking about? I would like to see that.

Q Is your unit for Houston Methodist Hospital earlier, you said that in your job role you have to be aware of accreditation agencies. Who assist in Methodist accreditation agency?

A DNV.

Q DNV. As a supervisor, what are your job responsibilities to meet their expectations with DNV?

MR. BURKE: Objection. Vague and ambiguous.

If you understand, you can answer.

THE WITNESS: It's -- it's vague. What exactly are you referring to? It's -- it's (indiscernible - audio disruption) there are several diagrams.

BY MS. WEATHERS:

Q What is your familiarity with DNV? What do

you know about the accreditation agency?

A They come and make sure that the hospitals are up to the standards that the immediate state has set in the -- when they -- they review several things, not -- you know, safety, quality, visual rounding. There's so much. And there's -- it's not just one arm. That this -- that -- that survey has multiple arms -- that stroke arm. It's, you know -- and there's scar -- the curve. And it -- I mean, I can't state all of them. But there are several arms that -- you know, it ensure if our hospital or the hospital they are going to is, you know, living up to the standard -- safety standard, quality standard, and everything is up to the par for their standards and there are several standards that the --

Q Are there separate standards and expectations for supervisors and for staff? And is there a differentiation for nursing staff, clinical staff?

MR. BURKE: Objection. Vague and ambiguous. Compound.

You can answer if you understand.

BY MS. WEATHERS:

Q Are there standards required for supervisors according to DNV?

MR. BURKE: Vague and ambiguous.

You can answer if you understand.

MS. WEATHERS: Objection. Unresponsive.
BY MS. WEATHERS:
Q To your knowledge, does this DNV have any expectations for supervisors to provide anything in writing to their staff?
A Again to what standard are you referring to?
Q To what standard? DNV's general standard.
A Do you have -- can you hold that standard up, or, you know, I --
Q In record -- in -- it's in our record. I have submitted it into evidence. I don't have it in front of me. But just to your knowledge, do you know whether DNV has any expectations for supervisors to provide written instructions to their staff?
A My ask -- again, is that you -- what are you -- there are so many things that the staff is responsible for. I would like to know exactly what -- which skills --
Q That's not the question that I --
MR. BURKE: Ma'am, please don't interrupt her.
MS. WEATHERS: It's a yes --
MR. BURKE: You can --
MS. WEATHERS: -- or no question. To her knowledge, do supervisors have to provide written

instructions to their staff?

MR. BURKE: Asked the answered.

You can finish your answer to the previous question.

MS. WEATHERS: Yes or no? She didn't say -- she didn't give an answer. She's saying that there are a lot of criteria, but that's not a responsive answer. I'm asking yes or no. To her knowledge, do supervisors have to provide written instructions to their staff according to DNV?

MR. BURKE: Objection. Asked and attempted to be answered, but you cut her off.

MS. WEATHERS: It was unanswered. Objection. Unresponsive.

MR. BURKE: Yeah. Wait for the next question.

BY MS. WEATHERS:

Q After Caitlin complained of harassment and discrimination, did you respond to those that you interviewed in any way that would -- that you would say was disciplinary? Did you discipline any of those who were interviewed?

MR. BURKE: Objection. Vague and ambiguous.

BY MS. WEATHERS:

Q Did Houston Methodist interview anyone after Caitlin Weathers filed complaints of harassment and discrimination?

MS. WEATHERS: Objection. Nonresponsive.

MR. BURKE: She's trying to -- she's thinking about your question.

THE WITNESS: Are you referring to a certain situation? If you -- if you can share those with me?

BY MS. WEATHERS:

Q Did you and HR conduct interviews following Caitlin Weathers' complaints of discrimination and harassment?

MR. BURKE: Objection. Vague and ambiguous.

If you understand what she's asking, you can answer.

MS. WEATHERS: Objection. Nonresponsive.

THE WITNESS: Ask for specifics. If you can give me some specifics?

BY MS. WEATHERS:

Q Earlier you said that you did conduct interview.

MR. BURKE: Again asked and answered.

BY MS. WEATHERS:

Q During the interviews that Houston Methodist and you -- you and Mariana Mondragon conducted after Caitlin Weathers' complaint of harassment and discrimination, did you follow up with any of the staff that you spoke to?

A Follow up with staff in what sense? Can you repeat the question or -- that's different --

Q Did you have to provide them any coaching or did you monitor them in any way with DCRs or PIPs?

MR. BURKE: Objection. Compound.

MS. WEATHERS: Objection. Nonresponsive.

BY MS. WEATHERS:

Q Other than Caitlin Weathers, was anyone else disciplined as a result of the findings of the interviews?

MR. BURKE: Objection. Lacks foundation. Vague and ambiguous.

You can answer if you understand question.

MS. WEATHERS: Objection. Nonresponsive.

MS. WEATHERS: Okay. Fine. Done.

MR. BURKE: Are you -- are you passing the witness? Is that what you mean?

MS. WEATHERS: You're not answering my questions. I think I'm being really clear. You know

what I'm asking, but instead you're just objecting to everything I'm saying.

MR. BURKE: I'm not being deposed. I'm making objections for the record. That's my job. And so when you say you're done, are you passing the witness? Are you done asking questions?

MS. WEATHERS: Sure. Yes.

MR. BURKE: Okay. Witness will read and sign. We'll reserve questions for time of trial.

THE PROCEEDINGS OFFICER: Okay. So Ms. Weathers, as a self-representing party, you'll be receiving the original transcripts. This is included in your order, correct?

MS. WEATHERS: Correct.

THE PROCEEDINGS OFFICER: And Counsel Burke, will you be purchasing a copy of the transcript?

MR. BURKE: Yes.

THE PROCEEDINGS OFFICER: All right.

So, just to confirm this, Weathers is getting the original transcript.

Counsel Burke, you'll be purchasing a copy of the transcript, and you're requesting a read inside for the witness?

MR. BURKE: Correct.

THE PROCEEDINGS OFFICER: And where does

the read and sign go?
MR. BURKE: To my address. I think I -- did you get the updated? Okay.
THE PROCEEDINGS OFFICER: Yes. Okay.
MR. BURKE: How --
THE PROCEEDINGS OFFICER: So we'll send that -- I'm sorry?
MR. BURKE: I'm sorry. What would be the anticipated turnaround on that?
THE PROCEEDINGS OFFICER: It's regular delivery. I don't have the number of days, right? In front of me. What are -- what do you need?
MR. BURKE: Well, we have a motion deadline coming up. So I want to make sure I get it.
THE PROCEEDINGS OFFICER: Okay. You want an expedited?
MR. BURKE: Is there -- what's the turnaround on an expedite? I just -- you get approximate. You don't have to -- I'm not going to hold you to a specific day.
THE PROCEEDINGS OFFICER: Sorry. I have to get that. And I would like to also just want to confirm a spelling. Is it Mariana?
MS. WEATHERS: Yes. Correct. Mariana, M-A-R-I-A-N-A.

THE PROCEEDINGS OFFICER: M-A-R-I-A-N-A?

MS. WEATHERS: Correct.

THE PROCEEDINGS OFFICER: And the last name?

MS. WEATHERS: Mondragon, M-O-N-D-R-A-G-O-N.

THE PROCEEDINGS OFFICER: And then I want to confirm it was DNV as in Victor? Okay.

MS. WEATHERS: Detnorskeveripas, D-E-T-N-O-R-S-K-E-V-E-R-I-P-A-S or DNV.

MR. BURKE: DNV is what was used. Yes.

THE PROCEEDINGS OFFICER: Okay. Well, I will go ahead and call this off the record.

The time is now 3:26 p.m., Eastern. We are going off the record.

(Proceedings concluded at 3:26 p.m., ET)

* * * * *

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---

CAITLIN WEATHERS,
Plaintiff,
v. Civil Action No.:
HOUSTON METHODIST 4:22-CV-04085
HOSPITAL, ET AL.,
Defendants.

---

REPORTER'S CERTIFICATION
DEPOSITION OF SUNILA ALI
Wednesday, November 19, 2025

---

I, OLIVIA WRIGHT, Court Reporter certify:

That the witness, SUNILA ALI, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness.

That the deposition transcript was submitted on December 1, 2025, to the witness or to the attorney for the witness for examination, signature and return to me within 20 days.

That the amount of time used by each party at the deposition is as follows:

TOTAL TIME ON THE RECORD: 1 hours, 7 minutes

MS. CAITLIN WEATHERS - From page 6 to page 43

MR. MIKE BURKE - None

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

MR. CAITLIN WEATHERS - Pro Se Plaintiff

MR. MIKE BURKE - Attorney for Defendants

And I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of the TRCP will be certified to after they have occurred.

Certified to by me this 1st day of December 2025.

Olivia Wright
REMOTE LEGAL, CRF-12610
11 Broadway
New York, New York 10016
800-752-0155

A C K N O W L E D G M E N T

I do hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony on the 19th day of November 2025.

I further certify that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified.

______________________________
SUNILA ALI

Sworn to before me this ___ day of _______________, 20__

______________________________
Notary Public

E R R A T A   S H E E T

Deponent: SUNILA ALI

Deposition Date: Wednesday, November 19, 2025

| PAGE | LINE | CHANGE FROM/TO | REASON FOR CHANGE |
| --- | --- | --- | --- |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |
| _____ | _____ | ________________ | ___________________________ |

Under penalties of perjury, I declare that I have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________          ____________

SUNILA ALI                   Date

Sworn to before me this ___ day of _______________, 20__

_____________________________

Notary Public